**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
**DIANE R. WILLIAMS,**                  )
                                        )
    **Plaintiff,**                   )
                                        )
    **v.**                          )    **Civil Action No. JDB-07-1452**
                                        )
**DAVID M. WALKER,**                    )
**Comptroller General of the United States** )
**Government Accountability Office**    )
                                        )
    **Defendant.**                   )
_____)

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Plaintiff Diane R. Williams hereby opposes Defendant's motion to dismiss, or in the alternative, for summary judgment. Defendant has failed to show that Plaintiff's allegations do not plausibly set forth a claim of discrimination, or that no genuine issues of material fact exist. Therefore, Defendant's motions must be denied and this matter should proceed to discovery.

## I.    INTRODUCTION

Diane Williams has served as a Senior Trial Attorney with the General Accountability Office, Personnel Appeals Board's Office of General Counsel since 1999. Ms. Williams has excelled in her position. Indeed, based on her outstanding performance, in 2003, Ms. Williams's supervisor requested that she be promoted to a Grade 15 pay level. That request was denied.

In 2006, Ms. Williams herself requested a promotion to Beth Don, the Executive Director of the PAB and the then-acting PAB General Counsel. Ms. Williams's request for promotion was again denied. Further, Ms. Williams pursued her request with her subsequent supervisor, Anne Wagner. Her request was again denied.

Ms. Williams believed that the denial of her promotion requests was discriminatory, and she informed Ms. Don that she was initiating a discrimination complaint. After that point, the terms and conditions of Ms. Williams's employment with the PAB changed drastically. Though she had never before been subject to disciplinary action of any kind, Ms. Williams was written up, reprimanded, interrogated, and suspended. Her workplace suddenly became a discriminatory and retaliatory hostile work environment. Her supervisors disparaged her work performance to Ms. Williams's co-workers, and threatened to take away her ability to even use necessary medical leave. Finally, after Ms. Williams had filed three formal discrimination complaints and had her repeated requests for promotion denied, her supervisors downgraded her position description, eliminating any possibility that Ms. Williams could ever be promoted.

Defendant's motion would prevent Plaintiff from even being able to investigate her claims through normal discovery.[1] Based on the allegations leveled by Ms. Williams and the small amount of evidence already available, Ms. Williams must have the right to pursue discovery in this case. It is undisputed that Ms. Williams has established a *prima facie* case of race discrimination, sex discrimination, age discrimination, and retaliation. Plaintiff has presented enough facts to state plausible claims of discrimination and retaliation. For these reasons and the reasons stated below, Defendant's motion must be denied.

---

[1]Defendant has filed a motion for summary judgment arguing that Plaintiff cannot establish the substantive elements of her claims. However, there has yet to be any discovery in this matter. Moreover, as this case did not proceed to a hearing administratively, there have been no depositions or cross-examination of witnesses. Accordingly, Plaintiff has been significantly hampered in compiling her response and she has filed a Rule 56(f) affidavit to that effect.

## II.    FACTUAL BACKGROUND

Diane Williams, an African-American female over 40 years of age, is a Senior Trial Attorney, GS-14, with the Personnel Appeals Board, Office of the General Counsel, of the U.S. Government Accountability Office.[2]  Exhibit 1 ¶ 2 (Affidavit of Diane R. Williams).  Ms. Williams began working with the PAB in 1999 and was made a permanent employee in 2000. Ex. 2 ¶ 5, 6 (Affidavit of Janice M. Reece).  Prior to 2006, Ms. Williams had never been subjected to a disciplinary action of any kind. Ex. 1 ¶ 3.  In fact, Ms. Williams shined as soon as she began her work at the Board.  Ex. 2 ¶ 6.  She grasped issues quickly, developed expert knowledge of GAO's processes, worked independently and thoroughly, and established the trust of complainants, staff and colleagues.  *Id.*  Notwithstanding her superior performance in PAB, which she has maintained consistently for several years, Ms. Williams has been the subject of her supervisor's targeted campaign of retaliation, discrimination, and hostile work environment on the bases of Ms. Williams' age, sex and race.[3]  Ms. Williams has further never been promoted during her employment with the PAB.  Ex. 1 ¶ 2.

Ms. Williams has, throughout her employment with PAB, performed her work at the level of a Grade 15 and has maintained duties consistent with a Grade 15.  Ex. 2 ¶¶ 8, 10-12. When Ms. Williams started her employment with PAB, the Senior Trial Attorney position was

---

[2]The Board has an immediate staff made up of an Executive Director, Director of Oversight, Solicitor, Staff Attorney, and Clerk of the Board.  A separate portion of the Board consists of the Office of the General Counsel, which includes the General Counsel, two Senior Trial Attorneys, a Paralegal Specialist, and a Secretary/ Legal Information Assistance.  Exhibit 2 ¶ 2.

[3]The racial make-up of the PAB was such that most employees in the Board's immediate staff were white females (and no African-American attorneys on the staff), while most of the PAB/OGC staff members were African-American.  Ex. 2 ¶ 3.

listed as a GS-14/15 position, *i.e.*, one with promotion potential to the Grade 15 pay level.  Ex. 1 ¶ 2.  Ms. Williams's direct supervisor at that time was Ms. Janice Reece, the PAB General Counsel.  Ms. Reece supervised Ms. Williams from February 1999 to December 2005.  Ex. 2 ¶ 2; Ex. 1 ¶ 4.  Before becoming General Counsel, Ms. Reece – like Ms. Williams – also previously served as a Senior Trial Attorney, but she was promoted to the GS-15 level while employed as a Senior Trial Attorney.  Ex. 2 ¶ 2.  Ms. Reece considered Ms. Williams' work to be at a high level of competency, found that Ms. Williams met challenges fully and that Ms. Williams was a valuable tool in obtaining information and generating results.  Ex. 2 ¶ 7.

Based on her knowledge of Ms. Williams' stellar work product, Ms. Reece recommended Ms. Williams for promotion to a GS-15 level in 2003.  Ex. 2 ¶ 8; Ex. 1 ¶ 6.  Ms. Beth Don (PAB Executive Director) and Anne Wagner (PAB Chair) were among the Board members and officials who reviewed the written recommendation for Ms. Williams' promotion.  Ex. 1 ¶ 6.  Ms. Reece recommended the promotion because Ms. Williams used considerable skill in negotiating settlement agreements on behalf of complainants and demonstrated a degree of responsibility and level of expertise higher than her colleagues.  Ex. 2 ¶ 11.  Ms. Williams' work level and ability exceeded that of her white female counterparts in the Board.  *Id.*  Ms. Williams was a member of the staff that identified legal issues presented by various cases brought to PAB, acquired documents relevant to the cases, interviewed witnesses and prepared reports of investigations with analyses of detailed facts and allegations.  *Id.*

Further, Ms. Reece had the opportunity to review Ms. Williams' position description and concluded "that Ms. Williams was at that time performing all of the tasks included in the GS-15 Senior Trial Attorney position description at a level that was commensurate with the GS-15 pay level."  Ex. 2 ¶ 10.  However, Ms. Reece did not alter the position description in any way that

4

would result in a change in grade.  *Id.*  Notwithstanding the evidence that Ms. Williams' position merited promotion to the GS-15 pay level, *id.*, she was not promoted to a Grade 15 level.  Ex. 1 ¶ 6.  Because Ms. Williams merited the promotion but did not receive it, while other Caucasian employees did receive promotions, it was Ms. Reece's belief that the difference was attributable to Ms. Williams' race.  Ex. 2 ¶ 12.

At all times during her employment with PAB, Ms. Williams has performed her work at an outstanding level and continues to perform duties and responsibilities performed by other GS-15s in the office, yet she has never been promoted.  Ex. 1 ¶¶ 6, 8.  However, another employee, a younger white female, was promoted to a GS-15 while she was employed with the Board.  Ex. 2 ¶ 4.  Other employees in PAB had also been hired at the 15 pay level immediately prior to Ms. Williams' commencement of employment at PAB.  Ex. 1 ¶ 5.  Those employees – Ms. Reece and Ms. Janice Willis – performed job duties and responsibilities as GS-15 Senior Trial Attorneys that were identical to the duties Ms. Williams has performed since at least 2002. *Id.*

When Ms. Reece retired in December 2005, Beth Don, PAB Executive Director, was appointed to serve as Acting General Counsel.  Ex. 1 ¶ 7.  Ms. Williams was not considered for the position of Acting General Counsel, even though she was the best qualified PAB employee to serve in that position.  *Id.*  Upon Ms. Don assuming the role of Acting General Counsel, Ms. Don instructed Ms. Williams not to report to her any information that would have the impact of causing Ms. Don to recuse herself from matters pending before the PAB Board.  *Id.*

Because Ms. Williams continued to maintain responsibility at the GS-15 level, she sent an electronic message to Ms. Don on January 20, 2006, seeking a promotion to the GS-15 pay level.  *See* Defendant's Brief, Exhibit 1, Tab D, p. 295 (E-mail of January 20, 2006).  In support

of her request, Ms. Williams referred to the promotion request previously prepared by Ms. Reece. Ex. 1 ¶ 8. Ms. Williams' position merited a promotion to the GS-15 level because of the degree of responsibility and skill required of the position, and her work was comparable to, if not better than, other employees who were employed at the GS-15 pay level. *Id.* Beth Don, Susan Inzeo and Gail Gerebenics, all white females, are all employed at the 15 pay level and perform work comparable to the work performed by Ms. Williams. *Id.* As compared to other employees in PAB, Ms. Williams' work merited a promotion to a Grade 15. *Id.* Although Ms. Williams was performing at the GS-15 level, as she always had (*id.*), on January 24, 2006, Ms. Don rejected Ms. Williams' request for promotion to a Grade 15. Ex. 1 ¶ 9; Defendant's Brief, Exhibit 1, Tab D, pp. 296-98 (e-mails from Don to Williams regarding denial of promotion).

Ms. Williams' decision to pursue an EEO complaint based on the denial of this promotion was the spark that ignited persistent, on-going and relentless discrimination against her. On February 8, 2006, Ms. Williams sent an electronic message to Ms. Don, stating that she wished to file an EEO complaint regarding PAB's discriminatory payment policies and practices. Ex. 1 ¶ 10; Defendant's Brief, Exhibit 1, Tab D, p. 299 (Williams' e-mail of February 8, 2006). Ms. Williams understood the rules for filing EEO complaints at the General Accountability Office as to require notification of her EEO complaint to either the PAB Executive Director or General Counsel. Ex. 1 ¶ 10. Therefore, Ms. Williams initiated her complaint by notifying Ms. Don, who was serving as both the PAB Executive Director and General Counsel at the time. *Id.* Ms. Williams further notified, at approximately the same time, Susan Inzeo (PAB Solicitor), Paul Coran (PAB Vice Chair), and Michael Doheny (PAB Chair) about her complaint. *Id.* Ms. Don acknowledged Ms. Williams' request and, after mediation, Ms. Williams was advised of her right to file a formal EEO complaint (Defendant's Brief, Exhibit 1, Tab D, p. 300), which she

did.  Neither Ms. Don nor any other official ever asserted that Ms. Williams had failed to

properly pursue the EEO process within PAB and GAO.  Defendant's Brief, Exhibit 1, Tab D, p.

300.

Remarkably soon after Ms. Williams' expression of her desire to file an EEO complaint –

exactly one week later – Ms. Williams received a written reprimand from Ms. Don.  Ex. 1 ¶ 11.

Ms. Don criticized Ms. Williams for allegedly failing to inform her of an issue that had arisen.

*Id.*  Ms. Don further directed Ms. Williams to assemble information for a meeting taking place

the next day.  *Id.*; Defendant's Brief, Exhibit 3 (Reprimand of February 15, 2006).  However,

Ms. Williams was performing her work in the same fashion as when she began her employment

as a Senior Trial Attorney and she was acting pursuant to Ms. Don's explicit directions – from

their conversation in December 2005 – regarding what information to withhold from Ms. Don.

Ex. 1 ¶ 11.  In contrast, Ms. Don maintains that Ms. Williams was directed to report "matters of

significance" and that when the PAB took on a significant amount of work, Ms. Williams failed

to inform Ms. Don of that increased workload.  Defendant's Brief, Exhibit 2 (Declaration of

Beth L. Don).

However, Ms. Williams acted pursuant to Ms. Don's explicit direction about what

information to report, and yet she was nonetheless reprimanded for allegedly failing to accept the

direction.  Ex. 1 ¶ 11.  Although Ms. Don does not characterize the letter as a reprimand,

Defendant's Brief, Exhibit 2, the letter could be used to support future disciplinary action against

Ms. Williams.  Ex. 1 ¶ 11.  Ms. Williams informed Ms. Don that she believed the written

reprimand was a retaliatory action in light of Ms. Williams' February 8th e-mail saying that she

wished to file an EEO complaint.  *Id.*  Notably, younger, white employees in PAB have not been

subjected to this same kind of discipline for similar acts.  *Id.*  In fact, during her tenure with

PAB, Ms. Williams did not learn of any other PAB employee who had been given a written reprimand. *Id.*

In April 2006, Ms. Anne Wagner became the PAB General Counsel. Defendant's Brief, Exhibit 5 (Declaration of Anne M. Wagner). Because Ms. Wagner had served as a PAB board member and was the chair of the PAB Board for a period of time, it seemed certain that Ms. Wagner would be picked in the "competitive" selection to serve as the PAB General Counsel. Ex. 1 ¶ 12. Ms. Wagner's clear predetermination for this role is further evinced by the very short period of time – precisely at the holiday time in December 2005 – during which the General Counsel vacancy announcement was open, and the fact that the announcement was clearly tailored to Ms. Wagner's qualifications. *Id.* Further, the announcement was posted at a time when Ms. Williams was scheduled to be out of the office. *Id.*

Once Ms. Wagner was awarded the position of General Counsel in April 2006, Ms. Williams' work environment took a bitter turn for the worse. Not to be shaken, Ms. Williams further pursued her request for a promotion with Ms. Wagner. After Ms. Wagner became PAB General Counsel in April, Ms. Williams met with Ms. Wagner to request promotion to a Grade 15 and noted the prior denial of her request. Ex. 1 ¶ 13. Ms. Williams outlined the reasons her position, qualifications and accomplishments merited a promotion, yet Ms. Wagner denied the promotion just the same. Ex. 1 ¶ 13. Ms. Wagner does not deny that Ms. Williams requested a promotion, or that she denied Ms. Williams' request. Defendant's Brief, Exhibit 5. Therefore, on May 17, 2006, Ms. Williams filed a formal EEO complaint alleging discrimination and retaliation from the PAB's denial of her request for promotion to the Grade 15 pay level and the written reprimand she received from Ms. Don in February 2006. Ex. 1 ¶ 14; Defendant's Brief, Exhibit 1, Tab B, p. 31. Notably, Ms. Wagner was aware of Ms. Williams' complaint as early as

(if not before) May 17, 2006, since Ms. Williams personally delivered a copy of her EEO complaint to Ms. Wagner on or about that date.  Ex. 1 ¶ 15.

After Ms. Williams filed her EEO complaint, Ms. Wagner's campaign of discrimination took on a new, more vigorous character.  First, Ms. Wagner issued an unsupported disciplinary action against Ms. Williams in July 2006 based on the following events.  In June 2006, Ms. Wagner sent an electronic message to Ms. Williams requesting any information Ms. Williams had pertaining to Peter Doheny's relationship with GRA, Inc., a contractor with PAB.  Ex. 1 ¶ 16.  Ms. Williams did not have any further knowledge or information than that already known to Ms. Wagner at the time, and Ms. Williams relayed that fact to Ms. Wagner in June 2006.  *Id.* Ms. Williams further explained to Ms. Wagner that Mr. Doheny's association with GRA, Inc. was noted on GRA, Inc.'s website and she referred Ms. Wagner to the website.  *Id.*  In contrast, Ms. Wagner did not ask any younger, Caucasian attorney at the PAB for such detailed information pertaining to Mr. Doheny, or for their knowledge about other employees who had such information.  Ex. 1 ¶ 17.

Although Ms. Williams never acquired additional information regarding Mr. Doheny, Ms. Wagner persisted in asking Ms. Williams to provide such information.  *Id.*  Ms. Williams was not able to provide information she did not have, and she did not have information in her immediate possession regarding anyone else who might have information about Mr. Doheny.  *Id.* Nonetheless, in July 2006, Ms. Williams received a written reprimand for allegedly failing to respond to Ms. Wagner's requests for information regarding Mr. Doheny.  Ex. 1 ¶ 18; Defendant's Brief, Exhibit 1, Tab B, p. 101.  However, none of the Caucasian attorneys in PAB was subjected to disciplinary action, of any kind, in relation to the search for information regarding Mr. Doheny.  Ex. 1 ¶ 18.

Ms. Williams was further discriminated against on the bases of her age, gender and race, subjected to a hostile work environment, and retaliated against in the events surrounding the *Blumner* investigation.  While Ms. Williams was out on leave for three days due to a death in her family in June 2006, Ms. Wagner contacted Ms. Williams at home, via personal e-mail, to inform Ms. Williams that she would not approve any further leave requests for Ms. Williams until the *Blumner* investigation was completed.  Ex. 1 ¶ 19.  Ms. Wagner repeated this same threat to Ms. Williams in a subsequent personal meeting.  *Id.*  Ms. Williams had accumulated a significant amount of leave at that time, which she would no longer be able to use.  *Id.*  However, consistent with her discriminatory animus towards Ms. Williams alone, Ms. Wagner did not restrict any other employees in PAB in their leave usage.  *Id.*

When Ms. Williams returned to work, she learned that Ms. Wagner had scheduled an interview of a key witnes, in an EEO complaint that Ms. Williams was currently investigating (the *Blumner* investigation) to be conducted on June 30, 2006.  *Id.*  Prior to this time, Ms. Wagner had not been involved in the *Blumner* investigation in any way and Ms. Williams was conducting the investigation without supervision.  *Id.*  In fact, Ms. Wagner had no experience of any kind in investigating EEO complaints.  Ex. 1 ¶ 20.

Given her experience and knowledge of EEO investigations, Ms. Williams determined that the investigation should proceed in the same manner in which she handled her other investigations and successfully investigated other EEO complaints.  *Id.*  While Ms. Williams disagreed with Ms. Wagner's approach to the *Blumner* investigation, she explained to Ms. Wagner the basis for her disagreement, and she informed Ms. Wagner that she would complete the investigation in the same manner in which she had proceeded up to that point.  *Id.*  Accordingly, Ms. Williams canceled the witness interview purportedly scheduled for June 30,

10

2006, prepared written interrogatories as Ms. Williams had agreed with officials at the Library of Congress, and completed the investigation. *Id.* In fact, the Library of Congress had agreed and requested that Ms. Williams handle the investigation by way of written interrogatories, and she further encountered numerous difficulties in arranging in-person interviews with the officials. *Id.* Notably the witness who was to be interviewed (Mr. Grijalva) stated "there were no plans to interview" him. Defendant's Brief, Exhibit 1, Tab B, p. 76. The administrative investigation has not shed any light on this factual question, and Ms. Wagner has not affirmed that Mr. Grijalva was contacted and knew about the interview. Defendant's Brief, Exhibit 5.

In addition, Ms. Williams performed other interviews, also scheduled by Ms. Wagner, regarding different investigations on June 30, 2006. Ex. 1 ¶ 21. Despite Ms. Williams' sound judgment in conducting and completing the *Blumner* investigation, Ms. Williams was suspended from employment for five days in August 2006, as discipline in connection with the *Blumner* investigation. Ex. 1 ¶ 22. Mr. Doheny approved the suspension. *Id.* However, no other employee of PAB has been subjected to this kind of discipline under similar circumstances, and certainly no Caucasian, younger, male employees, who have no prior EEO activity, have been subjected to such discipline. *Id.*

Ms. Wagner did not stop at the reprimand or the 5-day suspension; rather, her barrage of harassment continued and her treatment of Ms. Williams worsened. Ex. 1 ¶ 23. Ms. Wagner interfered with Ms. Williams' job responsibilities and created a hostile working environment for Ms. Williams by disparaging her work performance in the presence of her co-workers, *id.*, which Ms. Wagner does not deny. Defendant's Brief, Exhibit 5. Further, Ms. Wagner questioned co-workers about Ms. Williams' activities and inquired about Ms. Williams' whereabouts when

Ms. Williams had merely gone to the restroom. Ex. 1 ¶ 23. On no occasion did Ms. Wagner treat younger, white, male employees, who had no prior EEO activity, in a similar fashion. *Id.*

On at least one occasion, Ms. Wagner physically confronted Ms. Williams in a hostile and threatening manner by storming into Ms. Williams' office and criticizing her work performance in an alarming and threatening manner. Ex. 1 ¶ 24. On many occasions, Ms. Williams discussed the hostile work environment with Ms. Wagner and informed Ms. Wagner that the hostile environment was interfering with her job duties and the duties of her co-workers. Ex. 1 ¶ 25. Moreover, prior to her departure in 2005, Ms. Reece noticed that the Board treated white female attorneys much more favorably than Ms. Williams. Ex. 2 ¶ 9. For example, while the Board specifically requested that a white female attorney in the office attend a Board meeting, be formally introduced to the Board, and participate in a water club and Board lunches, Ms. Williams was never afforded the same courtesies. *Id.*

In an effort to confront this hostile work environment, in August 2006, Ms. Williams filed a second formal EEO complaint, which sought to amend her first EEO complaint, complaining of a discriminatory and retaliatory hostile work environment created by Ms. Wagner. Ex. 1 ¶ 26. In September 2006, Ms. Williams filed a third EEO complaint regarding her hostile work environment. *Id.* During the EEO process and her discussions with Ms. Don and Ms. Wagner regarding her complaints, Ms. Williams complained of discrimination on the bases of race, sex, age and retaliation related to the following matters: the denial of her requests to be promoted to the Grade 15 pay level; the failure of PAB to appoint her as Acting General Counsel following Ms. Reece's retirement; the written reprimand issued to her by Ms. Don in February 2006; Ms. Wagner's requests for information regarding Mr. Doheny; the written reprimand issued by Ms. Wagner in July 2006; Ms. Wagner's actions interfering with Ms.

Williams' work in the Blumner investigation; the five-day suspension proposed by Ms. Wagner and issued by Mr. Doheny; Ms. Wagner's actions disparaging Ms. Williams' job performance in the presence of her co-workers; Ms. Wagner's questioning co-workers of Ms. Williams' activities and whereabouts; Ms. Wagner's actions interfering with Ms. Williams' job responsibilities, including the fact that Ms. Wagner physically confronted Ms. Williams in a coercive and threatening manner; the creation of a hostile work environment; and the interference with Ms. Williams' access to the discrimination complaint process. *Id.*

As the final assault in the torrent of discriminatory acts Ms. Williams endured throughout 2006, the PAB altered Ms. Williams' position description in February 2007 to list the Senior Trial Attorney position as a Grade 13/14 position. Ex. 1 ¶ 27. Ms. Williams' position description had previously been listed as a Grade 14/15 position, and her predecessors in the position were paid at the Grade 15 level. *Id.* Although the new position description added new limitations to the promotion potential of Ms. Williams' position, it did not limit or alter Ms. Williams' duties and, in fact, the few changes that were made rendered her responsibilities more difficult. *Id.* Consistent with their previous acts against Ms. Williams, Ms. Don and Ms. Wagner were the individuals who directed the changed position description. *Id.* Further, the changed position description resulted in Ms. Williams being denied the opportunity to be paid at the Grade 15 level. *Id.* Given that PAB made the decision to alter the grade level of the position after Ms. Williams filed three EEO complaints and requested promotions to a Grade 15, such a drastic change in Ms. Williams' employment prerogatives was a decision made out of retaliation and discrimination against Ms. Williams. *Id.*

Ms. Williams has endured nothing but harassment, retaliation, and discrimination by Ms. Don and Ms. Wagner for over two years. After filing numerous EEO complaints and exhausting

her administrative remedies, Ms. Williams filed a complaint with this Court in August 2007.  No

reasonable Board employee would feel protected from reprisal if placed in Ms. Williams'

situation.  Ex. 1 ¶ 28.  While employed in a calm, congenial working environment, Ms. Williams

notified her supervisor that she wished to file an EEO complaint, and thereafter, her working

environment would never be the same.  Since that initial e-mail to Ms. Don in February 2006,

Ms. Williams has been the subject of reprimands, interrogations, suspensions, and threats, all of

which have no basis in fact.  *Id.*  No other employee in the Board has been treated in a

comparable fashion.  *Id.*  All Board employees are intimidated by the environment Ms. Don and

Ms. Wagner have created for Ms. Williams, and any employee would not feel safe to file an EEO

complaint as a result.  *Id.*

## III.    LEGAL STANDARD

### A.    Motion to Dismiss

A complaint need only set forth a short and plain statement of the claim, which gives the

defendant notice of the claim and the grounds for it.  *Baird v. Holway*, 2008 U.S. Dist. LEXIS

17409, 13-14 (D.D.C. 2008) (citing Fed. R. Civ. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41,

47 (1957)).  It is not necessary for the plaintiff to plead all elements of his prima facie case in the

complaint, or "plead law or match facts to every element of a legal theory."  *Williams v. Savage*,

2008 U.S. Dist. LEXIS 17682, at *7-8 (D.D.C. 2008) (citing *Krieger v. Fadely*, 211 F.3d 134,

136 (D.C. Cir. 2000) and *Swierkiewicz v. Sonoma N.A.*, 534 U.S. 506, 511-14 (2002)).

To determine whether a plaintiff has set forth enough facts to state a claim upon which

relief can be granted under Federal Rule 12(b)(6) of Civil Procedure, the plaintiff must set forth

"enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*,

127 S. Ct. 1955, 1974 (2007).  This standard does "not require heightened fact pleading of specifics"or "detailed factual allegations."  *Id.*

Further, the court "must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations."  *McManus v. District of Columbia*, 2007 U.S. Dist. LEXIS 94797, at *34-35 (D.D.C. 2007).  *See also Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251, 5 (D.C. Cir. 2008) (citing *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (citing *Twombly*, 127 S. Ct. at 1965)).  "In resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations-- including mixed questions of law and fact--as true and draw all reasonable inferences therefrom in the plaintiff's favor."  *Williams*, 2008 U.S. Dist. LEXIS 17682, at *7-8 (citing *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003)).

### B.    Motion for Summary Judgment

Summary judgment is appropriate only where the trier of fact determines that, given applicable substantive law, no genuine issue of material fact exists.  *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255 (1986).  An issue of fact is "genuine" if the evidence is such that a reasonable fact-finder could find in favor of the non-moving party.  *See George v. Leavitt,* 407 F.3d 405, 410 (D.C. Cir. 2005); *see also Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 105 (1st Cir. 1988).  In ruling on motions for summary judgment, the trier of fact's function is not to weigh the evidence and render a determination as to the truth of the matter, but only to determine whether there exists a genuine factual dispute.  *See Anderson*, 477 U.S. at 248-49.  Credibility determinations are not appropriate matters for summary judgment.  *See, e.g., id.*

A party seeking summary judgment faces a heavy burden.  Since such motions seek to preclude the opposing party from presenting evidence to the fact finder (here, the jury), the law

requires that all material facts and reasonable inferences therefrom must be viewed in the light

most favorable to the nonmoving party:

> Summary judgment is appropriate only in circumstances where "the
> evidence is such that a reasonable jury could not return a verdict for the
> nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248
> (1986). In deciding a motion for summary judgment, the district court is
> obliged to view the evidence in the light most favorable to the nonmoving
> party. *Adickes v. Kress & Co.*, 398 U.S. 144, 157 (1970); *Popham, Haik,*
> *Schnobrich, Kaufman & Doty, Ltd. v. Newcomb Securities Co.*, 751 F.2d
> 1262, 1263 (D.C. Cir. 1985) ("Any doubt is to be resolved against the
> moving party.").

*Washington Post Co. v. Dep't of Health and Human Services*, 865 F.2d 320, 325 (D.C. Cir.

1989). *See also Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284,1295 (D.C. Cir. 1998) (applying

these principles in an employment discrimination case). Defendant's motion cannot survive this

rigorous standard.

Courts must be especially cautious of summary judgment in Title VII claims because of

the difficulty in establishing discriminatory intent and disparate treatment. *See, e.g.*, *Hastie v.*

*Henderson*, 121 F. Supp.2d 72, 77 (D.D.C. 2000). Summary judgment is inappropriate when a

reasonable fact finder could infer discrimination based on the evidence. *Id.* *See also Holcomb v.*

*Powell*, 433 F.3d 889, 899 (D.C. Cir. 2006) (finding that a plaintiff can overcome a motion for

summary judgment by presenting evidence that would permit an inference of discrimination).

   1. <u>Legal Standard to Prove Discrimination</u>
     <u>in Violation of Title VII and ADEA.</u>

"The plaintiff can show discrimination 'either directly by persuading the factfinder that a

discriminatory reason more likely motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence.'" *George,* 407 F.3d at 413 (citing

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). The plaintiff can, but need

not, show that he was treated differently than a similarly-situated employee to prove discrimination. *See George,* 407 F.3d at 412 (admonishing the lower court for determining that the plaintiff failed to establish a *prima facie* case of discrimination on the basis that the plaintiff did not cite to a comparator).

The burden of establishing a prima facie case is not an onerous one. *See Burdine,* 450 U.S. at 253. Once the plaintiff sets forth a *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions. *See id.* If the defendant carries this burden, the plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *See id. See also Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 144 (2000). Proof that the defendant's explanation lacks credence represents one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. *See Burdine*, 450 U.S. at 235; *see also Czekalsi v. Peters*, 475 F.3d 360, 366 (D.C. Cir. 2007) (citing *Reeves*, 530 U.S. at 147).

Once both parties have met these burdens earlier, the burden shifting schemes of *McDonnell Douglas* disappear. *See Reeves*, 530 U.S. at 142-44. "At that point, the relevant inquiry is whether there is sufficient evidence from which a reasonable fact finder could find in favor of the plaintiff, although 'the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Sanders v. Veneman*, 211 F. Supp.2d 10, 17 (D.D.C. 2002) (citations omitted).

a.    Prima Facie *Case of Discrimination*.

The plaintiff carries the burden of proving a *prima facie* case of discrimination by the preponderance of the evidence.  *See George,* 407 F.3d at 411 (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  To establish a *prima facie* case of discrimination, the plaintiff must show that "(1) [she] is a member of a protected class; (2) [she] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002); *accord George,* 407 F.3d at 412.

b.    Prima Facie *Case of Retaliation*.

To make out a *prima facie* case of illegal retaliation, a plaintiff must show that "(1) she engaged in statutorily protected activity; (2) her employer took an adverse personnel action against her; and (3) a causal connection exists between the two." *Carney v. Am. Univ.*, 331 U.S. App. D.C. 416, 151 F.3d 1090, 1095 (D.C. Cir. 1998)).  "Title VII prohibits federal agencies from retaliating against employees for asserting their rights."  *Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir. 2006) (internal citations omitted).  The burden of establishing a *prima facie* case of retaliation is minimal.  *Id.* at 903.

c.    Prima Facie *Case of Age Discrimination*.

"To establish a *prima facie* case of age discrimination under the ADEA, the plaintiff must demonstrate 'facts sufficient to create a reasonable inference that age discrimination was a determining factor in the employment decision.'"  *Cuddy v. Carmen*, 694 F.2d 853 (D.C. Cir. 1982); *Miller v. Lyng*, 660 F. Supp. 1375, 1377 (D.D.C. 1987).  Such an inference is created if the plaintiff can show (1) she belongs to the statutorily protected age group; (2) she was qualified for her position and was performing her job well enough to meet her employer's expectations; (3) she suffered an adverse employment action despite her qualifications and performance; and

(4) she was disadvantaged in favor of similarly situated younger employees. *Reeves*, 530 U.S. at

142; *Dobbs v. Dr. James Roche*, 329 F. Supp. 2d 33, 40 (D.D.C. 2004). In an ADEA case,

appellant may establish a *prima facie* case by showing that she is in the protected group (over

40), and was treated less favorably than other similarly situated employees outside his protected

group. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 878 (1996).

d.    *A Comparator Is Not Required In Order For Plaintiff To Show Discrimination*.

The Supreme Court has emphasized that the *McDonnell Douglas* model of the *prima*

*facie* case is not intended to be "rigid, mechanized, or ritualistic" and that its requirements can

vary depending upon the factual context. *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139,

1150 (D.C. Cir. 2004), citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, (2002) (quoting

*Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)). This Circuit recently reaffirmed that

a Plaintiff may establish a *prima facie* case without identifying a similarly-situated comparator,

stating:

> [T]he court in *Stella v. Mineta* articulated an alternative
> formulation of the Title VII prima facie case, pursuant to which a
> plaintiff must establish that "(1) she is a member of the protected
> class; (2) she suffered an adverse employment action; and (3) the
> unfavorable action gives rise to an inference of discrimination."
> *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting
> *Brown v. Brody*. 199 F.3d 446, 452 (D.C. Cir. 1999)). This
> alternative formulation is designed to accommodate the wide
> variety of employment discrimination claims that extend beyond
> the typical "failure-to-hire" situations of the sort confronted in
> *McDonnell Douglas*.

*Teneyck*, 365 F.3d at 1150.

2.    Legal Standard to Show Hostile Work Environment
         Based on Race, Gender and Age Discrimination.

Like claims of discrimination based on discrete acts and absent direct evidence, hostile

work environment claims are analyzed pursuant to the *McDonnell-Douglas* framework outlined

above. *Brady v. Livingood*, 2006 U.S. Dist. LEXIS 71044, at *24 (D.C. Cir. 2006). "To

establish a *prima facie* case for a hostile work environment based on race [or gender or age],

plaintiff must demonstrate that (1) [s]he is a member of a protected class; (2) [s]he was subjected

to unwelcome harassment; (3) the harassment occurred because of h[er] race [or gender or age];

(4) the harassment affected a term, condition, or privilege of h[er] employment; and (5) the

employer knew or should have known of the harassment, but failed to take any action to prevent

it." *Brady*, 2006 U.S. Dist. LEXIS 71044, at *24 (D.C. Cir. 2006) (citations omitted). *See

Easton v. Snow*, 2006 U.S. Dist. LEXIS 42909, at *16 (D.C. Cir. 2006) (citing equivalent

elements for age discrimination cases); *see also Kilby-Robb v. Spellings*, 522 F. Supp. 2d 148,

162-63 (2007) (citing equivalent elements for gender discrimination cases).

"In order to prevail on a hostile work environment claim under Title VII, a plaintiff must

prove that 'the workplace is permeated with discriminatory intimidation, ridicule, and

insult,'...that is 'sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'" *Harris v. Forklift Systems*, 510 U.S.

17, 21 (1992). The *Harris* Court explained that whether an environment is hostile is determined

by looking at the totality of the circumstances: "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance. The effect on the

employee's psychological well-being is, of course, relevant to whether the plaintiff actually

found the environment abusive." *Id.* at 23. *See also Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (citing *Harris*, 510 U.S. at 23). "Very rarely will such fact-based determinations be appropriate for determination on summary judgment." *Jeffrey Armstrong v. Janet Reno*, 172 F. Supp.2d 11, 23-24 (D.D.C. 2001).

"For hostile-work-environment claims, then, discriminatory acts may be used by a plaintiff in proving the claim, even if those actions occurred outside of the filing period." *Coleman-Abedayo v. Michael O. Leavitt*, 326 F. Supp.2d 132, 137 (D.D.C. 2004). In this circuit, a hostile work environment claim can amount to retaliation under Title VII. *Singletary v. District of Columbia,* 351 F.3d 519, 526 (D.C. Cir. 2003); *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006).

## IV.   LEGAL ARGUMENT

### A.    Plaintiff Has Exhausted Her Administrative Remedies.

The regulations and procedures that apply to Title VII discrimination claims of federal employees like Plaintiff are different from those applicable to employment discrimination claims arising out of the private sector and, to a limited extent, executive branch agencies. An aggrieved individual in Plaintiff's position "must initiate contact with a[n] [Equal Employment Opportunity] Counselor [at the appropriate agency] within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). After a series of other administrative steps are completed, a complainant has a right to file a civil action in district court for a trial de novo. *See* 42 U.S.C. § 2000e-16(c); 29 C.F.R. §§ 1614.108, 1614.109, 1614.110, 1614.407; *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 59- 60 (1974), *limited on other grounds, Gilmer v. Interstate*

*Johnson Lane Corp.*, 500 U.S. 20 (1991); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

798-99 (1973).

 To complete administrative steps before filing a civil action, employees of the PAB who

believe they have "been denied [their] right to equal employment opportunity, . . . shall bring this

matter to the attention of the Board's Executive Director or General Counsel." 4 C.F.R.

§ 28.17(a)(2). Further, if the matter cannot be resolved, "the Executive Director shall notify the

employee of his or her right to file an EEO complaint." 4 C.F.R. § 28.17(a)(2). The employee

may then choose whether to consult with Board's Solicitor or General Counsel regarding

procedural matters of filing the EEO complaint. *Id.* The employee must, however, file her EEO

complaint, within 20 days of receiving the notice to file, with the PAB Office of the General

Counsel. *Id.* The complaint is then processed according to 4 C.F.R. § 28.17(b).

 The Agency claims that Ms. Williams' retaliation claim must be dismissed "to the extent

she alleges (1) she was physically confronted in a hostile or threatening manner; and (2) that the

Agency questioned her coworkers concerning her whereabouts" because she did include these

claims in her administrative charges. Defendant's Brief at 25. However, Ms. Williams' formal

EEO complaint of August 21, 2006, mentions numerous actions by Agency officials, including:

> (1) counseling [her], threatening to impose discipline, imposing
> discipline, and reprimanding me for non-existent transgressions . . .
> (4) engaging in surveillance of [her] activities and, by extension
> the activities of employees who contact [her] for information; (5)
> interfering with the investigation of employees' cases and
> otherwise making the performance of [her] job duties more
> onerous; (6) disparaging [her] job performance and [her] and then
> placing the blame on or otherwise attributing the disparaging
> comments to unnamed officials of a GAO client; and (7) acting in
> concert with PAB and PAB/OGC employees and supervisors to
> deprive [her] of [her] civil rights and equal employment
> opportunities.

Defendant's Brief, Exhibit 1, Tab B, p. 35-36.  Ms. Williams specifically complained of the

"surveillance of her activities," which incorporates directly – or at the very least, can reasonably

be interpreted to include – her complaint that Ms. Wagner questioned her about her whereabouts.

Further, Ms. Williams complained of the officials' threats to impose discipline on her and

interfering with her job duties so as to make them more onerous (Defendant's Brief, Exhibit 1,

Tab B, p. 35-36), which incorporates directly – or at the very least, can reasonably be interpreted

to include – her complaint that Ms. Wagner confronted her in a physically threatening and

hostile manner.  Ms. Williams' complaint on these points could not be any clearer.  The

Agency's interpretation of Ms. Williams' complaint is simply too narrowly drawn and must be

rejected.  *See Fed. Express Corp. v. Holowecki*, 128 S. Ct. 1147, 30-31 (2008) ("Documents

filed by an employee with the EEOC should be construed, to the extent consistent with

permissible rules of interpretation, to protect the employee's rights and statutory remedies.").

Furthermore, in conversations she had with Ms. Wagner and Ms. Don regarding her

complaints, Ms. Williams specifically raised the issues of Ms. Wagner's physically threatening

and hostile manner, as well as Ms. Wagner's actions in questioning coworkers about her

whereabouts and activities.  Ex. 1 ¶ 26.  Ms. Williams also discussed these two points with the

EEO investigator.  Ex. 1 ¶ 26.  Therefore, because Ms. Williams addressed these issues both

with Ms. Don and Ms. Wagner, and in her EEO complaint, she exhausted her administrative

remedies and the matters are properly within the jurisdiction of this Court.  4 C.F.R. § 28.17.

The Agency further argues that Ms. Williams' hostile work environment and retaliation

should be dismissed because she did not exhaust her administrative remedies on these issues.

Defendant's Brief at 26.  The Agency asserts that Ms. Williams did not bring these claims to the

attention of the Board's Executive Director or General Counsel, as she was required to do under

GAO complaint processes, before filing an EEO complaint. Defendant's Brief at 26-27, n. 13. However, Ms. Williams discussed her claims of hostile work environment and retaliation with her supervisors on numerous occasions. For example, on February 17, 2006, Ms. Williams informed Ms. Don that she believed the written reprimand was a retaliatory action based on Ms. Williams' declared intent to file an EEO complaint of a week earlier. Ex. 1 ¶ 11. On other occasions, Ms. Williams discussed with Ms. Wagner her belief that she was being subjected to a hostile work environment. Ex. 1 ¶ 25. Ms. Williams informed Ms. Wagner that Ms. Wagner's actions made it difficult for her to perform her job duties and that Ms. Wagner's comments and actions had a negative impact on her and her co-workers. Ex. 1 ¶ 25.

Further, in her discussions with Ms. Don and Ms. Wagner about her EEO complaint, Ms. Williams complained of discrimination related to matters that could be construed as retaliation and hostile work environment claims. For example, Ms. Williams raised issues regarding Ms. Wagner's actions regarding the coercive interrogation of her in the Doheny matter, interference with her work in the *Blumner* investigation and other job duties, disparaging her job performance in discussions with co-workers, questioning her co-workers regarding her whereabouts and activities, creation of a hostile work environment for Ms. Williams, and interference with her right to use the discrimination complaint process. Ex. 1 ¶ 26. Ms. Williams also informed both Ms. Don and Ms. Wagner that she believed these actions were retaliatory given her involvement in the EEO process and their awareness of her involvement. Ex. 1 ¶ 26.

Therefore, consistent with the Board's own regulations, Ms. Williams brought her claims of retaliation and hostile work environment to the attention of both Ms. Don (Executive Director) and Ms. Wagner (General Counsel). *See* 4 C.F.R. § 28.17(a)(2) ("When an employee of the Board believes that he or she has been denied his or her right to equal employment

opportunity, the employee shall bring this matter to the attention of the Board's Executive Director or General Counsel.").  Moreover, contrary to the Agency's claim, Ms. Williams clearly raised her claims of hostile work environment and retaliation in her formal EEO complaints.  *See supra* (complaint of August 21, 2006).  Ms. Williams alleged retaliation as a basis of discrimination in each of her three formal EEO complaints, *see* Defendant's Brief, Exhibit 1, Tab B, pp. 31, 35, 41 (alleging race, sex, age, and retaliation as bases of discrimination), and the allegations in her complaint can be construed as constituting a retaliation claim.  *See Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53 (2006) (retaliation claim may include any action that would dissuade reasonable employee from asserting a claim of discrimination).  In her August 21, 2006 formal EEO complaint, Ms. Williams specifically alleged a "hostile work environment," Defendant's Brief, Exhibit 1, Tab B, p. 35, and her other complaints allege facts that can be construed as constituting a hostile work environment.  Defendant's Brief, Exhibit 1, Tab B, pp. 31-32, 41; *see Fed. Express Corp. v. Holowecki*, 128 S. Ct. 1147, 2008 U.S. LEXIS 2196, at *2, *30-31 (2008)  ("Documents  filed by an employee with the EEOC should be construed, to the extent consistent with permissible rules of interpretation, to protect the employee's rights and statutory remedies.").  Ms. Williams raised her claims of retaliation and hostile work environment with the correct individuals as required by 4 C.F.R. § 28.17, and she raised these claims in her complaint.  *Burlington Northern*, 548 U.S. 53; *Holowecki*, 128 S. Ct. at 30-31.  The Agency's claim on this point must be rejected.

**B.    Plaintiff Has Provided Sufficient Facts To Warrant Discovery On Her Claims Of Discrimination.**

Plaintiff has alleged that the Board discriminated against her based on her race, sex, and age. With regard to her discrimination claims, Plaintiff has presented enough facts to state a claim that is plausible on its face.

1.    Plaintiff has established a *prima facie* case of discrimination.

It appears uncontested that Plaintiff has established a *prima facie* case of race, sex, and age discrimination. Plaintiff has established that she is a member of protected classes (African-American, female, over 40 years in age).

Plaintiff has established that she was qualified for her position and was performing her job well. Indeed, Plaintiff's previous supervisor sought a promotion of Ms. Williams to the Grade 15 pay level. Ex. 2 ¶ 8.

Plaintiff has provided facts to establish that she suffered adverse employment action, including denials of her requests for promotions, disciplinary actions against her, creation of a hostile work environment, and the elimination of her promotion potential.

Plaintiff has provided facts to establish that she was treated less favorably than employees outside of her protected class, thereby giving rise to an inference of discrimination. Plaintiff's requests to be promoted to the Grade 15 pay level were denied, even though other Board employees whose degree of responsibility and skill required for their positions were paid at the Grade 15 pay level. Ex. 1 ¶ 8. Plaintiff was subjected to disciplinary actions, while employees outside her protected class were not subjected to discipline in similar circumstances. Ex. 1 ¶¶ 11, 22, 28. And, as discussed in detail below, Plaintiff was singularly subjected to a hostile work environment.

Plaintiff has also provided other evidence of background circumstances to support an inference of discrimination. Plaintiff has provided evidence that African-American Board employees were generally treated less favorably than white employees. Ex. 2 ¶¶ 3, 9, 11. Plaintiff has also provided evidence that she was treated less favorably by the Board than a white Senior Trial Attorney. Ex. 2 ¶ 9. This evidence also goes to establishing a prima facie case of discrimination. *See Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (finding of discrimination supported by evidence of discriminatory attitude).

**B.    Plaintiff Has Provided Facts To Establish That
She Was Denied Promotion Based On Discrimination.**

Defendant's claims that Plaintiff has not shown that she was denied requested promotions to the Grade 15 pay level are specious and contradicted by the evidence. Plaintiff has provided documentary evidence to show that in January 2006, she requested to Ms. Don a promotion to Grade 15. Ex. 1 ¶ 8; Defendant's Brief, Exhibit 1, Tab D, p. 295. That request, received by Ms. Don, was rejected, and Ms. Williams was left at a Grade 14 pay level. Ex. 1 ¶ 9.

In addition, Plaintiff has provided evidence that she requested a promotion to the Grade 15 pay level in a personal meeting with Ms. Wagner in or about April 2006. Ex. 1 ¶ 13. Ms. Wagner denied that request at that time, and Ms. Williams was again left at a Grade 14 pay level. Ex. 1 ¶¶ 2, 13. Therefore, Plaintiff has submitted evidence that on two separate occasions, she requested promotion to the Grade 15 pay level, and her requests were denied.

In addition to the traditional *McDonnell Douglas* test for discrimination, the D.C. Circuit has held that an adjusted test may be utilized in a case where an employee challenges a denial of an increase in pay or grade. In cases involving a denial of requested promotion in terms of an increase in grade, "the literal *McDonnell* formula . . . designed for a claim of discriminatory

27

refusal to hire . . . does not precisely apply." *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir.

1981). This "other type of promotion case" requires an "adjusted" formula "to ask whether a

similarly situated person outside of [the plaintiff's] protected class requested and received the

benefit she sought." *Cones v. Shalala*, 199 F.3d 512, 517 (D.C. Cir. 2000) (citing *Bundy*, *supra*).

Here, as stated above, Plaintiff has established that she made repeated requests to be

promoted to the GS-15 pay level, and that her requests were denied. Ms. Don denied Plaintiff's

request for promotion in January 2006. Ex. 1 ¶ 9; Defendant's Brief, Exhibit 1, Tab D at 296-98.

Ms. Wagner denied Plaintiff's request for promotion in or about April 2006. Ex. 1 ¶ 13.

Plaintiff has also provided evidence that an employee outside her protected group was granted a

promotion to the GS-15 pay level. Susan Inzeo, a white female who is younger than Plaintiff,

was promoted to the GS-15 pay level. Ex. 2 ¶ 4.

Therefore, under the "adjusted" *McDonnell Douglas* formula established by the D.C.

Circuit in *Bundy*, Plaintiff has provided enough facts to state a plausible claim that she was

denied her requested promotion based on discrimination. Defendant's claim that Ms. Williams is

precluded from complaining about her non-promotion because she did not apply for the General

Counsel position is a red herring. Ms. Williams is not complaining about non-promotion to the

General Counsel position; she is complaining that Defendant did not promote her to Grade 15 *in

her position*. Ms. Williams' position was a GS-14/**15,** meaning she could serve in that position

at either a grade 14 or a grade 15 and she could be promoted to the 15 level non-competitively

and without application. Defendant claims that Ms. Williams never asked for a promotion to

GS-15, but at a minimum, there is a factual dispute on this score, as Ms. Williams has testified

that she asked both Ms. Don and Ms. Wagner. For these reasons, Ms. Williams is entitled to

pursue her claim that Defendant discriminatorily denied her a promotion in her position to the GS-15 level.

           1.      <u>Plaintiff Has Provided Facts to Support Her Claim of Pretext.</u>

Without an opportunity to conduct any discovery, Plaintiff has been unable at this point to develop complete information and evidence regarding her burden to prove pretext. Indeed, Plaintiff has not had an opportunity to depose or cross-examine the Board officials regarding their asserted explanations. However, even at this very early stage of proceedings, Plaintiff has provided facts to support a finding of pretext that is plausible on its face.

As an initial matter, Defendant has provided no evidence regarding the decision to repeatedly deny Plaintiff's requests for promotion. Once a plaintiff has established a *prima facie* case of discrimination, the burden shifts to the employer to "produce evidence that the plaintiff was rejected . . . for a legitimate, nondiscriminatory reason." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Defendant has not carried its burden of production to provide evidence to support a legitimate, nondiscriminatory explanation for its decisions to deny Plaintiff's requests for promotion. Therefore, as Defendant has failed to meet its burden of production, an inference of discrimination is appropriate regarding the denials of Plaintiff's requests for promotion. *See, e.g., Forman v. Small,* 271 F.3d 285, 301 (D.C. Cir. 2001) (reversing summary judgment where employer "failed to meet its burden of production to set forth a legitimate, nonretaliatory reason" for employment action).

In addition, Plaintiff has provided evidence that casts doubt on the veracity of Defendant's explanations for the other employment actions against Ms. Williams. Evidence that Defendant's proffered explanations for its employment actions against Plaintiff may be "unworthy of credence [is] probative [and] may be quite persuasive" proof of intentional

discrimination.  *Reeves*, 530 U.S. 133.  Indeed, "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  *Id.*

Specifically, with regard to the reprimand issued by Ms. Don, Plaintiff has provided evidence to show that Plaintiff's actions were proper and correct, and were consistent with the directions provided to Plaintiff by Ms. Don.  Ex. 1 ¶¶ 7, 11.  Ms. Don had directed that certain information be withheld from her, due to potential conflicts that might arise if Ms. Don were to serve as part of the adjudicatory body on a complaint.  Ex. 1 ¶ 7.  Ms. Williams followed these directions.  Ex. 1 ¶ 11.  Therefore, Plaintiff has produced sufficient evidence for a jury to conclude that the asserted basis for the written reprimand was false.

With regard to the written reprimand issued by Ms. Wagner, Plaintiff has provided evidence to show that Plaintiff in fact did respond to Ms. Wagner's request for information regarding Mr. Doheny.  Ms. Williams has testified:

> I had no information that was not then known to Ms. Wagner regarding Mr. Doheny and his relationship with GRA, Inc., and I responded in June 2006 by telling her that.  Mr. Doheny's association with GRA, Inc. was noted on GRA, Inc.'s website, and I stated to Ms. Wagner that she could see the information on the website.

Ex. 1 ¶ 16.  Therefore, Plaintiff has provided evidence that casts doubt on the asserted basis for the written reprimand.

With regard to the suspension action, Plaintiff has provided evidence to cast doubt on the propriety of suspending Ms. Williams for merely performing her job.  As explained in Ms. Williams's affidavit, her method of conducting the *Blumner* investigation was consistent with her regular practice in conducting EEO investigations, was consistent with the requests of Library of Congress officials, and was consistent with Ms. Wagner's eventual directions.  Ex. 1 ¶

20.  Ms. Williams cited her successful experience conducting EEO investigations, as opposed to

Ms. Wagner's lack of any EEO investigation experience, as a basis for determining the best

method of conducting the *Blumner* investigation.  Ex. 1 ¶ 20.  Therefore, Plaintiff has provided

evidence that shows that the Board's asserted explanations for the suspension action are false.

Additionally, Plaintiff has established that no employee outside her protected class was

subjected to the disciplinary actions imposed against her.  For example, no Board employee

outside Plaintiff's protected class was ever issued a written reprimand, even though Plaintiff was

issued two separate written reprimands.  Ex. 1 ¶¶ 11, 18 .  No Board employee outside Plaintiff's

protected class was ever suspended, even though Plaintiff was suspended for five days.  Ex. 1 ¶

22.  No Board employee outside Plaintiff's protected class was subjected to threats that requests

for leave would be refused.  Ex. 1 ¶ 19.  When allegations regarding an improper business

relationship between Mr. Doheny and a Board contracting company arose, Plaintiff was singled

out for interrogation regarding the matter.  Ex. 1 ¶ 17. Even though the allegations regarding Mr.

Doheny were provided to Board management by another Board employee, and even though Ms.

Williams told Ms. Wagner in June 2006 that she had no information beyond what was publicly

available on the GRA, Inc. website, the Board singled Ms. Williams out for interrogation and

disciplinary action related to this matter.  Ex. 1 ¶¶ 16 -18. The evidence showing that Ms.

Williams was subjected to such disciplinary actions, while those outside her protected class were

not, belies the Board's explanations for its actions against Ms. Williams, and supports an

inference of discrimination.

In addition, Plaintiff has provided facts that the Board failed to follow its normal

processes.  With respect to the *Blumner* investigation, the facts show that the Board radically

changed its normal process of supervising Ms. Williams' investigations.  Ms. Williams was

regularly allowed great independence to conduct her investigations. *See* Ex. 1 ¶ 2; Ex. 2 ¶¶ 6-7. However, Ms. Wagner failed to follow this regular practice with respect to the *Blumner* investigation. Ms. Wagner directed Ms. Williams to drastically alter her method of investigation, and Ms. Wagner even went so far as to schedule meetings for Ms. Williams to attend. Ex. 1 ¶ 19. This was despite the fact that Ms. Williams had extensive successful experience conducting EEO investigations, and Ms. Wagner had no experience conducting EEO investigations. Ex. 1 ¶ 20. This dramatic departure from the regular process of supervision of Ms. Williams's work supports an inference of discrimination. *See, e.g., Lathram v. Snow*, 336 F.3d 1085, 1093-94 (D.C. Cir. 2003) (jury could draw an inference of discrimination where agency departed from its normal process); *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982) ("failure on the part of the prospective employer to follow its own regulations and procedures . . . is a factor that the trier of fact may deem probative . . . in determining the true motivation behind the" employment action).

Even without the ability to conduct discovery, Plaintiff has presented significant evidence to prove that the Board's proffered explanations for the employment actions imposed against Ms. Williams are unworthy of credence. Therefore, Defendant's motion must be denied.

**C.    Other Evidence Of Discrimination.**

Plaintiff has also provided facts that indicate discrimination by the Board toward her and other members of her protected class, particularly African-American females. This evidence may also be used by a reasonable jury to support a finding of discrimination. *See Aka v. Washington Hospital Center*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc) (evidence "of discriminatory statements or attitudes on the part of the employer" may support finding of discrimination); *Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758 (D.C. Cir. 2002) (reversing

32

summary judgment to an employer in Title VII case where Plaintiff produced evidence of discriminatory attitude on part of supervisor); *Czekalski v. Peters*, 475 F.3d 360, 368 (D.C. Cir. 2007) (reversing summary judgment to an employer in Title VII case where Plaintiff produced evidence of discriminatory attitude).

Here, Plaintiff has provided facts to establish that she was treated less favorably than employees outside of her protected class, thereby giving rise to an inference of discrimination. Plaintiff's requests to be promoted to the Grade 15 pay level were denied, even though other Board employees, whose degree of responsibility and skill required for their positions were equal to or lesser than Ms. Williams' responsibility, were paid at the Grade 15 pay level. Ex. 1 ¶ 8. Plaintiff was subjected to disciplinary actions, while employees outside her protected class were not subjected to discipline in similar circumstances. Ex. 1 ¶¶ 11, 22, 28. And, as discussed in detail below, Plaintiff was singularly subjected to a hostile work environment.

Plaintiff has also provided evidence that African-American Board employees were generally treated less favorably than white employees. The hard work and outstanding performance of Ms. Williams and other African-American employees in the PAB's Office of General Counsel were "ignored" by Board officials, while white employees were treated more favorably. Ex. 2 ¶¶ 9, 11-12. Plaintiff provided evidence that she was treated less favorably by the Board than a white Senior Trial Attorney. For example, the Board asked the white employee to attend a Board meeting in order to be formally introduced, while no such invitation was ever extended to Ms. Williams. Ex. 2 ¶ 9. The same white Senior Trial Attorney was invited to social functions in the Board's office, such as catered lunches, while no such invitations were extended to Ms. Williams. *Id.* This evidence of a discriminatory attitude among the Board's officials supports an inference of intentional discrimination.

Of course, Plaintiff has not yet had the opportunity to conduct any discovery. Plaintiff will certainly be able to uncover additional evidence to support her claim that the Board's explanations for its employment actions against her are mere pretext for discrimination. However, even without the benefit of discovery, Plaintiff has provided sufficient facts to establish plausible claims of race, sex, and age discrimination. Thus, the court must deny Defendant's motion.

### D.    Plaintiff Has Provided Facts Establishing Retaliation.

Plaintiff's successful career at PAB suddenly reversed course when she complained of discrimination. Immediately after Ms. Williams initiated the EEO complaint process in February 2006, her supervisors responded with a series of negative employment actions that continues still, including a written reprimand in February 2006, another reprimand in July 2006, and a five-day suspension in July 2006. Management even downgraded her position description in January 2007, eliminating any possibility that Ms. Williams could ever be promoted. We allege that each of these adverse employment actions constitutes unlawful retaliation for Ms. Williams's protected EEO activity throughout 2006.[4]

#### 1.    *Prima facie* case.

Plaintiff easily satisfies the *prima facie* case for retaliation. "To establish a *prima facie* case of retaliation, the plaintiff must present evidence that (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) the adverse action was causally related to the exercise of her rights." *Holcomb v. Powell*, 433 F.3d 889, 901-02 (D.C. Cir. 2006).

---

[4]As explained in Section IV.E *infra*, these adverse acts are also challenged collectively as a hostile work environment.

The first prong of the *prima facie* test (i.e., protected activity) is satisfied by Plaintiff's initiation of discrimination complaints on three separate occasions in 2006. Defendant's Brief, Ex. 1, Tab B, pp. 31, 35, 41. On February 8, 2006, Ms. Williams sent an email to her acting supervisor, Ms. Don, specifically stating that she wished to file an EEO complaint regarding PAB's discriminatory pay policies and practices. Defendant's Brief, Ex. 1, Tab D, p. 299. Formal discrimination complaints were filed by Ms. Williams in May, August, and September 2006. Defendant's Brief, Ex. 1, Tab B, pp. 31, 35, 41.

The second prong of the *prima facie* test (*i.e.*, adverse employment action) is easily satisfied as well. At least five adverse employment actions are encompassed by this lawsuit: denial of promotion requests in January and April 2006; written reprimand in February 2006; written reprimand in July 2006; five-day suspension in July 2006; and elimination of promotion potential (*i.e.*, position downgrade) in January 2007.

The Supreme Court has recently explained that the anti-retaliation protections of Title VII encompass all negative employment actions that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53 (2006) (quotation marks and citation omitted). Written reprimands like those challenged here fit within this category. Ms. Williams received the first reprimand within days of her email alleging discrimination. As she had never before received a negative write-up before, this sent a strong intimidating message. Moreover, the February 15, 2006 reprimand was entirely baseless - Ms. Don criticizes Ms. Williams even though she was following Ms. Don's explicit instructions. Defendant's Brief, Ex. 3; Ex. 1 ¶ 11. The second written reprimand was similarly trumped-up: it criticizes Ms. Williams for failing to provide information that Ms.

Williams simply did not possess.  Ex. 1 ¶ 17.  At PAB, written reprimands may form the basis

for subsequent, more severe discipline, further establishing the adverse nature of these actions.

The five-day suspension (issued in July 2006) plainly rises to the level of an adverse

employment action for purposes of the *prima facie* test.  Formal punishment of this nature

directly "affect[s] the terms, conditions, or privileges of employment."  *Holcomb*, 433 F.3d at

902 (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002)).  In other words, a

five-day suspension is "tangible harm"  *Id.*

The elimination of promotion potential for Ms. Williams in January 2007 also constitutes

an adverse employment action.  As explained in *Holcomb* (quoting *Forkkio*), "the threshold is

met when an employee 'experiences materially adverse consequences affecting the terms,

conditions, or privileges of employment or future employment opportunities.'"  *Id.*  Ms.

Williams's "future employment opportunities" were directly impinged when PAB formally

downgraded her position so that she could never rise to the grade 15 level in her job.  By re-

casting the job from a "grade 14/15" position to a "grade 13/14" position, management capped

Plaintiff's "future employment opportunities" at her current grade 14 level, placing the grade 15

pay level permanently out of reach.  This is "tangible harm" (*id.*) that hits Ms. Williams in her

pocketbook.

In *Holcomb*, the D.C. Circuit cautioned that "[a]dverse actions are not confined to

hirings, firings, promotions, and other discrete incidents.  So long as a plaintiff meets the

statutory requirement of being 'aggrieved' by an employer's action, we do not categorically

reject a particular personnel action as nonadverse simply because it does not fall into a

cognizable type."  433 F.3d at 902 (citations omitted).  In *Holcomb*, the employee claimed

retaliation when her job responsibilities were temporarily altered upon return from an out-of-

agency detail. Even though the employee's grade level never changed, the court determined that these circumstances satisfied the "adverse employment action" test. Here, Ms. Williams has experienced even more severe harm than the employee in *Holcomb*. Her claims of retaliation therefore satisfy the second prong of the *prima facie* case.

The third prong of the *prima facie* test (*i.e.*, causal connection) is also satisfied. "A plaintiff may satisfy this third element of a *prima facie* case by showing 'the employer had knowledge of the employee's protected activity, and . . . the adverse personnel action took place shortly after that activity.'" *Holcomb*, 433 F.3d at 903 (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)). Here, there is a very close temporal connection between Plaintiff's protected EEO activity and the challenged retaliatory acts. Ms. Williams emailed her acting supervisor about discrimination on February 8, 2006, and the first retaliatory reprimand was issued precisely one week later. Defendant's Brief, Ex. 1, Tab D, p. 299; Defendant's Brief, Ex. 3. When Ms. Williams refused to back down and filed her first formal complaint on May 17, 2006, she experienced another written reprimand and a five-day suspension in July 2006. Ms. Williams filed her second and third discrimination complaints in August and September 2006, and management formally downgraded her position (from 14/15 to 13/14) in January 2007.

Only a few days or weeks separate Plaintiff's protected EEO activity and the challenged adverse personnel actions. As explained in *Holcomb*, "close temporal proximity" raises an inference of causation, thus satisfying this *prima facie* element. *Holcomb*, 433 F.3d at 903. *See also Cones v. Shalala*, 199 F.3d 512 (D.C. Cir. 2000) ("[T]he close temporal proximity of appellant's discrimination complaints and the refusal to consider him for the position was sufficient to establish a causal connection."). In *Holcomb*, the district court had determined that no causal connection could be inferred, but the D.C. Circuit reversed, emphasizing that a

plaintiff's burden at the *prima facie* stage "is not great." *Id.* (quoting *McKenna v. Weinberger*, 729 F.2d 783 (D.C. Cir. 1984)). Here, close temporal proximity (not to mention the other suspicious aspects of the challenged adverse actions) provides more than sufficient basis for satisfaction of the *prima facie* test.

2.    <u>Plaintiff Has Provided Facts to Support Her Claim of Pretext</u>.

No discovery has occurred in this case, and Plaintiff thus has had no opportunity to develop information and evidence regarding pretext. Plaintiff has not had an opportunity to depose or cross-examine the Board officials regarding their asserted explanations. However, even at this very early stage of proceedings, Plaintiff has provided facts to support a finding of pretext that is plausible on its face.

As to the written reprimand issued on February 15, 2006, it is highly suspicious that Ms. Williams was criticized for following her supervisor's explicit instructions, especially since no other employee had been written-up for similar alleged wrongdoing. Ex. 1 ¶ 11. Similarly, the written reprimand issued in July 2006 is suspicious in that no other employee was interrogated regarding information about Mr. Doheny, and Ms. Williams had done nothing wrong. Ex. 1 ¶¶ 16-18. These questionable circumstances, when added to the close timing between protected activity and reprimand, would provide sufficient basis for a reasonable jury to reject Defendant's explanations as pretext.

The five-day suspension is even more suspicious, for there is no indication that Defendant had ever before issued this type of serious punishment for alleged mis-handling of a single case file. Moreover, as Ms. Williams makes clear, she had not erred in her handling of the *Blumner* case, but rather continued to discharge her efforts in the same manner that had been successful (and highly praised) for many years prior to her protected EEO activity. Ex. 1 ¶ 20.

*See George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005) (prior performance evaluation and statements from other employees provided sufficient evidence to survive summary judgment in termination case: "a reasonable jury could have concluded that the employee did not suffer from performance and conduct deficiencies and that the employer's explanation was not worthy of credence"). Defendant's unfair and unprecedented suspension occurred within weeks of Ms. Williams's first formal EEO complaint; this too adds strong support for a finding of pretext.

Pretext evidence also undermines PAB's downgrading of Plaintiff's position. As explained by the PAB's long-time General Counsel (now retired), Ms. Williams's position description was set at grade 14/15, and Ms. Williams consistently performed at the grade 15 level held by other employees (who had not engaged in EEO activity). Ex. 2 ¶¶ 10-11. But within approximately one year from the General Counsel's retirement, and within a few months from Ms. Williams's third formal EEO complaint, Defendant summarily downgraded Ms. Williams's position to the grade 13/14 level. Ex. 1 ¶ 27. This action capped Ms. Williams's career path at the grade 14 level, permanently foreclosing promotion opportunity to the grade 15 level in that job. Management's downgrade action with respect to Ms. Williams's position is not consistent with its preservation of grade 15 level compensation for other employees in the same job category. Ex.1 ¶ 8. Management's inconsistency in setting grade levels, and the abrupt change from the considered views of the long-time General Counsel, support a finding of pretext, especially when added to the highly-suspicious timing.

For all these reasons, the Court must deny Defendant's motion to dismiss Plaintiff's retaliation claim.

E.    **Plaintiff Has Produced Facts Supporting
A Claim Of Hostile Work Environment.**

In the weeks and months immediately after PAB's long-time General Counsel (Ms.

Reece) retired and Ms. Williams initiated EEO activity, Ms. Williams's work experience

transformed from positive and professional to negative and hostile.  The previous General

Counsel (who is African-American) praised Ms. Williams's work quality and independent

judgment (Ex. 2 ¶¶ 6-7); but Ms. Don and Ms. Wagner (both Caucasian) aggressively attacked

Ms. Williams's competence and trumped-up every possible mis-step.  Ms. Reece never

reprimanded or disciplined Ms. Williams; but Ms. Don reprimanded Ms. Williams and Ms.

Wagner reprimanded her and suspended her for five days.  Ms. Reece fairly applied the agency's

rules on taking leave; but Ms. Wagner announced that Ms. Williams could take no leave

regardless of the reason.  Ex. 1 ¶ 19.  Ms. Reece observed that Ms. Williams performed grade 15

level work on par with grade 15 Caucasian employees and urged the PAB to raise her

compensation accordingly (Ex. 2 ¶¶ 7-8); but Ms. Don refused to support this promotion, and

management went so far as downgrading Ms. Williams's position description, permanently

foreclosing her opportunity to reach the grade 15 level in her job. Ex. 1 ¶ 27.  Management's

persistent and pervasive intimidation, ridicule, and abuse of Ms. Williams has created a hostile

work environment in violation of Title VII.

The D.C. Circuit has confirmed that creation of a hostile work environment can constitute

unlawful retaliation under Title VII. *See Singletary v. District of Columbia*, 351 F.3d 519, 526

(D.C. Cir. 2003).  Here, the facts show that PAB created a hostile work environment based on

retaliation, as well as race, sex, and age.

To prevail on a claim of hostile work environment, a plaintiff must show "discriminatory intimidation, ridicule, and insult" of such "severity or pervasiveness [as] to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). To determine whether a work environment is hostile, the Court looks "'at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris*, 510 U.S. at 23).

In *Singletary*, *supra*, the employee was required to work in a poorly lit, unheated, and unventilated storage room full of brooms and boxes of debris. The D.C. Circuit held that this action could support a claim for hostile work environment. *Singletary*, 351 F.3d at 528-29 (rejecting employer's argument for summary adjudication on appeal). Ms. Williams's work environment, however, was degraded more severely than the workspace change challenged in *Singletary*. While employer hostility may surely be exhibited through isolation and unpleasant office space, as in *Singletary*, Ms. Williams has endured a more aggressive variety of hostility, in virtually all aspects of her work. The following examples are emblematic of Ms. Williams' environment:

- Following many years of supervisory praise and a spotless employment record, Ms. Williams suddenly experienced repeated baseless attacks on her job performance and conduct, including a written reprimand from Ms. Don, a written reprimand from Ms. Wagner, and a five-day suspension imposed by Ms. Wagner. Ms. Williams vehemently contests the validity of these trumped-up disciplinary actions. Ex. 1 ¶¶ 11, 18, 22.

- Despite years of successful independent work responsibility, Ms. Williams suddenly faced repeated unwarranted intrusion into her work methods. Ex. 1 ¶¶ 23, 26.

41

- Ms. Wagner's hostility included physically confronting and loudly threatening Ms. Williams in her office on June 30, 2006.  Ex. 1 ¶ 24.

- Ms. Wagner has regularly disparaged Ms. Williams's job performance in discussions with co-workers.  Ex. 1 ¶ 23.

- Ms. Wagner has routinely questioned Ms. Williams's co-workers about her, and even questioned others about her whereabouts when she had simply gone to the restroom.  Ex. 1 ¶ 23.

- Ms. Wagner announced that Ms. Williams was prohibited from taking any leave for any reason during the *Blumner* investigation, a blanket denial of leave rights that appears unprecedented in the entire PAB.  Ex. 1 ¶ 19.

- The Agency downgraded Ms. Williams's position from the grade 14/15 level to the grade 13/14 level, capping her future career opportunities below the grade level permitted for other attorneys at the Agency.  Ex. 1 ¶ 27.

These facts demonstrate that PAB, through its pervasive and severe acts of repeated baseless discipline, intimidation, ridicule, abuse, and interrogation, has created a hostile work environment that unreasonably interferes with Ms. Williams's work performance.  Thus, these factual allegations raise a valid claim pursuant to *Faragher v. City of Boca Raton, supra*, 524 U.S. at 787-88.  These facts presented are plausible, and summary adjudication is not appropriate.  *See, e.g.*, *Singletary*, 351 F.3d at 528-29 (rejecting employer's argument for summary adjudication on hostile work environment claim).[5]

The hostile work environment claim is supported by the close temporal proximity between plaintiff's protected EEO complaint activity and defendant's onslaught of unfair treatment.  Indeed, the pattern of abusive treatment toward Ms. Williams began almost immediately after her email raising an EEO complaint in February 2006.  Defendant's Brief, Ex.

---

[5] As explained in previous sections of this brief, Ms. Williams has presented facts specifically and vigorously contesting PAB's alleged rationale for its actions in each of these instances.  *See generally*, Ex. 1.

1, Tab D, p. 299.  The D.C. Circuit has repeatedly observed that a close connection in time

between protected activity and adverse action establishes an inference of retaliatory animus.

*See, e.g., Singletary*, 351 F.3d at 525; *Holcomb*, 433 F.3d at 903.  The inference of retaliation is

very strong on the facts presented here.

The hostile work environment created by PAB is the type of employment action that

would deter employees from pursuing protected EEO activity, thus bringing this case within the

ambit of *Burlington Northern v. White*, 126 S.Ct. 2405 (2006).  In *Burlington Northern*, the

Supreme Court explained that Title VII's anti-retaliation provision encompasses employer

actions that are harmful to the point that they "might have dissuaded a reasonable worker from

making or supporting a charge of discrimination."  126 S.Ct. at  2415 (internal quotation marks

omitted).  The pattern of hostile employment actions against Ms. Williams has had the chilling

effect described in *Burlington Northern*; indeed, a co-worker has told Ms. Williams that she is

scared to even speak with her. Ex. 1 ¶ 28.   Pursuant to *Burlington Northern*, Ms. Williams's

claim of retaliatory hostile work environment is legally valid, and must be allowed to go

forward.[6]

Moreover, the facts support a finding of racial motivation for creation of the hostile work

environment.  The abrupt turn-around in treatment coincided with the retirement of Ms.

Williams's African American supervisor (Ms. Reece), who was replaced by a Caucasian acting

supervisor (Ms. Don) and a Caucasian permanent supervisor (Ms. Wagner).  Ms. Williams has

---

[6]Defendant avers that no discrimination complaint had ever been raised at PAB before
Ms. Williams pursued her EEO complaints.  Defendant's Brief at 6.  This could help explain the
fierceness of the Agency's reaction to Ms. Williams's exercise of protected rights.  After all, Ms.
Williams's EEO activity seemed to tarnish the PAB's spotless EEO record.  Put another way, in
light of the hostile reception given to Ms. Williams's EEO complaints, there is little wonder that
no one else at PAB has been willing to invoke Title VII rights.

observed that no Caucasian employee within PAB has ever been subjected to this type of hostility.  Ex. 1 ¶ 23.[7]

Defendant asks the Court to grant judgment against Plaintiff's hostile work environment claims without allowing Plaintiff the benefit of basic discovery.  However, the facts presented demonstrate that the claim of hostile work environment is plausible.  Therefore, the Court must deny Defendant's motion, and permit Plaintiff the opportunity to perform basic discovery to uncover further support for her claims.

## V.      CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss, or in the alternative, for summary judgment, must be denied.

Respectfully submitted,


_____/s/_____
Michael Kator (366936)
Adrienne M. Tranel (502502)
KATOR, PARKS & WEISER, P.L.L.C.
1200 18th Street, N.W., Tenth Floor
Washington, D.C. 20036
Phone: (202) 898-4800
Fax: (202) 289-1389

March 24, 2008                          Attorneys for Plaintiff

_____

[7]Similarly, Plaintiff's claims of sex and age discrimination are supported by the fact that no male employee, nor any younger employee, has been subjected to this pattern of adverse treatment.  Ex. 1 ¶ 23.

AFFIDAVIT OF DIANE R. WILLIAMS

Before me, the undersigned authority, on this day personally appeared DIANE R. WILLIAMS, who, being by me duly sworn upon her oath, deposed as follows:

1.      My name is Diane R. Williams. I am the plaintiff in Case No. JDB-07-1452, in the United States District Court for the District of Columbia. I am an African-American female over 40 years of age.

2.      I have been employed in the U.S. Government Accountability Office's Personnel Appeals Board ("PAB") in the Office of the General Counsel as a Senior Trial Attorney since February 1999. When I started my employment with the PAB, the Senior Trial Attorney position was listed as a Grade 14/15 position, with promotion potential to the Grade 15 pay level. During the entire time I have been employed by the PAB, I have been paid at the Grade 14 ("GS-14") pay level. As a Senior Trial Attorney, I have generally been provided great independence to conduct the investigations of cases assigned to me in the manner that I feel is most appropriate, effective, and efficient.

3.      Prior to January 2006, no PAB supervisor had subjected me to any disciplinary action, or any proposed disciplinary action, of any kind.

4.      During the time period February 1999 to December 2005, Janice M. Reece served as my direct supervisor. Ms. Reece is an African-American female. Ms. Reece, a former Senior Trial Attorney with the PAB, was employed as the PAB General Counsel during the time that she served as my direct supervisor.

5.      Immediately prior to the time that my employment with the PAB began, PAB employed two Senior Trial Attorneys. Both of these employees, Ms. Reece and Ms. Janice Willis, were employed at the Grade 15 pay level. Based on information and belief, the job duties and responsibilities performed by Ms. Reece and Ms. Willis as GS-15 Senior Trial Attorneys were identical to those that I have performed at the Board since at least 2002.

6.      In September 2003, Ms. Reece recommended that I be promoted to a Grade 15. Ms. Reece submitted a written recommendation to the PAB Board members regarding my proposed promotion. Among the PAB Board members and officials to whom Ms. Reece sent her written recommendation was PAB Chair Anne Wagner. Ms. Reece's recommendation was rejected, and I was not promoted to a Grade 15.

7.      Ms. Reece retired from her position as PAB General Counsel in December 2005. I was apparently not considered to serve as the Acting General Counsel, even though I was the best qualified PAB employee to serve in that position. Instead, Beth Don, PAB Executive Director, was appointed to serve as PAB Acting General Counsel. Ms. Don, who continued to serve as PAB Executive Director, was my direct supervisor during the time that she served as Acting General Counsel. After Ms. Don assumed the role of Acting PAB General Counsel, Ms. Don directed me not to report to her any information that might have the impact of causing her to

have to recuse herself from matters pending before the PAB Board (which adjudicates matters filed before the PAB).

8.      On January 20, 2006, I sent an electronic message to Ms. Don, then my direct supervisor, seeking a promotion to a Grade 15 pay level. A copy of this message was also sent to the two PAB members, including Michael Doheny, PAB Chair. My message stated, "I am requesting a promotion to GS-15 to compensate me for the quality and the quantity of my work performance." I referenced in my statement to Ms. Don the basis for a promotion that had been previously submitted by Ms. Reece. I believed that the level of responsibility and skill required of my position, when compared to other PAB employees, warranted a promotion to Grade 15. The level of independence and trust placed in my work supported my promotion to Grade 15, since I was already doing Grade 15 level work with excellent performance. In particular, I believed that the responsibility and skill required for my position was superior to the responsibility and skill required for the positions of Beth Don (PAB Executive Director), Susan Inzeo (PAB Solicitor), and Gail Gerebenics (Director of Equal Employment Opportunity (EEO) Oversight for the PAB), all of whom are employed at the Grade 15 pay level, and all of whom are Caucasian females. It is my belief that Susan Inzeo and Gail Gerebenics are younger than I am and have not engaged in protected EEO activity.

9.      On January 24, 2006, Ms. Don rejected my request for promotion to a Grade 15.

10.     On February 8, 2006, I sent an electronic message to Ms. Don, stating that I wished to file an EEO complaint regarding the PAB's discriminatory pay policies and practices. Under my understanding of the rules for PAB employees to file EEO complaints at the Government Accountability Office, I had to initiate my complaint by informing the PAB Executive Director or General Counsel regarding my complaint. Given that Ms. Don was serving at that time in both capacities, I initiated my complaint by notifying Ms. Don. At that time, I also notified Susan Inzeo (PAB Solicitor), Paul Coran (PAB Vice Chair), and Michael Doheny (PAB Chair) about my intent to file a complaint.

11.     Shortly thereafter, on February 15, 2006, I was issued a written reprimand by Ms. Don. Even though I had performed my job in the same fashion as I had since beginning my employment as a Senior Trial Attorney, and even though I was acting pursuant to Ms. Don's explicit directions to me regarding what information to withhold from her, Ms. Don accused me of failing to adequately perform my job duties. In her written reprimand, Ms. Don criticized my job performance and directed me to assemble information for a meeting taking place the very next day. This written reprimand could be used to support a future disciplinary action against me, whether regarding this situation or any other allegations against me. Based on information and belief, no Caucasian attorney at the PAB has been subject to a written reprimand based on facts similar to this situation, no younger employee at the PAB has been subject to a written reprimand based on facts similar to this situation, no PAB employee who had never taken protected EEO activity has been subject to a written reprimand based on facts similar to this situation, and I know of no other PAB employees who have been subjected to any written reprimand during my entire tenure with the Board. Upon information and belief, no male employee of the PAB has been subjected to a written reprimand based on facts similar to this

situation.  On February 17, 2006, I informed Ms. Don that I believed that the written reprimand was a retaliatory action.

12.    When Ms. Reece retired from her position as PAB General Counsel in December 2005, it was clear to me that the position would be awarded to Anne Wagner.  Ms. Wagner had served as a PAB Board member, and was the Chair of the PAB Board from about 2003 to 2005.  I strongly believed that Ms. Wagner would receive the PAB General Counsel position because Ms. Wagner had recently been serving as the Chair of the PAB, her term was extended until shortly before Ms. Reece retired, the General Counsel vacancy announcement was opened for a very short period around the holidays (when Board officials knew that I was scheduled to be off work), and it appeared that the General Counsel vacancy announcement was tailored to fit Ms. Wagner's qualifications.  In March 2006, PAB employees were notified that Ms. Wagner had been selected as the PAB General Counsel.  In April 2006, Ms. Wagner was appointed PAB General Counsel, and became my direct supervisor.  Ms. Wagner is a Caucasian female who is younger than I am.  Upon information and belief, she has not engaged in protected EEO activity.

13.    When Ms. Wagner became PAB General Counsel, I met with her to discuss my request to be promoted to a Grade 15.  I explained to Ms. Wagner what had happened with my past requests to be promoted, and I urged her to promote me to a Grade 15 at that time.  I stated to Ms. Wagner that I believed that the level of responsibility and skill required of my position, when compared to the responsibility and skill of other PAB employees who were at Grade 15, warranted a promotion to Grade 15.  Ms. Wagner denied my request to be promoted, and I was left at the Grade 14 pay level.

14.    On May 17, 2006, I filed a formal EEO complaint.  I complained of discrimination related to the PAB's denial of my requests for promotion to the Grade 15 pay level.  I also complained of discrimination and retaliation related to the February 2006 written reprimand issued by Ms. Don.

15.    Ms. Wagner became aware of my EEO complaint on or about May 17, 2006, when I personally delivered a copy of my complaint to her.  Ms. Wagner gave a copy of my EEO complaint to Ms. Don.

16.    In June 2006, Ms. Wagner sent me an electronic message seeking information that I had regarding PAB Chair Michael Doheny's relationship with GRA, Inc., a contractor with GAO.  I had no information that was not then known to Ms. Wagner regarding Mr. Doheny and his relationship with GRA, Inc., and I responded in June 2006 by telling her that.  Mr. Doheny's association with GRA, Inc. was noted on GRA, Inc.'s website, and I stated to Ms. Wagner that she could see the information on the website.

17.    During a meeting with Ms. Wagner in June/July 2006, she insisted that I provide additional information about Mr. Doheny, and which GAO employees might have information about Mr. Doheny's association with GRA, Inc.  I stated to Ms. Wagner that, at that time, I did not have with me additional information about Mr. Doheny's association, or information regarding who else might know about Mr. Doheny beyond what was on the website.  Based on

information and belief, no Caucasian attorney, no male employee, no younger employee, and no employee who had never engaged in protected EEO activity at the PAB was asked for such detailed information related to Mr. Doheny, or knowledge about other employees who had such information. Mr. Doheny's five-year term as Chair of the PAB expired in or about September 2007, after it had been extended by six months.

18.     In July 2006, Ms. Wagner issued a written reprimand to me. Ms. Wagner's written reprimand stated that it was based on my refusal to comply with her instructions to provide her with information regarding which GAO employees knew of Mr. Doheny's association with GRA, Inc. Based on information and belief, no Caucasian attorney, no male employee, no younger employee, and no employee who had never engaged in protected EEO activity at the PAB was subject to disciplinary action of any kind in connection with information related to Mr. Doheny. Upon information and belief, no disciplinary action was taken against Mr. Doheny, a Caucasian male with no prior EEO activity.

19.     In June 2006, I was forced to take leave for three days because of a death of a family member. While at home, Ms. Wagner sent an e-mail to my personal e-mail address. I had not previously given Ms. Wagner or any other then current employees of the PAB my personal e-mail address. Ms. Wagner stated that she would not approve any leave requests by me, for any reason, until the *Blumner* investigation was completed. Ms. Wagner later repeated this statement in a personal meeting with me. At that time, I had accumulated approximately 1175 hours of sick leave and 329 hours of annual leave. Based on information and belief, no Caucasian attorney, no younger employee, no male employee, and no employee who had never engaged in protected EEO activity at the PAB has ever been informed that future leave requests would be denied, and no Caucasian attorney, no younger employee, no male employee, and no employee who had never engaged in protected EEO activity was told at that time that they would not be able to use leave until the *Blumner* investigation was complete. When I returned to work, I learned that Ms. Wagner had scheduled for June 30, 2006 an interview of a key witness for me to conduct in one of the EEO complaints that I was currently investigating (the *Blumner* investigation). Prior to this time, I had been conducting the *Blumner* investigation without detailed supervision.

20.     Based upon my experience and knowledge in the field, and according to the regulations of the U.S. Equal Employment Opportunity Commission, I had determined to handle the investigation in the way in which I had been successful in my prior investigations. At that time, I had over 13 years successfully investigating EEO and other job-related complaints. Upon information and belief, Ms. Wagner at that time had no experience investigating EEO complaints. Therefore, I disagreed with Ms. Wagner's attempt to alter the manner of my work in the *Blumner* investigation, and I explained the basis for my disagreement. I took appropriate action to notify the key witness that the interview that was scheduled by Ms. Wagner would not take place on June 30, 2006, and that the investigation would proceed as initially planned and agreed with the Library of Congress. Indeed, officials at the Library of Congress and I agreed to handle the *Blumner* investigation by way of written interrogatories, as opposed to oral interviews, and I encountered significant difficulties in trying to arrange and conduct oral interviews with Library of Congress officials, typing interview notes, and obtaining their

agreement as to the content of their statements to be included in the *Blumner* report of investigation. Ms. Wagner then directed me to proceed with written interrogatories in completing the investigation.

21.    Also, when I returned to work, I learned that Ms. Wagner had scheduled another interview for the afternoon of June 30, 2006 with a GAO employee regarding a complaint that the employee had recently filed against GAO. On June 30, 2006, I did conduct the scheduled interview with the complaining GAO employee.

22.    On July 5, 2006, Ms. Wagner sent me a notice informing me that I was being disciplined with a five-day suspension because of my work on the *Blumner* investigation. Ms. Wagner's proposed suspension action was approved by Mr. Doheny. I served the five-day suspension in August 2006, just prior to completing as much work as I could on the *Blumner* investigation. Based on information and belief, no Caucasian attorney, and no younger employee, no male employee, and no employee of any description who had never engaged in protected EEO activity at the PAB has been subjected to disciplinary action of any kind, in situations similar to this or in any situation.

23.    Ms. Wagner's treatment of me became even worse. She regularly disparaged my job performance in discussions with my co-workers. She regularly questioned my co-workers about my activities, and even requested information on several occasions regarding my whereabouts when I had simply gone to the restroom. Ms. Wagner started interfering more with my job responsibilities, making my job more onerous. In short, Ms. Wagner created a hostile work environment after learning that I had filed an EEO complaint. Ms. Wagner did not take similar actions with regard to other PAB employees, including any Caucasian employees, any younger employees, any male employees, or any employees who had never engaged in protected EEO activity at the PAB.

24.    After Ms. Wagner learned that I had not gone to the Library of Congress interview on June 30, 2006, Ms. Wagner physically confronted me in a hostile and threatening manner. At that time, Ms. Wagner stormed into my office and, with a raised voice, stood alarmingly and threateningly close to me, and criticized my work performance.

25.    On at least one other occasion, I mentioned to Ms. Wagner herself my belief that she was creating a hostile work environment. I informed her that her actions were making it more difficult for me to take care of my job duties, and that her comments and actions were having a negative impact not only on me, but also on my co-workers, who were asked about my whereabouts and encouraged to monitor my activities.

26.    In August 2006, I filed a second formal EEO complaint, complaining of the discriminatory and retaliatory hostile work environment created by Ms. Wagner. With this second EEO complaint, I sought to amend my first EEO complaint to include these issues. I filed another amendment to my formal EEO complaint on September 1, 2006 related to the continuing hostile work environment. During my discussions with Ms. Don and Ms. Wagner regarding my complaints, and in my discussions with the EEO investigator assigned to my EEO

complaint, as amended, I complained of discrimination on the bases of race, sex, and age, stereotypes related to race, sex, and age, and retaliation related to the following matters: the denial of my requests to be promoted to the Grade 15 pay level; the written reprimand issued to me by Ms. Don in February 2006; Ms. Wagner's coercive interrogation of me regarding Mr. Doheny; the written reprimand issued to me by Ms. Wagner in July 2006; Ms. Wagner's actions in interfering with my work in the *Blumner* investigation; the five-day suspension action proposed by Ms. Wagner and issued by Mr. Doheny; Ms. Wagner's actions disparaging my job performance in discussions with my co-workers; Ms. Wagner's questioning my co-workers about my activities and my whereabouts; Ms. Wagner's actions of physically confronting me in a coercive and threatening manner; creating a hostile work environment; and interfering with my access to and use of a discrimination complaint process.

27.     In or about January 2007, the position description for my position was altered by the PAB. In the new position description, the Senior Trial Attorney position is listed as a Grade 13/14 position. It had previously been a Grade 14/15 position, and (as stated above) my predecessors in the position were paid at the Grade 15 level. There was no significant change in the job duties for the Senior Trial Attorney position in the revised January 2007 position description – in fact, the minor changes that were made to the job duties made my position more difficult. On information and belief, the Board's action in altering the grade levels related to my position was directed by Ms. Don and Ms. Wagner. The PAB's action of changing the grade level of the Senior Trial Attorney position in or about January 2007 had the effect of denying me the opportunity ever to be promoted and paid at the Grade 15 level. This decision to alter the grade level of the Senior Trial Attorney position was made by the PAB after I had been denied requested promotions to Grade 15 several times, and after I had filed three formal EEO complaints. I believe that the decision to alter the grade level of the Senior Trial Attorney position in or about January 2007 was made because of discrimination and retaliation against me.

28.     Based on the retaliation and the hostile work environment that I faced after filing EEO complaints, no reasonable Board employee would engage in protected EEO activity and feel safe from significant reprisal. The terms and conditions of my employment with the Board were altered dramatically after I first notified Ms. Don that I was filing an EEO complaint. Since that time, I have been subjected to being written up, reprimanded, interrogated, humiliated, and suspended, all based on trumped up charges. No other Board employee has been or would have been subjected to these actions based on the same types of issues and circumstances. Another Board employee has informed me that, because of the retaliation by the Board against me, she is nervous to be seen speaking with me. With their actions against me based on my protected EEO activity, Ms. Don and Ms. Wagner have intimidated all of the Board's employees.

29.     I, Diane R. Williams, declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_Diane R. Williams_
DIANE R. WILLIAMS, Affiant

SUBSCRIBED AND SWORN TO before me on this 24th day of March 2008, to witness which my hand and seal of office.

_Ramona C Coke_
Notary Public

My Commission
expires
1/2/2012

## AFFIDAVIT OF JANICE M. REECE

I, the undersigned, hereby declare and state the following:

1.    My name is Janice M. Reece. I am an African-American female over 40 years in age.

2.    I was employed by the Government Accountability Office's Personnel Appeals Board ("PAB" or "Board") from March 21, 1993 until December 3, 2005. From March 21, 1993 to January 7, 1995, I held the position of GS-14 Senior Trial Attorney in the PAB General Counsel's Office (PAB/OGC). I was promoted to GS-15 Senior Trial Attorney on January 8, 1995. From October 1, 1997 until February 27, 1999, I served as Acting General Counsel for the PAB. On February 28, 1999, I became PAB General Counsel (a promotion to a Senior Level position), and I held that position until December 3, 2005, when I retired from government service. I was Diane Williams's direct supervisor from February 1999 until December 2005.

2.    For all times relevant to this statement, the Board's immediate staff was comprised of the following positions: Executive Director, Director of Oversight, Solicitor, Staff Attorney (a position added in or about 2001), and Clerk of the Board. The PAB/OGC was comprised of the following positions: General Counsel, two Senior Trial Attorneys, Paralegal Specialist, and Secretary/Legal Information Assistant.

3.    During my tenure with the PAB, two persons held the position of PAB General Counsel, Jessie James, Jr. and me. Mr. James is an African-American male. The General Counsel supervised the work performed by all PAB/OGC staff members. During my tenure at the GAO, most of the PAB/OGC staff members were African-American. The Board's immediate staff was headed by a White female (Beth Don, the Board's Executive Director), and was comprised primarily of White females. For about 10 of the approximately 13 years that I was employed by the Board, there were no African-American attorneys on the Board's immediate staff.

4.    Based on information and belief, Susan Inzeo, the PAB Solicitor, was promoted to a GS-15 pay grade level during my employment with the PAB.

5.    When I became Acting General Counsel, I was the only attorney permanently assigned to the PAB/OGC office. In late December 1998, the Board authorized me to hire a full-time attorney in a temporary (not to exceed 1 year) position. After receiving a number of applications for the competitively advertised position, I selected Diane Williams in February 1999. She was hired at the GS-14 grade level. At the time Ms. Williams was hired, the PAB Board members were Harriet Davidson, Jeffrey Gulin, and Chair Michael Wolf.

6.    From the beginning, Ms. Williams showed a penchant for the work of the office. She used her prior expertise in employment law to quickly grasp the issues presented in and the laws and regulations applicable to the complaints assigned to her for investigation. She became expert in GAO's unique nomenclature and processes, which knowledge she used to identify and obtain documents and other information relevant to the issues of a charge. Although I reviewed her work, she worked independently to develop preliminary case strategies. She gained the trust and respect of complainants, readily shared information with other PAB/OGC staff, and established a professional working relationship with GAO attorneys. Because of her hard work

and dedication, I recommended that she become a permanent employee in my office. Ms. Williams was made a permanent PAB employee in 2000.

7.     After she became a permanent member of my staff, Ms. Williams continued to demonstrate a high level of competency in increasingly more complex assignments, particularly in case investigations. For example, when GAO drastically changed its rules and procedures in the area of human capital, Ms. Williams met the challenge by thoroughly researching the issues and internal GAO procedures. This preparation proved to be a valuable tool for the entire office in obtaining relevant information from GAO that we might not have otherwise obtained through more general requests. As a result of Ms. Williams's hard work on case investigations, I was able to offer to represent employees in a number of her cases.

8.     In September 2003, I requested that Ms. Williams be promoted to the GS-15 pay level. I based my recommendation on Ms. Williams's dedication and the continued high quality of her work. The Board denied my requested promotion of Ms. Williams. Anne Wagner was then serving as Chair of the Board.

9.     I hired another Senior Trial Attorney, a White female, in or about 2000. I noted that the Board treated the White female attorney much more favorably than they treated Ms. Williams. For example, the Board requested that the White female attorney attend a Board meeting in order to be formally introduced to the Board members. Ms. Williams had not been asked to be formally introduced to the Board. The Board's immediate staff also invited the White female attorney to share in their water club and, on occasion, lunches with Board members. However, no such invitation was extended to Ms. Williams (or any other African-American employee in the PAB/OGC).

10.     Before my retirement from the Board, I was asked by the Board's Executive Director to update the position descriptions for the positions allotted to the PAB/OGC, including the Senior Trial Attorney position, in preparation for the development of a performance appraisal system for the all Board employees. At that time (and since I began my employment with the Board), there were two pay grade levels for the Senior Trial Attorney – GS-14 and GS-15 – and each pay grade had a separate position description. Upon review, however, the language of each position description was identical. Therefore, I undertook to redraft the position descriptions in order to differentiate between the GS-14 and GS-15 pay levels for this position, focusing on the levels of expertise, competence, knowledge, and supervision for each pay grade level. After completing my work to update the position descriptions for the Senior Trial Attorney position, it was clear to me based on my best recollection that Ms. Williams, at the time, was performing or had demonstrated her ability to perform all the factors I included as commensurate with a GS-15 Senior Trial Attorney position. It was not my assignment, intent, or plan to revise the pay grade levels applicable to that position and I was not involved in any discussions, meetings, decisions to revise the pay grade levels for the Senior Trial Attorney position. The revisions I made to the Senior Trial Attorney position descriptions were not finalized or made effective before I retired from the Board.

11.     Ms. Williams should have been promoted to a GS-15 pay level based on the level of responsibility and skill required of her position, and based on her consistently excellent level of

performance.  The Board's denial of her promotion in 2003 was made even more questionable when comparing the work performed by Ms. Williams and the work performed by the GS-15 employees within the Board's immediate staff (all of whom were White females).  There was no question that the work performed by the attorneys of the PAB/OGC far exceeded the work performed by the Board's immediate staff.  The work performed by PAB/OGC attorneys in the investigation, resolution, and litigation of charges filed with the office was considerable.  These investigations involved the identification of the legal issues presented by each case (also called a charge) filed with the office, obtaining documentary information pertinent to those issues, taking the testimony (through oral interviews) of persons with knowledge of the facts alleged in the charge, analyzing the facts and pertinent legal precedent, and preparing a report of investigation that contained analysis of whether reasonable grounds existed to believe that a prohibited personnel practice had occurred.  When requested, Ms. Williams and other PAB/OGC attorneys negotiated settlements on behalf of complainants (also called charging parties), which often took considerable skill.  Litigation involved the preparation of all necessary pleadings and briefs, conducting depositions, and the examination of witnesses during the hearing.  Because of the amount and quality of the work Ms. Williams and other PAB/OGC attorneys performed, our office received the trust of and accolades from complainants, employee groups, private counsel, and GAO counsel.

12.     However, despite the accomplishments of Ms. Williams and the PAB/OGC, the Board consistently ignored and failed to recognize the hard work and dedication of the PAB/OGC attorney staff.  At the same time, the Board's immediate attorney staff was rewarded and recognized for its limited work productivity.  I believe that Ms. Williams, and the other African-American PAB/OGC staff, were treated less favorably by the Board based on their race.

I, Janice M. Reece, declare under the penalty of perjury that the foregoing is true and correct.

Date:   March 20, 2008

JANICE M. REECE, Affiant

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                                )
**DIANE R. WILLIAMS,**                                          )
                                                                )
     **Plaintiff,**                                         )
                                                                )
     **v.**                                                )     **Civil Action No. JDB-07-1452**
                                                                )
**DAVID M. WALKER,**                                            )
**Comptroller General of the United States**                    )
**Government Accountability Office**                             )
                                                                )
     **Defendant.**                                         )
_____)

## PLAINTIFF'S STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

Pursuant to Local Rule 7(h), Plaintiff Diane R. Williams hereby submits the following

statement of genuine issues of material fact. As an initial matter, however, Plaintiff notes for the

record that she has not had the opportunity to conduct discovery in this matter. Absent

discovery, Plaintiff cannot identify all material facts that may be in dispute. Where possible,

Plaintiff has marshaled those facts of which she is currently aware. Absent discovery, however,

Plaintiff is severely handicapped in responding to these contentions.

    1. Admit.

    2. Admit.

    3. Admit.

    4. Admit that Ms. Don states that no other PAB employee other than Ms. Williams has

ever filed a complaint of discrimination. Absent discovery, Plaintiff cannot state whether this

assertion is accurate.

    5. Admit.

6.  Admit.  Ms. Reece served as a GS-14 Senior Trial Attorney from 1993 to 1995 and was promoted to a GS-15 Senior Trial Attorney on January 8, 1995.  Ex. 2 ¶ 2.  Ms. Reece was promoted to a Senior Level position when she became General Counsel in 1999.  *Id.*

7.  Admit.  Ms. Reece recommended Ms. Williams for promotion because Ms. Williams was performing at the GS-15 level.  Ex. 2 ¶¶ 8, 10-11.

8.  Admit that Ms. Don states that Ms. Alexander worked as a GS-14 Senior Trial Attorney at the PAB/OGC, reporting to Ms. Reece, from 2000 until June 2005.  Absent discovery, Plaintiff cannot state whether this assertion is accurate.

9.  Admit that the Board did not grant a promotion to either Plaintiff or Ms. Alexander.  Absent discovery, Plaintiff cannot state whether the remaining assertions are accurate.

10.  Admit that Ms. Reece did not renew her request during the remaining two and one-half years of her tenure with the PAB/OGC.  Absent discovery, Plaintiff cannot state whether the remaining assertions are accurate.

11.  Admit.

12.  Admit.

13.  Admit.

14.  Admit.

15.  Admit that Ms. Williams sent an e-mail asking for a promotion to GS-15.  Absent discovery, Plaintiff cannot state whether these assertions are accurate.  Ms. Don's response operated as a denial of Ms. Williams' request for promotion to a Grade 15 level.  Ex. 1 ¶¶ 8-9.

16.  Admit.

17.  Deny that Ms. Don did not deny Ms. Williams' request.  Ms. Don's decision not to grant Ms. Williams' request for a promotion operated as a denial of the promotion.  Ex. 1 ¶¶ 8, 9. Absent discovery, Plaintiff cannot state whether these assertions are accurate.

18.  Admit that Ms. Williams' e-mail began with this sentence.  Ms. Williams further wrote, "I am alleging discrimination on the bases of race, gender, and age.  Meanwhile, I am requesting that a desk audit be conducted of all the positions held by attorneys of the PAB and the PAB/OGC.  Thank you for your prompt attention to this matter."  Defendant's Brief Ex. 1, Tab B, p. 299.

19.  Absent discovery, Plaintiff cannot state whether these assertions are accurate.

20.  Deny that Ms. Williams had knowledge of the influx of the charges, but failed to alert Ms. Don as to the increase.  Ex. 1 ¶¶ 7, 11.

21.  Admit that Ms. Don's letter states that Ms. Don expected Ms. Williams to keep her timely and fully informed of all matters of importance to the office.  Defendant's Brief Ex. 3. Absent discovery, Plaintiff cannot state whether this assertion is accurate.

22.  Admit that Ms. Don's letter was not placed in Ms. Williams' official personnel file. Deny that the letter did not impact the terms and conditions of Ms. Williams' employment.  Even though Ms. Williams had performed her job in the same fashion as she had since beginning her employment as a Senior Trial Attorney, and even though she was acting pursuant to Ms. Don's explicit directions to her regarding what information to withhold from Ms. Don, Ms. Don accused Ms. Williams of failing to adequately perform her job duties.  Ex. 1 ¶ 11.  In her written reprimand, Ms. Don criticized Ms. Williams' job performance and directed Ms. Williams to assemble information for a meeting taking place the very next day.  *Id.*  This written reprimand could be used to support a future disciplinary action against Ms. Williams, whether regarding

this situation or any other allegations against her. *Id.* No Caucasian attorney at the PAB has been subject to a written reprimand based on facts similar to this situation, no younger employee at the PAB has been subject to a written reprimand based on facts similar to this situation, no other employee who has never engaged in protected EEO activity has been subject to a written reprimand based on facts similar to this situation, and Ms. Williams knows of no other PAB employees who have been subjected to any written reprimand during her entire tenure with the Board. *Id.* No male employee of the PAB has been subjected to a written reprimand based on facts similar to this situation. *Id.* On February 17, 2006, Ms. Williams informed Ms. Don that she believed that the written reprimand was a retaliatory action. *Id.*

23. Admit.

24. Deny. When Ms. Wagner became PAB General Counsel, Ms. Williams met with her to discuss Ms. Williams' request to be promoted to a Grade 15. Ex. 1 ¶ 13. Ms. Williams explained to Ms. Wagner what had happened with her past requests to be promoted, and she urged Ms. Wagner to promote her to a Grade 15 at that time. *Id.* Ms. Williams stated to Ms. Wagner that she believed that the level of responsibility and skill required of her position, when compared to the responsibility and skill of other PAB employees who were at Grade 15, warranted a promotion to Grade 15. *Id.* Ms. Wagner denied her request to be promoted, and Ms. Williams was left at the Grade 14 pay level. *Id.*

25. Absent discovery, Plaintiff cannot state whether this assertion is accurate. When Ms. Williams started her employment with the PAB, the Senior Trial Attorney position was listed as a Grade 14/15 position, with promotion potential to the Grade 15 pay level. Ex. 1 ¶ 2. During the entire time Ms. Williams has been employed by the PAB, she has been paid at the Grade 14 ("GS-14") pay level. *Id.*

26.  Absent discovery, Plaintiff cannot state whether this assertion is accurate. Immediately prior to the time that Ms. Williams' employment with the PAB began, PAB employed two Senior Trial Attorneys.  Ex. 1 ¶ 5.  Both of these employees, Ms. Reece and Ms. Janice Willis, were employed at the Grade 15 pay level.  *Id.*  The job duties and responsibilities performed by Ms. Reece and Ms. Willis as GS-15 Senior Trial Attorneys were identical to those that Ms. Williams has performed at the Board since at least 2002.  *Id.*

Furthermore, Ms. Susan Inzeo, the PAB Solicitor, was promoted to a GS-15 pay grade level during Ms. Reece's employment with the PAB.  Ex. 2 ¶ 4.  The responsibility and skill required for her position was superior to the responsibility and skill required for the positions of Beth Don (PAB Executive Director), Susan Inzeo (PAB Solicitor), and Gail Gerebenics (Director of Equal Employment Opportunity (EEO) Oversight for the PAB), all of whom are employed at the Grade 15 pay level, and all of whom are Caucasian females.  Ex. 1 ¶ 8.  Susan Inzeo and Gail Gerebenics are younger than Ms. Williams and they have not engaged in protected EEO activity.  *Id.*

27.  Absent discovery, Plaintiff cannot state whether these assertions are accurate.

28.  Admit.

29.  Admit.

30.  Admit that the cited documents speaks for itself.  Absent discovery, however, Plaintiff cannot state whether this assertion is accurate.

31.  Admit that the cited documents speaks for itself.  Absent discovery, however, Plaintiff cannot state whether this assertion is accurate.

32.  Absent discovery, Plaintiff cannot state whether this assertion is accurate.

33. Plaintiff submits that this is not a material "fact," but instead either an opinion or a legal conclusion. Absent discovery, Plaintiff cannot state whether this assertion is accurate.

34. Absent discovery, Plaintiff cannot state whether this assertion is accurate.

35. Absent discovery, Plaintiff cannot state whether these assertions are accurate.

36. Admit that the cited documents speaks for itself. As to the remaining statements, absent discovery, Plaintiff cannot state whether these assertions are accurate.

37. Admit. Plaintiff had a death in the family and accordingly was unable to schedule leave to be absent from the office on those days. Ex. 1 ¶ 19.

38. Absent discovery, Plaintiff cannot state whether these assertions are accurate.

39. Defendant omitted number 39.

40. Absent discovery, Plaintiff cannot state whether these assertions are accurate.

41. Absent discovery, Plaintiff cannot state whether this assertion is accurate. Plaintiff notes, however, that Mr. Grijalva stated that no interview had ever been scheduled. Defendant's Brief Ex. 1, Tab B, p. 76.

42. Admit.

43. Admit. Based upon Ms. Williams's experience and knowledge in the field, and according to the regulations of the U.S. Equal Employment Opportunity Commission, Ms. Williams had determined to handle the investigation in the way in which she had been successful in her prior investigations. Ex. 1 ¶ 20. At that time, Ms. Williams had over 13 years successfully investigating EEO and other job-related complaints. *Id.* Ms. Wagner at that time had no experience investigating EEO complaints. *Id.* Therefore, Ms. Williams disagreed with Ms. Wagner's attempt to alter the manner of her work in the *Blumner* investigation, and Ms. Williams explained the basis for her disagreement. *Id.* Ms. Williams took appropriate action to

notify the key witness that the interview that was scheduled by Ms. Wagner would not take place

on June 30, 2006, and that the investigation would proceed as initially planned and agreed with

the Library of Congress.  *Id.*  Indeed, officials at the Library of Congress and Ms. Williams

agreed to handle the *Blumner* investigation by way of written interrogatories, as opposed to oral

interviews, and Ms. Williams encountered significant difficulties in trying to arrange and

conduct oral interviews with Library of Congress officials, typing interview notes, and obtaining

their agreement as to the content of their statements to be included in the *Blumner* report of

investigation.  *Id.*  Ms. Wagner then directed Ms. Williams to proceed with written

interrogatories in completing the investigation.  *Id.*

     44.  Deny.  See response to number 43, *supra*.

     45.  Absent discovery, Plaintiff cannot state whether this assertion is accurate.  Plaintiff

admits that Ms. Wagner stated that the basis of the proposed suspension was the cancellation of

the interview.  Plaintiff contends that was not Ms. Wagner's true reason but instead was merely a

pretext to hide her discriminatory and retaliatory animus.  Ex. 1 ¶ 22.

     46.  Plaintiff has no knowledge of when Ms. Wagner may have learned of rumors

concerning the PAB Chair or what those rumors may have been.  Absent discovery, Plaintiff

cannot state whether this assertion is accurate.

     47.  Plaintiff submits that this is not a material "fact," but instead either an opinion or a

legal conclusion.

     48.  Plaintiff submits that this is not a material "fact," but instead either an opinion or a

legal conclusion.

     49.  Absent discovery, Plaintiff cannot state whether this assertion is accurate.

50. Admit that Ms. Wagner e-mailed Plaintiff on the date stated. Deny that Plaintiff did not respond. Plaintiff had no information that was not then known to Ms. Wagner regarding Mr. Doheny and his relationship with GRA, Inc., and Ms. Williams responded in June 2006 by telling Ms. Wagner that. Ex. 1 ¶ 16. Mr. Doheny's association with GRA, Inc. was noted on GRA, Inc.'s website, and Ms. Williams stated to Ms. Wagner that she could see the information on the website. *Id.*

51. Absent discovery, Plaintiff cannot state whether this assertion is accurate.

52. Deny. During a meeting with Ms. Wagner in June/July 2006, she insisted that Ms. Williams provide additional information about Mr. Doheny, and which GAO employees might have information about Mr. Doheny's association with GRA, Inc. Ex. 1 ¶ 17. Ms. Williams stated to Ms. Wagner that, at that time, she did not have with her additional information about Mr. Doheny's association, or information regarding who else might know about Mr. Doheny beyond what was on the website. *Id.* No Caucasian attorney, no male employee, no younger employee, and no employee who had never engaged in protected EEO activity at the PAB was asked for such detailed information related to Mr. Doheny, or knowledge about other employees who had such information. *Id.*

53. Absent discovery, Plaintiff cannot state whether this assertion is accurate. However, Plaintiff asserts that Ms. Wagner regularly disparaged her job performance in discussions with her co-workers. Ex. 1 ¶ 23.

54. Deny. See responses to numbers 50 and 52 above. Absent discovery, Plaintiff cannot state whether these assertions are accurate.

55. Plaintiff admits that Ms. Wagner stated that the basis of the proposed reprimand was her putative refusal to provide the information requested. Plaintiff contends that was not Ms.

Wagner's true reason but instead was merely a pretext to hide her discriminatory and retaliatory animus.  Ex. 1 ¶ 18.

56.  Admit.  With this second complaint, Plaintiff sought to amend her first EEO complaint to include these issues.  Ex. 1 ¶ 26.

57.  Admit that Plaintiff filed her third EEO complaint on September 1, 2006.  This complaint related to Ms. Williams's hostile work environment claim.  Ex. 1 ¶ 26.  During her discussions with Ms. Don and Ms. Wagner regarding her complaints, and in her discussions with the EEO investigator assigned to her EEO complaint, as amended, Ms. Williams discussed multiple factors contributing to her EEO complaint.  *Id.*

58.  Admit, except to the extent that the EEOC does not issue a "Notice of Right to Sue" in federal sector cases.

Respectfully submitted,


_____/s/_____
Michael Kator (366936)
Adrienne M. Tranel (502502)
KATOR, PARKS & WEISER, P.L.L.C.
1200 18th Street, N.W., Tenth Floor
Washington, D.C. 20036
Phone: (202) 898-4800
Fax: (202) 289-1389

March 24, 2008                          Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
**DIANE R. WILLIAMS,**                               )
                                                    )
         **Plaintiff,**                              )
                                                    )
         **v.**                                      )          **Civil Action No. JDB-07-1452**
                                                    )
**DAVID M. WALKER,**                                 )
**Comptroller General of the United States**         )
**Government Accountability Office**                 )
                                                    )
         **Defendant.**                              )
_____)

**O R D E R**

Upon consideration of Defendants' Motion to Dismiss or in the Alternative for Summary

Judgment, Plaintiff's Opposition, and the entire record herein, it is this _____ day of April, 2008,

hereby

ORDERED that Defendant's motion shall be and hereby is DENIED.

                                        _____
                                        John D. Bates, District Judge

Copies to:

Michael J. Kator
1200 18th Street, NW Suite 1000
Washington, DC 20036

Melanie L. Glickson
Assistant United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                              )
**DIANE R. WILLIAMS,**                        )
                                              )
    **Plaintiff,**                        )
                                              )
    **v.**                               )    **Civil Action No. JDB-07-1452**
                                              )
**DAVID M. WALKER,**                          )
**Comptroller General of the United States**  )
**Government Accountability Office**          )
                                              )
    **Defendant.**                        )
_____)

## <u>RULE 56(f) AFFIDAVIT</u>

Pursuant to Fed. R. Civ. P. 56(f), I, Michael J. Kator, do hereby depose and state as follows:

1.      I am the Counsel for Plaintiff in the above-captioned matter.

2.      On February 11, 2008, Defendant in this matter filed his Motion to Dismiss, or in the Alternative, for Summary Judgment.

3.      Defendant has not filed an Answer in this matter. Plaintiff has, therefore, not conducted discovery in this matter. Moreover, there was no administrative hearing in this matter and thus no discovery was undertaken previously. In particular, there were no depositions taken or cross-examination at the administrative stage.

4.      Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment, attached two declarations as well as other documents. The declarations, submitted by the responsible management officials employed by Defendant, purport to state in detail the manner in which Defendant determined to take certain actions that are at issue in this case.

5.      As Plaintiff has not had the opportunity to conduct discovery of Defendant, Plaintiff has no personal knowledge of many of the facts asserted by Defendant, and is thus unable to provide any countervailing statements or even indicia that the declarations and documents produced by Defendant may be incomplete, incorrect or misleading.

6.      Plaintiff is unable at this time to provide opposing affidavits, as required by Fed. R. Civ. P. 56, regarding a number of issues raised by Defendant.  Among those issues that Plaintiff is unable to provide opposing affidavits at this time are:

- the intent behind the decisions to deny Plaintiff's requests for promotions;

- the intent behind the decision to issue Plaintiff a written reprimand in February 2006;

- the intent behind the decision to issue Plaintiff a written reprimand in July 2006;

- the intent behind the decision to interrogate Plaintiff regarding the professional relationship between Mr. Doheny and GRA, Inc.;

- the intent behind the decision to interfere in Plaintiff's work on the *Blumner* investigation;

- the intent behind the decision to issue Plaintiff a five-day suspension action;

- the intent behind the decision to disparage Plaintiff's job performance in discussions with her co-workers;

- the intent behind the decision to question Plaintiff's co-workers about her activities and whereabouts;

- the intent behind the decision to physically confront Plaintiff in a coercive and threatening manner;

- the intent behind the decision to create a hostile work environment;

- the intent behind the decision to interfering with Plaintiff's access to and use of a discrimination complaint process;

- whether Defendant has ever promoted other employees at the Board or PAB/OGC to the GS-15 level;

- the intent behind the Defendant's decision to work with the Library of Congress on the *Blumner* investigation;

7.     If allowed discovery in this matter, I would request documents relating to the decisions challenged in this matter, and I would seek to depose the individuals from whom Defendant obtained declarations.


I declare under penalty perjury and the provisions of 28 U.S.C. § 1746 that the foregoing is true and correct.


Executed on:  March 24, 2008            _____/s/_____
                                                                  Michael J. Kator