# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**DIANE R. WILLIAMS,**

   **Plaintiff,**

    v.

**GENE L. DODARO, Comptroller General
of the United States Government
Accountability Office,**[1]

   **Defendant.**

</td><td>

Civil Action No.  07-1452 (JDB)

</td></tr>
</table>

## MEMORANDUM OPINION

Plaintiff Diane R. Williams, a Senior Trial Attorney employed at the Government Accountability Office's ("GAO") Personnel Appeals Board ("PAB" or "Board") in the Office of the General Counsel ("PAB/OGC"), brings this action against Gene L. Dodaro in his official capacity as the Comptroller General of GAO, alleging age, race, and sex discrimination, retaliation, and a hostile and abusive work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.  Presently before the Court is the Comptroller General's motion to dismiss or, in the alternative, for summary judgment.  Upon careful consideration of the motion and the parties' memoranda, the applicable law, and the entire record, the Court will grant in part and deny in part the Comptroller General's motion.

---

[1] The Court has substituted the Acting Comptroller General as a defendant in place of his predecessor, David M. Walker, who had been party to this suit in his official capacity only.  See Fed. R. Civ. P. 25(d)(1).

## BACKGROUND

Williams, an African-American female over 40 years old, has been a Senior Trial

Attorney with the PAB/OGC at the GS-14 level since February 1999.  Def.'s Statement Of

Material Facts Not In Dispute ("Def.'s Stmt.") ¶ 4; Pl.'s Opp'n Ex. 1 ("Williams Aff.") ¶¶ 1-2.[2]

Until December 2005, Williams reported to Janice Reece, an African-American female over the

age of forty, who was employed as General Counsel above the GS-15 level.  Def.'s Stmt. ¶ 6.  In

September 2003, Reece recommended to the Board that two employees, Williams and a younger,

white female Senior Trial Attorney, be promoted from GS-14 to GS-15 within their positions.

Id. ¶¶ 7-8.  The Board did not grant either promotion.  Id. ¶ 9.

Reece retired in December 2005 and the Board thereafter sought to hire a new General

Counsel.  Id. ¶ 11.  In the interim, Beth Don, the Board's Executive Director, served as Acting

General Counsel, id. ¶ 12, until April 2006 when Anne M. Wagner was hired for the position, id.

¶ 13.  Williams did not apply for the vacant GS-15 position of General Counsel, id. ¶ 14, instead

continuing to be supervised by whomever was fulfilling those duties, id. ¶¶ 12-13.

---

[2] The Comptroller General suggests that Williams's affidavit is "largely inadmissible" because Williams lacks personal knowledge as to some of the subject matter and other parts contain speculation and opinions without the proper foundation.  See Def.'s Reply at 3-4.  He also contends that much of plaintiff's affidavit is actually contradicted by the record.  Id. at 4. Accordingly, the Comptroller General requests that Williams's affidavit and the opposition that relies upon it be stricken in their entirety.  Id. at 10.  For the purposes of summary judgment, affidavits "shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e).  Exhibits that do not conform to Rule 56 may be stricken from the record.  United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency, 456 F. Supp. 2d 46, 51 (D.D.C. 2006) ("A court may [] strike all or part of an affidavit for failing to satisfy the requirements of Federal Rule of Civil Procedure 56(e).").  Although the Court agrees that parts of plaintiff's submissions do not conform to the requirements of Rule 56, the Court does not find that the documents are inadmissible in their entirety.  For present purposes, the Court will disregard non-complying portions of Williams's affidavit.

On January 20, 2006, Williams sent Don an e-mail requesting a promotion to GS-15 within her position.  Id. ¶ 15.  Don responded that it would be more appropriate for Williams to make her request to the new permanent General Counsel when the position was filled.  Id.[3]  Less than a month later, Williams e-mailed Don and other PAB members stating that she "wish[ed] to file an EEO complaint regarding the PAB's discriminatory pay policies and practices."  Id. ¶ 18.

When Don first assumed the role of Acting General Counsel, she directed Williams "not to report to her any information that might have the impact of causing her to have to recuse herself from matters pending before the PAB Board."  Williams Aff. ¶ 7.  Then, on February 15, 2006, Don sent Williams a letter asking Williams "to keep her timely and fully informed of all matters of importance to the office going forward."  Def.'s Stmt. ¶ 21.  This letter was evidently prompted by a large increase in the number of charges filed with PAB that Don believed Williams was aware of but had failed to inform Don about.  Id. ¶¶ 19-20.  The parties disagree as to whether the letter affected the terms and conditions of Williams's employment, compare Def.'s Stmt. ¶ 22 with Pl.'s Stmt. ¶ 22, but it is undisputed that the letter was not placed in Williams's personnel file, Pl.'s Stmt. ¶ 22.  On May 17, 2006, Williams filed an Equal Employment Opportunity ("EEO") Complaint, alleging discrimination on the basis of race, sex, and age, and retaliation for prior EEO activity.  That retaliation, Williams contends, manifested itself in the failure to grant her January 20 promotion request and Don's letter regarding timeliness.  See Def.'s Stmt. ¶ 29.

At some point during 2006, Williams had been assigned to investigate a complaint of

---

[3] The parties disagree as to whether Don's response constituted a denial of the promotion request.  Compare Def.'s Stmt. ¶ 17 with Pl.'s Statement Of Genuine Issues Of Material Fact ("Pl.'s Stmt.") ¶ 15.

discrimination filed by a Library of Congress ("LOC")[4] employee, Linda B. Blumner.  Id. ¶¶ 31-32.  Ricardo Grijalva, the Acting Director of the Office of Workforce Diversity, expressed his concern that, based on the work that had been done so far, the investigation would not be completed by the LOC policy's deadline for processing investigations -- July 7, 2006, in this case. Id. ¶ 36.  Williams was out of the office on unscheduled leave on the Friday that Mr. Grijalva relayed his concerns to Don, as well as on the following Monday and Tuesday.  Id. ¶ 37. Wagner, the new General Counsel, called Williams at home and told her that she needed to come in to complete the Blumner investigation.  She informed Williams that no further requests for leave would be approved until the investigation was complete.  Id. ¶ 42.  Wagner also notified Williams that she had scheduled an interview for Williams to conduct with Mr. Grijalva, one of the key witnesses in the investigation.  Id. ¶ 41.  Williams subsequently canceled this interview and proceeded with the investigation through written interrogatories instead.  Id. ¶ 43-44.  When Wagner learned of that development, she issued a notice proposing to suspend Williams for five days, which the Board later approved.  Id. ¶ 45.  At the same time, Williams states that when Wagner learned that Williams had canceled the interview, "Ms. Wagner physically confronted me in a hostile and threatening manner.  At that time, Ms. Wagner stormed into my office and, with a raised voice, stood alarmingly and threateningly close to me, and criticized my work performance."  Williams Aff. ¶ 24.

On June 6, 2006, Wagner e-mailed Williams asking for information about a rumored business relationship between the Chair of the PAB, Michael Doheny, and one of GAO's private

---

[4] PAB/OGC "commenced a pilot program with the Library of Congress" during 2006. Def.'s Stmt. ¶ 30.

consultants, a relationship that could have created the appearance of a conflict of interest if substantiated.  See Def.'s Stmt. ¶¶ 46-50.  Although the parties disagree about whether Williams replied initially, compare id. ¶¶ 50-52 with Pl.'s Stmt. ¶¶ 50-52, Wagner continued to request more information from Williams, Def.'s Stmt. ¶¶ 51, 54.  On July 26, 2006, Wagner issued a letter of reprimand to Williams for her "refusal to comply" with Wagner's multiple requests to her satisfaction.  Id. ¶ 55.  On August 21, 2006, Williams filed a second EEO complaint alleging that she was being subjected to a hostile work environment based on race, sex, and age discrimination and retaliation.  Id. ¶ 56.  On September 1, 2006, she filed a third EEO complaint, also relating to her claims of a hostile work environment.  Id. ¶ 57.  The EEOC was assigned to investigate Williams's complaints; she received a Notice of Right to Sue on July 13, 2007.  Id. ¶ 58.  She then filed this civil action on August 10, 2007.  Id.

## STANDARD OF REVIEW

### I.      Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)

All that the Federal Rules of Civil Procedure require of a complaint is that it contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atl. Corp. v. Twombly, 550 U.S. ___, 127 S. Ct. 1955, 1964 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); accord Erickson v. Pardus, 551 U.S. ___, 127 S. Ct. 2197, 2200 (2007) (per curiam).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  Bell Atl. Corp., 127 S. Ct. at 1964-65; see also Papasan v. Allain, 478 U.S. 265, 286

(1986).  Instead, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp., 127 S. Ct. at 1965 (citations omitted).  However, a court "must not make any judgment about the probability of the plaintiff's success, for a complaint 'may proceed even if it appears that a recovery is very remote and unlikely'" or that the plaintiff "will fail to find evidentiary support for his allegations." Aktieselskabet AF 21. November 21 v. Fame Jeans, Inc., 525 F.3d 8, 17 (D.C. Cir. 2008).

The notice pleading rules are not meant to impose a great burden on a plaintiff. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005); see also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512-13 (2002).  When the sufficiency of a complaint is challenged by a motion to dismiss under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true and should be liberally construed in his or her favor. Leatherman v. Tarrant County Narcotics & Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968 (D.C. Cir. 1979); see also Erickson, 127 S. Ct. at 2200 (citing Bell Atl. Corp., 127 S. Ct. at 1965)).  The plaintiff must be given every favorable inference that may be drawn from the allegations of fact. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  However, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." Kowal v. MCI Commc'n Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Nor does the court accept "legal conclusions cast in the form of factual allegations." Aktieselskabet AF 21. November 21, 525 F.3d at 17 n.4; see also Domen v. Nat'l Rehab. Hosp., 925 F. Supp. 830, 837 (D.D.C. 1996) (citing Papasan, 478 U.S. at 286).

## II.      Summary Judgment Pursuant to Fed. R. Civ. P. 56(c)

When, on a Rule 12(b)(6) motion, "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(b); see Yates v. District of Columbia, 324 F.3d 724, 725 (D.C. Cir. 2003).  Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by identifying those portions of "the pleadings, the discovery and disclosure materials on file, and any affidavits" which it believes demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c); see Celotex, 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50

(citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## III.    The **McDonnell Douglas** Framework

The framework for establishing a prima facie case of discrimination or retaliation was introduced for Title VII claims in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), and courts have since routinely applied the same analysis to claims arising under the ADEA, e.g., Hall v. Giant Food, Inc., 175 F.3d 1074, 1077 (D.C. Cir. 1999).  The first step in the analysis requires a plaintiff to carry the burden of establishing a prima facie case by a preponderance of the evidence.  Id.; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  In order to make out a prima facie case of discrimination, a plaintiff must show that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999)).  To establish a prima facie case of retaliation, a plaintiff must establish: "(1) that she engaged in statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two." Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985) (quoting McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984)); Brown,199 F.3d at 452.  Under the Supreme Court's decision in Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 70 (2006), an adverse employment action in the retaliation context is one that could conceivably dissuade a reasonable worker from making or supporting a charge of discrimination.  See also Velikonja v. Gonzales, 466 F.3d 122, 124 (D.C. Cir. 2006); Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006).

Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.  McDonnell Douglas, 411 U.S. at 802.  The employer's burden, however, is merely one of production.  Burdine, 450 U.S. at 254-55.  The employer "need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  Id.

Where assessment of the employer's legitimate, nondiscriminatory reason becomes necessary, a prolonged evaluation of the sufficiency of plaintiff's prima facie case is unnecessary, for the central inquiry then becomes "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis."  See Adeyemi v. District of Columbia, 525 F.3d 1222, 1226 (D.C. Cir. 2008); see also Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494(D.C. Cir. 2008) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08, 511 (1993), and U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714-16 (1983)).  "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors . . . includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148-49 (2000); accord Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc); see also Waterhouse v. District of Columbia, 298 F.3d 989, 992-993 (D.C. Cir. 2002).

In other words, the <u>McDonnell Douglas</u> shifting burdens framework effectively evaporates -- the sole remaining issue is discrimination or retaliation <u>vel</u> <u>non</u>, and "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." <u>Lathram v. Snow</u>, 336 F.3d 1085, 1088 (D.C. Cir. 2003); <u>see</u> <u>Reeves</u>, 530 U.S. at 142-43. Examination of that issue in this setting therefore requires consideration of all the relevant circumstances in evidence, including the strength of the prima facie case, any direct evidence of discrimination, any circumstantial evidence that defendant's proffered explanation is false (which may be enough with the prima facie case to infer unlawful discrimination or retaliation), and any properly considered evidence supporting the employer's case. <u>Reeves</u>, 530 U.S. at 147-48; <u>see</u> <u>also</u> <u>Adeyemi</u>, 525 F.3d at 1226; <u>Teneyck v. Omni Shoreham Hotel</u>, 365 F.3d 1139, 1151 (D.C. Cir. 2004); <u>Lathram</u>, 336 F.3d at 1089; <u>Waterhouse</u>, 298 F.3d at 993; <u>Aka</u>, 156 F.3d at 1290.

## DISCUSSION

### I.      Exhaustion

Under Title VII and the ADEA, employees of the GAO cannot bring a civil action for employment discrimination unless they have first received notice of "final action" taken by the agency, thereby exhausting their administrative remedies. <u>See</u> 42 U.S.C. § 2000e-16(c). The subsequent lawsuit is limited to claims that are "like or reasonably related to the allegations of the charge and growing out of such allegations," so the agency may have fair notice of the claims against it. <u>Park v. Howard Univ.</u>, 71 F.3d 904, 907 (D.C. Cir. 1995) (internal citation omitted).

Here, the Comptroller General argues that, to the extent that Williams's retaliation claim is premised upon her allegations that she was physically confronted in a hostile or threatening

manner and that the agency questioned her coworkers concerning her whereabouts, Williams failed to raise those issues in any of her administrative complaints. Thus, the Comptroller General contends, Williams failed to exhaust her administrative remedies with respect to those claims. See Def.'s Mot. at 25. Williams, however, points out that she noted in her second EEO complaint that agency officials were "threatening to impose discipline" against her and "engaging in surveillance of [her] activities." Pl.'s Opp'n at 22 (quoting Def.'s Mot. Ex. 1, Tab B at 35-36). Williams is correct, then, that the specific conduct complained of today is encompassed by the broader, more general allegations outlined in her EEO filings. It is important to note that the Court is obligated to construe Williams's EEO filings in her favor. See Fed. Express Corp. v. Holowecki, 128 S. Ct. 1147, 1160 (2008) ("Documents filed by an employee with the EEOC should be construed, to the extent consistent with permissible rules of interpretation, to protect the employee's rights and statutory remedies."). Hence, the fact that Williams described her allegations with greater specificity in these proceedings does not establish that she failed adequately to present them at the administrative level.

More importantly, Williams states that she informed both Don and Wagner, as well as the EEO investigator assigned to her case, of her complaints concerning: "Ms. Wagner's actions disparaging my job performance in discussions with my co-workers; Ms. Wagner's questioning my co-workers about my activities and my whereabouts; [and] Ms. Wagner's actions of physically confronting me in a coercive and threatening manner." See Williams Aff. ¶ 26. Thus, by allegedly bringing these issues to the attention of individuals in the agency and the EEO officer, Williams put the agency on notice of her specific allegations, thereby providing an opportunity for investigation at the administrative level. This lawsuit, then, is "reasonably

related to the allegations of the [EEOC] charge and grow[s] out of such allegations." Park, 71

F.3d at 907.  On that basis, the Court declines to dismiss Williams's specific claims for failure to

exhaust.

Similarly, the Comptroller General also argues that Williams's hostile work environment

and retaliation claims must be dismissed for failure to exhaust administrative remedies because

she "fail[ed] to seek EEO counseling with regard to these claims." Def.'s Mot. at 26.  "When an

employee of the Board believes that he or she has been denied his or her right to equal

employment opportunity, the employee shall bring this matter to the attention of the Board's

Executive Director or General Counsel." 4 C.F.R. § 28.17(a)(2).  The Comptroller General

claims that Williams never raised her claims regarding a hostile work environment or retaliation

to either of the proper officials before filing her EEO complaints.  See Def.'s Mot. at 27.

Williams responds, however, that she presented these complaints to both Don and Wagner, the

appropriate officials pursuant to 4 C.F.R. § 28.17(a)(2).  See Williams Aff. ¶¶ 25-26.  Thus,

Williams has at least raised, by submission of her sworn affidavit, a factual dispute regarding

whether she sought the requisite EEO counseling.  It would therefore be improper to dismiss

these claims for a failure to exhaust at this juncture, particularly because the Court must accept

Williams's factual allegations as true for purposes of the motion to dismiss and draw all available

inferences in her favor for purposes of summary judgment.  Accordingly, the Comptroller

General's motion to dismiss these claims for want of administrative exhaustion will be denied.

There is one claim, however, that has not been administratively exhausted.  Williams now

contends that her position has been "downgraded" from a GS-14/15 to a GS-13/14 level due to

GAO's updated position description.  That change, she says, robs her of the ability to reach GS-

15 through a non-competitive promotion and constitutes unlawful retaliation for her protected

EEO activity.  It appears that this claim was never raised by Williams at the administrative level.

The claim also fails as a factual matter in any event.  The Comptroller General has produced

documentation -- including the very position posting from which Williams was hired -- that

establishes conclusively that Williams's position was never classified as a GS-14/15 level to

begin with; instead, when she was initially hired the position was listed as a GS-12/13/14

position.  See Def.'s Reply Exs. 1-4.  Williams's unsupported statement that her position was in

fact a GS-14/15 cannot stand in light of the record evidence produced by the Comptroller

General.

## II.       Discrimination in Non-Promotion and Pay

Under the McDonnell Douglas framework discussed above, it is Williams's initial burden

to make out a *prima facie* case of unlawful discrimination.  Thus, Williams must demonstrate

that "(1) she is a member of a protected class; (2) she suffered an adverse employment action;

and (3) the unfavorable action gives rise to an inference of discrimination."  Stella, 284 F.3d at

145.  It is undisputed that Williams, an African-American female over forty years of age, is a

member of a protected class.[5]  She contends that the adverse employment action that she endured

was the agency's failure to promote her to GS-15 due to her race, gender, and age.  It is well-

---

[5] In this context, the inquiry under the ADEA is substantially the same as the Title VII
approach.  Under the ADEA, a plaintiff must show that "(1) he belongs to the statutorily
protected age group; (2) he was qualified for his position and was performing his job well
enough to meet his employer's legitimate expectations; (3) he suffered an adverse employment
action despite his qualifications and performance," see Dobbs v. Roche, 329 F. Supp. 2d 33, 40
(D.D.C. 2004) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)).
For her part, Williams offers no independent arguments relating to her claim of age
discrimination that are distinct from her allegations regarding Title VII race discrimination.
Thus, the Court will address both under the same basic rubric.

established that a "failure to promote is an 'adverse action' for purposes of a prima facie case." Id. at 146 (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).

The Comptroller General, however, argues that Williams cannot establish a *prima facie* case of discriminatory non-promotion because she failed to apply for any vacant GS-15 position, including the position of General Counsel that was posted during her tenure at the agency. Although it is true that Williams cannot satisfy the particular articulation of the prima facie case found in Lathram, 336 F.3d at 1085, she is not required to do so here.  In Lathram, the D.C. Circuit explained that one way for a plaintiff to demonstrate a *prima facie* case in the promotion context is to show that: "(1) he is a member of a protected class; (2) he applied for and was qualified for an available position; (3) despite his qualifications he was rejected; and (4) either someone . . . filled the position or the position remained vacant and the employer continued to seek applicants."  Id.  But that test does not translate neatly to the present context where an employee seeks an in-position promotion to a higher grade.  Here, Williams contends that she "is not complaining about a non-promotion to [a vacant GS-15] position; she is complaining that Defendant did not promote her to Grade 15 in her position."  Pl.'s Opp'n at 29 (emphasis in original).  Thus, the Court concludes that the familiar *prima facie* standard articulated in Stella is the proper framework to apply here.

Under that mode of analysis, Williams can satisfy her *prima facie* burden by showing that the agency's decision not to promote her to a higher grade in-position -- based on the "accretion of duties" theory, as the Comptroller General puts it, see Def.'s Reply at 12 -- was motivated by unlawful criteria.  To that end, Williams has submitted a sworn affidavit from Ms. Reece (her former supervisor) that attests to Williams's "dedication and the . . . high quality of her work."

-14-

Pl.'s Opp'n Reece Aff. ¶ 8.  Indeed, due to the high caliber of Williams's work product, Ms.

Reece recommended her for a promotion to the GS-15 level in September 2003.  Id.  Although

that request was denied by the Board, Williams has submitted sufficient information to

demonstrate that she was at least arguably qualified to perform at a GS-15 level.  That

demonstration rebuts, for *prima facie* case purposes, one of "the two most common legitimate

reasons" advanced by employers for failure to promote: the "absolute or relative lack of

qualifications."  See George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005).[6]  Thus, as the D.C.

Circuit put it in George, Williams's showing that the agency's failure to promote her to the GS-

15 level was not due to her lack of qualifications[7] for that grade "'is sufficient, absent other

explanation, to create an inference that the decision was a discriminatory one.'"  Id. (quoting Int'l

Bhd. of Teamsters v. United States, 431 U.S. 324, 358 n. 44 (1977)).  With that, Williams has

satisfied her *prime facie* case burden on the non-promotion question.

　　Turning to the second part of the McDonnell Douglass inquiry, then, the Comptroller

General argues the agency has offered legitimate, non-discriminatory explanations for its actions.

To begin with, Williams's initial request at issue here -- the January 2006 request directed to Ms.

Don -- was "denied," the argument goes, because Don was merely the Acting General Counsel

---

[6] The second "most common" explanation is "the absence of a vacancy in the job sought."
George, 407 F.3d at 412.  As discussed above, that consideration is not relevant here.

[7] The agency does permit "change to [a] higher level based on accretion of duties," but
only in "very unusual circumstances."  See GAO Order 2335.6.  GAO's regulations provide the
criteria and procedure required to obtain such a promotion.  Here, the Comptroller General takes
Williams to task for her failure to even mention GAO Order 2335.6, let alone demonstrate why
she satisfied its requirements.  Although it is true that Williams has not specifically framed her
opposition in terms of that agency regulation, the Court is satisfied for *prima facie* case purposes
that Williams's allegations are sufficient to establish that she would arguably be eligible for an
accretion of duties promotion pursuant to the terms of GAO Order 2335.6.

on a temporary basis.  Don believed that it would be inappropriate for her to promote an

employee to GS-15 because she "had been serving as Acting General Counsel for [only] six

weeks, and Ms. Williams had been on leave for more than two weeks during that time period."

Def.'s Mot. Don Aff. ¶ 10.  She also had "little direct knowledge of Ms. Williams'[s] work."  Id.

Moreover, because Don's tenure as "Acting General Counsel would be over shortly," she

believed that it would be "more appropriate for the new permanent General Counsel to make

decisions concerning the grade levels of PAB/OGC staff."  Id.  That explanation represents a

legitimate personnel decision that does not involve the consideration of any unlawful factor.

On the issue of plaintiff's second request for a promotion, there is a dispute as to whether

that request was ever actually made.  According to Wagner, "Ms. Williams never asked . . . to be

promoted to GS-15."  Def.'s Stmt. of Facts ¶ 24.  Williams, however, maintains that she met

with Wagner and "explained to [her] what had happened with her past requests to be promoted,

and . . . urged Ms. Wagner to promote [Williams] to a Grade 15 at that time."  Pl.'s Stmt. of

Facts ¶ 24.  According to Williams, "Ms. Wagner denied her request to be promoted, and Ms.

Williams was left at the Grade 14 pay level."  Id.  The Comptroller General correctly points out

that "this alleged second request to Ms. Wagner has never before been raised in any

administrative complaint and is also not mentioned in the federal court complaint."  Def.'s Reply

at 11 (emphasis added).  Hence, Williams's allegation regarding her second promotion request

improperly appeared for the first time in her opposition brief.  Because the agency maintains that

this supposed second request was never made, it has not offered a legitimate non-discriminatory

explanation for the alleged rejection.  Instead, the Comptroller General correctly argues that

Williams has failed to exhaust her administrative remedies with respect to this allegation.

Ultimately, however, the Court will assume that Williams made a second promotion request because even if she did, her non-promotion claim must fail in any event.

Hence, the inquiry now proceeds to the final step in the McDonnell Douglas inquiry, where the sole remaining issue is discrimination vel non. The question, then, is whether a reasonable jury could conclude from this record that the "adverse employment decision was made for a discriminatory reason." Lathram, 366 F.3d at 1088. The Court concludes that Williams has failed to her carry her burden here. She has offered no evidence that the decision(s) not to promote her were motivated by any unlawful criteria -- race, gender, or age. Similarly, she has not identified any reason to conclude that the agency's asserted non-discriminatory explanation on this point is mere pretext. As the Comptroller General aptly puts it, Williams's entire argument boils down to a bald assertion that "in her own estimation, she was performing at an 'outstanding' level, and also performing duties consistent with the GS-15 grade level . . . [such that] the Agency's failure to grant [her promotion] requests must be based on discrimination." Def.'s Reply at 12.

Although a plaintiff is not strictly required to identify similarly-situated comparators who were treated differently, see George, 407 F.3d at 412, it is still significant that Williams cannot identify a single Senior Trial Attorney -- of any race, age, or gender -- who was promoted to the GS-15 level during her tenure at the agency. In fact, Don stated in her affidavit that there has been "no Senior Trial Attorney . . . hired at or promoted to the GS-15 grade level" during the course of Williams's tenure. See Def.'s Mot. Don Aff. ¶ 12. Moreover, the three comparators who Williams has identified as receiving promotions to the GS-15 grade -- Beth Don, Susan Inzeo, and M. Gail Gerebenics -- are not similarly-situated to Williams herself. Indeed, none of

-17-

those individuals hold or held the title of Senior Trial Attorney, and none of them are even

employed at the Office of General Counsel.[8]  In fact, the only individual who is similarly-situated

to Williams is Ms. M.J. "Alex" Alexander, a Caucasian female who was previously employed as

a GS-14 Senior Trial Attorney.  See Def.'s Reply at 17.  Tellingly, like Williams, Ms. Alexander

was denied a promotion to GS-15 in 2003, which belies Reece's suggestion, see Def.'s Opp'n

Reece Aff. ¶¶ 11-12, that the non-promotion was motivated by the agency's "less favorabl[e]"

treatment of African-Americans.[9]

Aside from the bare allegations of discriminatory conduct lodged by Williams (and, to a

lesser extent, Reece), there is no evidence whatsoever that the agency unlawfully discriminated

against Williams on the basis of race, gender, or age.  Mere allegations and conclusory assertions

made on the basis of "belief" do not suffice to establish discrimination for purposes of the

McDonnell Douglas test.  See Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999).  Williams

has alleged no facts and produced no record evidence to substantiate her Title VII and ADEA

claims.[10]  It is often said that the federal anti-discrimination statutes do "not authorize a federal

---

[8] Don is presently the Executive Director of the PAB.  See Def.'s Reply at 16.  Ms. Inzeo is the Solicitor for the PAB.  Id.  Ms. Gerebenics is the Director of the Office of EEO Oversight. Id. at 17.  All three of those positions entail significantly different responsibilities and duties than does Williams's Senior Trial Attorney position.  Id. at 16-17.

[9] At some point prior to Williams joining PAB/OGC, the office evidently employed two Senior Trial Attorneys at the GS-15 level, one of whom was Reece who later went on to become General Counsel.  See Def.'s Reply at 17.  This fact does not aid Williams's case because it is undisputed that no Senior Trial Attorney was employed at the GS-15 grade during her tenure there.  In fact, both Reece and Jan Willis are African-American females over the age of forty, which further undercuts Williams's suggestion that the agency discriminates against members of her class when it comes to promoting individuals to the GS-15 grade.

[10] In fact, the only factual suggestion whatsoever of possible disparate treatment on the basis of race comes from Ms. Reece's affidavit.  She stated that the Board's staff "invited [a]

court to become a super-personnel department that reexamines an entity's business decisions."

Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (internal quotation omitted).  It may

well be that decision-makers at the agency harbor some personal animus towards Williams or

that she has not been treated "fairly" by PAB.  But that is not enough to establish a Title VII or

ADEA violation absent any factual evidence that would tend to suggest discrimination on the

basis of unlawful criteria.  Ultimately, Williams has produced no evidence -- direct,

circumstantial, or otherwise -- that would permit a reasonable jury to find that her non-promotion

was motivated by discriminatory animus.  Moreover, Williams has not proffered any evidence to

support her contention that the agency's asserted non-discriminatory explanation is mere pretext.

Absent such evidence, the jury would be forced to engage in impermissible speculation to find in

Williams's favor on this question.  Accordingly, the Comptroller General's motion on the non-

promotion claims will be granted.[11]

---

White female attorney to share in their water club and, on occasion, lunches with Board
members.  However, no such invitation was extended to Ms. Williams (or any other African-
American employee in the PAB/OGC)."  Def.'s Opp'n Reece Aff. ¶ 9.  Those allegations fall far
short of establishing unlawful discrimination for Title VII purposes.  See Broderick v.
Donaldson, 437 F.3d 1226, 1233 (D.C. Cir. 2006) ("[N]ot everything that makes an employee
unhappy is an actionable adverse action.  Minor and even trivial employment actions that an
irritable, chip-on-the-shoulder employee did not like would otherwise form the basis of a
discrimination suit.") (internal quotation marks omitted); see also Taylor v. Small, 350 F.3d
1286, 1293 (D.C. Cir. 2003) (explaining that an unlawful adverse action must constitute a
"significant change in employment status").

   [11] Williams also argues that she requires discovery to substantiate further her claims of
unlawful discrimination.  The Court fails to see how discovery would aid Williams's case here,
however.  The record establishes that the PAB/OGC is a very small office -- Reece states that it
is "comprised of the following positions: General Counsel, two Senior Trial Attorneys, Paralegal
Specialist, and Secretary/Legal Information Assistant."  Def.'s Opp'n Reece Aff. ¶ 2.  Discovery
would thus not enable Williams to, for instance, discover additional comparators as she is quite
likely already aware of the identity of all of the individuals who worked in the office during her
tenure there (and, indeed, during Reece's time at the agency as well).  More generally, Williams

### III.     Retaliation

To establish a *prima facie* case of unlawful retaliation, a plaintiff must demonstrate that:

"(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment

action against her; and (3) the adverse action was causally related to the exercise of her rights."

Holcomb v. Powell, 433 F.3d 889, 901-02 (D.C. Cir. 2006).  Because "filing a formal complaint

of discrimination" constitutes "protected activity," id. at 902, Williams easily satisfies the first

prong of the *prima facie* case here.  On February 8, 2006, Williams sent an email to Don (and

others) "specifically stating that she wished to file an EEO complaint regarding PAB's

discriminatory pay policies and practices."  Pl.'s Opp'n at 35.  Williams then filed "[f]ormal

discrimination complaints . . . in May, August, and September 2006."  Id.

The question whether Williams suffered any adverse employment action in retaliation for

her protected activity is not so simple, however.[12]  The Supreme Court has indicated that an

------

should already be personally aware of many of the facts that would serve to establish unlawful discrimination, such as derogatory comments or other conduct directed towards her that might suggest discriminatory animus on the basis of race, gender, or age.  It is not clear how additional fact discovery will help her in that regard.  Moreover, much of the information identified in Williams's Rule 56(f) affidavit has already been entered into the record by the Comptroller General.  Still other facts that Williams seeks -- most notably the "intent behind the Defendant's decision to work with the Library of Congress on the *Blumner* investigation," see Def.'s Opp'n Kator Aff. ¶ 6 -- are irrelevant.  Thus, the Court concludes that discovery is not warranted at this time on the claims that will be dismissed today.  Of course, discovery may proceed for the claims that survive.

[12] The Court is cognizant that the D.C. Circuit has recently cautioned that district courts should not ordinarily examine at length a plaintiff's *prima facie* case in the event that the employer has proffered a legitimate, nondiscriminatory explanation for its actions.  See Adeyemi, 525 F.3d at 1226.  In this case, however, such an examination is necessary because many of Williams's claims do not constitute material adverse action.  Indeed, the Comptroller General has not offered any explanation in response to several allegations other than to point out the deficiency in Williams's *prima facie* showing.

adverse decision need not take any specific form to be actionable; instead, it must be the sort of action that is "materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" White, 548 U.S. at 68 (quoting Rochon, 438 F.3d at 1219).  In this case, although the exact contours of her retaliation complaint are far from clear, Williams contends that there are "[a]t least five adverse employment actions . . . encompassed by this lawsuit: denial of promotions in January and April 2006; written reprimand in February 2006; written reprimand in July 2006; five-day suspension in July 2006; and elimination of promotion potential (i.e., position downgrade) in January 2007." Pl.'s Opp'n at 35.  The Court, however, disagrees with that conclusion.  To begin with, although denial of promotion can plainly constitute adverse action, Williams's claim that the January 2006 denial arises to retaliation is puzzling because it occurred before she engaged in any protected activity -- in fact, it is what gave raise to her EEO complaint in the first instance.  Put otherwise, there is no way to establish a causal connection for retaliation purposes between the January 2006 denial of promotion and Williams's protected activity beginning in February 2006.

Next, the Court concludes that the so-called "written reprimand" issued to Williams in February 2006 also does not constitute actionable adverse action.  The Supreme Court has emphasized in White that an adverse employment decision must be "material" because "it is important to separate significant from trivial harms."  548 U.S. at 68.  Indeed, "Title VII . . . does not set forth 'a general civility code for the American workplace,'" id. (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)), and an "employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience," id.  With that

established, it is evident that the February 2006 "reprimand" does not amount to <u>material</u>

retaliatory action.  The letter in question merely reminded Williams that she was required to keep

Don apprised of significant developments in PAB/OGC while Don was serving as Acting

General Counsel.  <u>See</u> Def.'s Mot. Don Aff. ¶ 15.  It also directed Williams to prepare a report

concerning the significant uptick in complaints received by OGC in preparation for an upcoming

staff meeting.  <u>Id.</u>  The letter did not indicate that it was a reprimand, it was not placed in

Williams's personnel file, and it did not lead to any disciplinary action levied against Williams.

<u>Id.</u>[13]  Thus, Don's letter did not alter any of the conditions of Williams's employment such that it

would dissuade a reasonable employee from filing a discrimination complaint.[14]  Accordingly, it

does not constitute a material adverse employment action for purposes of Williams's *prima facie*

retaliation claim.

Similarly, Williams's claim that her position was "downgraded" does not constitute an

adverse employment action.  As detailed above, not only has Williams failed to exhaust her

administrative remedies with respect to this claim, she is also mistaken about the substance of it

as well.  The Comptroller General has produced record evidence that definitively establishes that

Williams's position was <u>not</u> a GS-14/15 grade to begin with, but rather a GS-12/13/14 position.

Thus, the position description change to a GS-13/14 grade does not in any way constitute a

"downgrade" of her grade and does not amount to unlawful adverse action.  Thus, of the initial

---

[13] In fact, Don has stated that the letter was "not meant as a reprimand."  Def.'s Mot. Don Aff. ¶ 15.

[14] Williams's suggestion that the letter may serve as the basis for some future discipline to be imposed against her is entirely speculative and cannot transform Don's memo into an actionable adverse action.

"adverse employment actions" identified by Williams, only three -- the denial of the promotion in April 2006, the written reprimand in July 2006, and the five-day suspension in July 2006 -- survive as potentially actionable adverse employment decisions as a legal matter.  Thus, the Court turns to the next step in the <u>McDonnell Douglas</u> framework with respect to those three actions.[15]

The Comptroller General offers non-discriminatory explanations for two of those three allegedly retaliatory actions.  First off, the Comptroller General argues that PAB's written reprimand issued to Williams in July 2006 was "warranted in light of [her] insubordinate conduct in failing to respond to Ms. Wagner's requests for information on June 6, 9, 16 and July 15, 2006."  Def.'s Mot. at 35.  According to Wagner, Williams refused to comply with repeated requests to supply Wagner -- who, it bears repeating, is her direct supervisor -- with all pertinent information in her possession concerning the potential conflict of interest involving Mr. Doheny.  Def.'s Mot. Wagner Aff. ¶¶ 7-9.  Thus, PAB's explanation for issuing the reprimand to Williams was to punish her direct insubordination (and, presumably, to deter similar future actions), a plainly legitimate employer goal.  The same goes for PAB's decision to suspend Williams for five days.  In that instance, Williams had refused to conduct an investigation in the manner in which Wagner had directed her to do, even going so far as to cancel a witness interview that Wagner had herself scheduled for Williams to attend.  Once again, the proffered explanation --

_____

[15] The Comptroller General does not appear to contend that these three remaining claims cannot amount to adverse employment actions for a retaliation claim.  Moreover, he also does not appear to argue that Williams cannot demonstrate a causal connection between these alleged retaliatory actions and her protected activity.  Finding no independent reasons that Williams cannot satisfy those requirements, the Court concludes that she has met her *prima facie* case burden.

combating Williams's alleged insubordination -- provides a legitimate reason for the five-day suspension imposed by PAB.

The alleged denial of promotion in April 2006 presents a different problem.  Here, the Comptroller General has not offered a legitimate explanation for its refusal to promote Williams at that time because, as explained above, the agency simply contends that she never actually made a second request.  See Def.'s Stmt. ¶ 24 ("Ms. Williams never asked Ms. Wagner to be promoted to GS-15.").  In her sworn affidavit, however, Williams insists that she did exactly that: "When Ms. Wagner became PAB General Counsel, I met with her to discuss my request to be promoted to a Grade 15 . . . and I urged her to promote me to a Grade 15 at that time."  Williams Aff. ¶ 13.  That request, according to Williams, was denied by Wagner.  Id.  It is apparent, then, that the very occurrence of this alleged retaliatory action presents a disputed question of fact that cannot be resolved -- or, indeed, even analyzed further -- at this time on either a motion to dismiss or a motion for summary judgment.  Accordingly, the Comptroller General's motion on this point will be denied.

That leaves the question of discrimination vel non with respect to the July 2006 written reprimand issued to Williams and the five-day suspension imposed by PAB during that same month.  Turning first to the reprimand decision, the Court concludes that disputed issues of material fact would permit a reasonable jury to conclude that the agency's proffered legitimate explanation is mere pretext for discriminatory animus.  As noted above, Wagner testifies in her sworn affidavit that Williams refused to comply with her direct requests for information concerning an important matter affecting PAB.  See Def.'s Mot. Wagner Aff. ¶¶ 7-9.  But Williams's sworn affidavit flatly contradicts Wagner's account.  According to Williams, she

responded to Wagner's first request for information by noting that she "had no information that was not then known to Wagner" and explaining that there was apparently publicly available information concerning Doheny's potential conflict of interest contained on a particular website. See Williams Aff. ¶ 16.  Moreover, in response to additional requests by Wagner, Williams claims that she once again told Wagner that she did not have "additional information about Mr. Doheny's association, or information regarding who else might know about Mr. Doheny beyond what was on the website." Id. ¶ 17.

Based on the current state of the record, a jury could reasonably conclude that the agency's explanation is mere pretext by crediting Williams's testimony over Wagner's testimony. This Court, of course, cannot make such credibility determinations on a motion to dismiss or a motion for summary judgment.  See United States v. Project on Gov't Oversight, 454 F.3d 306, 313 (D.C. Cir. 2006).  In the event that the jury found Williams's testimony on this point to be credible, it could also reasonably conclude that there was no reason to issue a reprimand to Williams and that PBA took that action in retaliation for filing a formal EEO complaint, which Williams had recently done on May 17, 2006, see Williams Aff. ¶ 15.  Accordingly, the Comptroller General's motion will be denied with respect to this claim of unlawful retaliation.

On the other hand, the Court finds that Williams has not carried her burden on her final claim of retaliation regarding her five-day suspension.[16]  Here, Williams effectively concedes that PAB's proffered explanation is accurate.  In her affidavit, Williams stated that she had

---

[16] The Court considers the factual allegations contained in plaintiff's complaint regarding denial of leave effectively to be subsumed by the suspension claim.  Williams has not framed those claims as separate incidents of adverse employment action and it is unlikely in any event that they could rise to the required level of materiality to sustain that characterization.

"determined to handle the investigation in the way in which [she] had been successful in [her] prior investigations."  Williams Aff. ¶ 20.  Indeed, Wagner "had no experience investigating EEO complaints," according to Williams, and thus Williams "disagreed with Ms. Wagner's attempt to alter the manner of my work in the *Blumner* investigation."  Id.  Williams also confirmed that she canceled the interview that Wagner had specifically scheduled for her and directed her to conduct.  Id.  In effect, Williams admits that she directly and openly defied directions from her immediate supervisor.

There is no evidence whatsoever that PAB's reaction -- the five-day suspension -- was motivated by anything other than Williams's patent insubordination.  As the Comptroller General aptly put it, Williams's evidentiary showing on this claim "actually challenges her own supervisor's experience investigating EEO complaints and admits that she felt no need to adhere to [Wagner's] directive."  Def.'s Reply at 18.  PAB's proffered non-discriminatory explanation, coupled with Williams's candid admission that she flouted the directions of her supervisor, leaves no room for a jury to conclude that the suspension was retaliation for Williams's protected EEO activity.  Instead, the only inference available on the basis of this record is that Williams was suspended in response to her insubordination.  Hence, the Comptroller General's motion on this claim will be granted.

## IV.    Hostile Work Environment

To make out a *prima facie* case of hostile workplace environment, a plaintiff must demonstrate that:

(1) she is a member of a protected class; (2) she was subject to unwelcome harassment; (3) the harassment occurred because of her race or disability; (4) the harassment affected a term, condition, or privilege of employment; and (5) the

-26-

employer knew or should have known of the harassment, but failed to take any action
to prevent it.

Kilby-Robb v. Spellings, 522 F. Supp. 2d 148, 162-63 (D.D.C. 2007) (citing Jones v. Billington,

12 F. Supp. 2d 1, 11 (D.D.C. 1997)).  To meet this requirement, moreover, a plaintiff must show

that the workplace is so "permeated with discriminatory intimidation, ridicule, and insult that it is

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive work environment." Oncale, 523 U.S. at 78 (internal citations omitted).  Most

importantly, the "Supreme Court has made it clear that 'conduct must be extreme to amount to a

change in the terms and conditions of employment.'" George, 407 F.3d at 416 (quoting Faragher

v. City of Boca Raton, 524 U.S. 775, 788 (1988)).

With that established, Williams presents a litany of factual examples of discriminatory

conduct that she contends, taken together, constitute a hostile workplace environment: (1) Don's

"baseless" attack on Williams's job performance as evidenced by the February 2006 memo; (2)

Wagner's written reprimand and five-day suspension of Williams; (3) a sudden "unwarranted

intrusion" into Williams's "work methods"; (4) Wagner allegedly "physically confront[ed] and

loudly threaten[ed]" Williams "in her office on June 30, 2006"; (5) Wagner "regularly

disparaged" Williams's job performance during discussions with her co-workers and "routinely

questioned" those co-workers concerning Williams's whereabouts during work days; (6) Wagner

took the supposedly unprecedented step of issuing a "blanket denial of leave rights" pending the

conclusion of the Library of Congress investigation; and (7) PAB "downgraded" Williams's

position to GS-13/14.  See Pl.'s Opp'n at 41-42.  Many of those allegations, however, cannot

even plausibly serve as the basis of a hostile work environment claim.

To begin with, workplace harassment must be related to race or disability to arise to an unlawful hostile work environment for present purposes.  See Kilby-Robb, 522 F. Supp. 2d at 162-63.  As explained above, the Court has already concluded that PAB's actions as reflected in Don's February 2006 letter and Wagner's five-day suspension relate to the substance of Williams's work performance and do not constitute unlawful discrimination; they also do not constitute workplace harassment on this record.  Similarly, the fact that Wagner supposedly "physically confront[ed] and loudly threaten[ed]" Williams in her office on June 30, 2006, see Williams Aff. ¶ 24, cannot relate to a hostile workplace environment claim unless that action of harassment was causally connected to Williams's race, gender, or age.  But even accepting Williams's account of that event, her claims do not in any way indicate that the supposed harassment occurred due to Williams's race or other prohibited criteria.  Instead, as explained above, Williams's allegations rather plainly establish that Wagner was incensed at Williams's direct insubordination and that it was such insubordination (rather than any unlawful criteria) that motivated Wagner to confront Williams.

The same goes for Williams's contentions that Wagner improperly withheld leave from her pending the completion of the Library of Congress investigation.  Once again, Williams has failed to allege any facts that would even suggest that this action was taken due to her race, gender, or age.  Instead, the record reflects only that Wagner was concerned that Williams would not complete the investigation by the specified deadline -- that cannot support a hostile workplace claim.  So, too, for Williams's claim that Wagner's actions concerning the investigation constituted an "unwarranted intrusion" into Williams's work methods.  The evidence shows only that Wagner monitored Williams's work progress to ensure that Williams

conducted the investigation consistent with Wagner's instructions -- and certainly a supervisor is ordinarily entitled to direct an employee how to perform a task.  There is no suggestion whatsoever that this so-called monitoring was motivated by discriminatory animus.  Finally, as detailed above, Williams's position was not "downgraded" at all, so that too cannot serve as a basis for her hostile work environment claim.

That leaves just two allegations as the only plausible (but quite weak) bases for Williams's hostile workplace claim: (1) Wagner's written reprimand of Williams; and (2) the fact that Wagner disparaged Williams in front of her co-workers and questioned them concerning Williams's whereabouts at certain times.  The Court need not belabor this matter any further. These claims do not amount to the type of "severe" or "extreme" conditions that would give rise to an actionable hostile work environment claim.  As the Supreme Court has emphasized, harassment must be severe and pervasive to create a hostile work environment.  See Faragher, 524 U.S. at 787-88.  The relevant factors to consider, among others, are: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employees's work performance."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  In short, a plaintiff faces a difficult burden when seeking to substantiate a hostile work environment claim.  Measured against that steep requirement, Williams's allegations here fall well short.  She has not even alleged that any PAB employee made an "offensive utterance" relating to her race, gender, or age, let alone pervasively did so in an extreme or severe manner.  In sum, Williams cannot meet the strict requirements for a hostile workplace claim.  Accordingly, the Comptroller General's motion on this claim will be granted.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court will grant the Comptroller General's motion for summary judgment with respect to Williams's claims of discrimination in pay and promotions (Counts One, Two, and Three) and her claim of hostile work environment (Count Five). The Court will grant in part and deny in part the Comptroller General's motion for summary judgment on the retaliation claims in Count Four. Summary judgment will be entered in favor of the Comptroller General on the retaliation claims that are based on the denial of promotion in January 2006, Don's letter in February 2006, the five-day suspension in July 2006, and the position downgrade. This leaves two surviving retaliation claims: the alleged retaliatory non-promotion in April 2006 and the written reprimand in July 2006. A separate Order accompanies this Memorandum Opinion.


                                    _____/s/_____
                                    JOHN D. BATES
                                    United States District Judge

Date:   September 17, 2008