# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DIANE R. WILLIAMS,

     Plaintiff,

       v.                           Civil Action No. 1:07-CV-1452  (JDB)

GENE L. DODARO, Comptroller General
of the United States Government
Accountability Office,

     Defendant.

## MEMORANDUM OPINION

Plaintiff Diane R. Williams, a former Senior Trial Attorney at the Government Accountability Office ("GAO" or "the Agency") Personnel Appeals Board ("PAB" or "Board") in the Office of the General Counsel ("PAB/OGC"), brings this action against Gene L. Dodaro in his official capacity as Comptroller General ("Comptroller General"). Plaintiff's original complaint alleged age, race and sex discrimination, retaliation, and a hostile and abusive work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. In two previous rounds of summary judgment, the Court dismissed Williams' discrimination and hostile work environment claims, as well as retaliation claims based on events in January 2006 and February 2006. Remaining are plaintiff's claims of retaliation based on her

failure to receive a promotion in April 2006, a formal reprimand she received in July 2006, and her termination in December 2008. Currently before the Court is the Comptroller General's third motion for summary judgment.[1]

## **BACKGROUND**

The facts surrounding Williams' April 2006 non-promotion claim and her July 2006 reprimand claim are set forth more fully in <u>Williams v. Dodaro</u>, 576 F. Supp. 2d 72 (D.D.C. 2008). The facts relating to Williams' termination claim is laid out in <u>Williams v. Dodaro</u>, 691 F. Supp. 2d 52 (D.D.C. 2010). However, further facts are included herein insofar as they are necessary to resolve this latest motion for summary judgment.

Plaintiff's original complaint against the GAO encompassed claims of discrimination on the basis of age, race and sex, hostile work environment, and retaliation, and arose in large part from defendant's denial of Williams' requests for a non-competitive promotion from grade GS-14 to grade GS-15. On September 17, 2008, the Court entered summary judgment for the Comptroller General on all then-existing claims except for plaintiff's claims concerning retaliation in the form of a non-promotion in April 2006 and a written reprimand in July 2006. <u>Williams</u>, 576 F. Supp. 2d at 93. Then, on December 31, 2008, Williams was terminated from her position at GAO. Following her termination, Williams sought leave to amend her complaint by adding a termination-based retaliation claim. The Court granted Williams' motion and stayed discovery on all claims pending a pre-discovery motion for partial summary judgment on the

---

[1] At the outset, Williams asserts that the "law of the case" doctrine binds the Court to its previous decisions in her favor. Pl.'s Opp'n at 25. Specifically, plaintiff argues that the Court has already denied summary judgment with respect to each of the claims currently before the Court, and hence it must do so again. <u>Id.</u> However, the Court is not foreclosed from revisiting its previous denials of summary judgment because there has been no final judgment in this case. Fed. R. Civ. P. 54(c) ("Any . . . decision . . . that adjudicates fewer than all the claims . . . does not end the action . . . and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."); <u>see also</u> <u>Jones v. Bernanke</u>, 557 F.3d 670, 678-79 (D.C. Cir. 2009) (stating that a trial court may revisit a denied summary judgment motion prior to final judgment). Additionally, the previous motions were litigated without the benefit of discovery.

new retaliation claim. The Comptroller General filed that motion and the Court denied it on March 5, 2010, finding that, in considering all the evidence then in the record and by drawing all reasonable inferences for plaintiff, a reasonable jury could conclude that the proffered motives for terminating Williams were pretextual. Williams, 691 F. Supp. 2d at 56-57.

## I.     The April 2006 Non-promotion

On January 20, 2006, Williams sent an email to her temporary supervisor, Beth Don, requesting a promotion from the GS-14 to GS-15 pay grade -- what is generally known as an "accretion of duties" promotion. In that email, Williams also requested that Don perform a desk audit of all of the attorney positions at PAB/OGC.[2] Pl.'s Opp'n. at 4; Def.'s Mot. Ex. 6 ("Williams Dep.") 103:5-105:8 (Aug. 2, 2010); Pl.'s Statement of Genuine Issues ¶ 24 ("Pl.'s Stmt.") Don denied the promotion request, deferring the decision to the permanent general counsel, but offered to do a desk audit of Williams' position to evaluate the merits of Williams' request.[3] Def.'s Ex. 2 ("Don Interrog.") ¶ 12 (March 23, 2007). There is no indication in the record that a desk audit was ever performed, or that Williams made any further attempts to secure one. See Williams' Dep. 103:5-105:8. During Williams' tenure at PAB/OGC, there were no vacant GS-15 Senior Trial Attorney positions, nor had any senior trial attorneys been promoted to the GS-15 level. Def.'s Ex. 3 ("Don Decl.") ¶ 11-12 (Feb. 18, 2008).

Anne Wagner subsequently became the new PAB general counsel and, as a result, Williams' new supervisor. In April 2006, about a month after Wagner had assumed this

---

[2] When an employee requests an accretion of duties promotion, GAO Order 2335.6 allows for a "desk audit" of an employee's work to determine if she is qualified for the promotion. Although the term 'desk audit' does not appear to be specifically defined anywhere in the record, a desk audit is a process by which an employee may request his or her work to be reviewed and if, in the eyes of the reviewers, that work is at a level higher than that at which the employee is currently graded, the employee will be promoted to the level which is reflected by his or her performance. See Marshall v. Shalala, 16 F. Supp. 2d 16, 24 n. 4 (D.D.C. 1998).

[3] The Court granted summary judgment with respect to the January 2006 claim in its 2008 opinion. See Williams, 576 F. Supp. 2d at 88, 93.

position, Williams met with Wagner and again indicated that she would like to be promoted from GS-14 to GS-15. Pl.'s Opp'n at 4; Pl.'s Stmt. ¶ 6. Wagner did not recall Williams making a promotion request in April 2006, but knew about Williams' previous promotion request from 2003, as well as the January 2006 request made to Beth Don. Def.'s Mot. Ex. 7 ("Wagner Dep.") 13:1-6; 14:3-15:16 (Oct. 7, 2010). Wagner claims that during their meeting, Williams never formally requested a promotion but merely discussed her professional aspirations. Id. 14:3-5; 15:1-16. Wagner told Williams that she was not familiar enough with Williams' work, which Williams does not dispute. Pl.'s Opp'n at 5; Williams Dep. 71:15-18; 74:11-17. Wagner, in turn, told Williams her goals for PAB/OGC; Wagner wanted the office to become more active in representational work before the Board, which would, in turn, let the Board assess and observe the type of work product expected of a GS-15 position. Wagner Dep. 15:1-16.

## II.     The July 2006 Reprimand

In June 2006 Wagner became aware of a rumor circulating among GAO employees that then-PAB Chair Michael Doheny had a business relationship with a private company, GRA Inc., which had performed work for GAO. Def's Statement of Material Facts ("Def.'s Stmt") ¶ 9. Wagner was concerned that this created a conflict of interest or an appearance of a conflict of interest that could jeopardize the integrity of PAB, so she sought to gather information about the source and veracity of these rumors and to mitigate the damaging impact of any misinformation. Id. On June 6, 2006, Wagner emailed Williams asking: "Were you aware that Mike Doheny was identified as a GRA associate? If so, when and how did you hear about it?" Def's Stmt. ¶ 10; Def.'s Mot. Ex. 10. Wagner sent another email on June 8, 2006 asking Williams to respond by close of business on Friday, June 9, 2006. Def.'s Mot. Ex. 11. There are no emails in the record indicating that Williams responded. On June 16, 2011, Wagner also states that she counseled

Williams about her failure to provide the information requested.  Def.'s Stmt. ¶ 11.  Wagner

claims that the meeting concluded with Williams not providing the information, but instead,

Williams was to decide whether or not she would "cooperate."  According to Wagner, Williams

did not ultimately provide this information.  Wagner Dep. 23:15-21.

Williams admits that Wagner emailed her on those dates, but contends that she did not

have any information about Doheny's relationship to GRA that Wagner did not already know,

and had told Wagner as much sometime in June 2006.  Pl.'s Stmt. ¶¶ 10-11; Williams Dep.

98:17-20; 99:8-14.  Regardless, notices were sent out to employees advising them that any

relationship between Doheny and GRA had been discontinued; at that point, Wagner believed

the matter had been sufficiently addressed.  However, on July 24, 2006, Beth Don received

renewed inquiries from a GAO employee about the connection between Doheny and GRA.  That

same day, Don issued a memorandum to Wagner.  Def's Mot. Ex. 12.  In that memorandum,

Don stated: "I know that as part of your initial effort to be in touch with folks who may have

gotten the wrong idea about [Doheny's] professional commitment, you had asked Diane (you did

not need to ask Gail because she had volunteered this information) about communications she

may have had on the matter.  It is my recollection that Diane never provided you with the

information that you requested . . . please follow up with Diane and find out about all

communications she may have had about Mike Doheny and GRA and get back to me by COB

tomorrow."  Id.

On July 25, 2006, at 1:50 pm Wagner emailed Williams requesting information about any

communications Williams had with GAO employees about Doheny's relationship to GRA.  In

that email, she described Williams' failure to respond to prior requests for information on that

subject.  Def's Mot. Ex. 15.  She directed Williams to respond by close of business, July 26,

2008.  Id. A few minutes after sending that email, Wagner sent a joint email to Darian Jackson and Gail Gerebenics, two PAB employees, asking if they had any further communications with GAO employees concerning Doheny's relationship to GRA since Wagner had last asked about it. The tone and nature of this communication was noticeably different from the one Wagner sent Williams.  Def's Mot. Ex. 13.  Gerebenics responded, "I have had absolutely no contact about this with anyone but this is the first time that you have asked me." Id. Wagner replied: "You are right. I didn't ask you because you were the one who originally brought the entire matter to my attention in the first place." Id.  Darian Jackson also replied in the negative.  Def's Mot. Ex. 14.

Williams responded to Wagner's email the morning of Wednesday, July 26, 2006, and told Wagner she did not have her notes regarding Doheny with her, and wanted to respond by Thursday, July 27, 2006 so that she could be as accurate as possible.  Def.'s Mot. Ex. 15.  At 3:19 p.m., Wagner replied that she needed the information by 5:30 p.m. that day because she needed to prepare her own response by Friday, July 28, 2006; she indicated that Williams would receive an hour of credit time that day so that she could review her notes. Id.  Williams replied to this email the following morning, stating that she did not see Wagner's email directing her to respond the previous day.  Id.  Williams claims she had gone home the evening of July 26, 2006, reviewed her notes, and drafted a response.  Id.; Pl's Stmt. ¶ 13.  However, on July 26, 2006, Wagner had already prepared the official letter of reprimand, which was served on Williams the next day. Pl.'s Stmt. ¶ 13; Def's Mot. Ex. 16. The letter was to remain in Williams' official personnel folder for not longer than three years and warned Williams that her continued refusal to provide the requested information could lead to more severe disciplinary action, including removal from employment. Def's Mot. Ex. 16.

**III.    Plaintiff's Termination**

After a partially favorable resolution for Williams on the Comptroller General's first motion for summary judgment in September 2008, the Court held a scheduling conference on November 10, 2008, and entered an order allowing discovery to go forward on plaintiff's remaining claims -- the April 2006 non-promotion and the July 2006 reprimand.  Subsequently, on December 1, 2008, Wagner issued a "Notice of Proposed Removal" to Williams.  See Def.'s Mot. Ex. 21.  Wagner admits that she drafted the notice on November 18, 2008.  Williams, 691 F. Supp. 2d at 56.  The Notice contains three charges stemming from two incidents in early November 2008.  The Notice charged Williams with deliberate misrepresentation, falsification, or concealment of material facts based on an incident surrounding a brief that was filed in Jones v. GAO, a matter in which Williams was a counsel of record,  and insubordination and concealment of a material fact with regard to her interview notes in Beyah v. Walker, a matter in which Williams had acted as an investigatory attorney for the administrative complaint, and later a witness when the case was ultimately pursued in federal court. See id. at 2-4. The Notice of Proposed Removal gave Williams fourteen days to respond, and stated that she could provide documentary evidence in support of her response. Wagner also concluded that Williams' continued presence in the office pending a final removal decision posed a risk, and placed Williams on sick leave.[4]  The Notice stated: "[Y]ou do not have authorized access to any GAO facility" and ordered Williams to turn over all identification cards to the building, as well as any identification cards, devices, and keys for any other worksite or equipment.  Id. at 6.

---

[4] The notice of proposed removal indicates that Williams had requested leave and had submitted a letter from a doctor recommending that Williams receive one-month leave due to work-related stresses.  The notice stated that this letter was insufficient to justify such prolonged leave, and that Williams had failed to otherwise supply proper evidence to support her leave request.  Wagner indicated that she contacted Williams' doctor to find out whether Williams' continued presence in the office posed a threat; the doctor would not answer since there was no release from Williams.

Williams replied to the charges on December 15, 2008, indicating that she was not permitted to take anything from her office, including any papers, so she was unable to support her reply with documentary evidence. Def.'s Mot. Ex. 44. On December 31, 2008, a decision on the proposed removal was issued by Paul Coran, the Chair of PAB, finding Williams' reply insufficient to defeat any of the charges and hence sustaining all of them. Def.'s Mot. Ex. 27, Decision by Paul Coran on Proposed Removal (Dec. 31, 2008) ("Removal Decision."). In that document, Coran stated that Williams "furnished no supporting documentation" in her reply. Id. In supporting a penalty of removal, the termination letter also referenced Williams' previous disciplinary record, including a prior suspension for insubordination, the July 2006 reprimand for refusing to cooperate with an investigation, and an admonishment for an unauthorized communication to GAO employees in a pending PAB case. Id. at 4. The removal was effective that same day. The grounds for the termination are discussed below.

**A.      Re-Filing of Brief**

Williams was listed as a counsel of record in an administrative proceeding, Jones v. GAO. Pl.'s Opp'n at 10; Pl.'s Stmt. ¶ 15. An opposition to GAO's motion for summary judgment was due on Friday, October 31, 2008. Pl.'s Stmt. ¶ 15. Even though Williams was counsel of record on the case, she maintains that, in practice, Wagner required Williams to clear all actions through her. Id. ¶ 15.

The parties agree that Williams had been busy with hearings on another matter that whole week. Wagner Dep. 86:7-8; Williams Dep. 131:23-25; 145:5-9. However, the accounts of the parties diverge with respect to what transpired during the October 31, 2008 attempt to file the brief and exhibits, and the subsequent filing the following Monday, November 3, 2008. Wagner claims she reviewed a draft of the brief that afternoon, that it clearly needed more work, but that

she still thought it could be completed by the 4:00 pm filing deadline. Wagner Dep. 86:18-87:3. She also testified that close to the filing deadline, she saw Williams attempting to photocopy the exhibits for the brief. Wagner Dep. 87:8-19. Wagner further stated that she took a copy of the brief with her to the PAB to get permission from the Board to use its copier to get the brief filed. When she got to the PAB's copier, she noticed that the brief had not been signed, so Wagner signed the brief, as she was "typically on everything" that was filed with PAB. Wagner stated that she also signed Williams' name on the brief. Wagner Dep. 87:20-88:13. Wagner and Darian Jackson, a legal information specialist who worked at PAB, then filed the incomplete brief that Friday. Wagner Dep. 88:3-16. Wagner told Williams to continue with preparing the exhibits, and that Wagner would take care of contacting opposing counsel to let them know what happened, and to see if they had an objection to filing out of time. Wagner Dep. 88:17-89:3. The record is not clear as to whether Wagner actually contacted opposing counsel and, if so, what was communicated to them at that time.

The following Monday, November 3, 2008, Wagner was working remotely. On that day, a second, more complete version of the brief was filed, although the parties dispute whether it was Williams or Jackson who filed the brief. Pl.'s Opp'n Ex. 3 ¶ 10, Williams Affidavit (Aug. 31, 2009). Jackson indicated in a memorandum she prepared for Wagner dated November 13, 2008, that she noticed that the filing from Friday did not include exhibit numbers and brought it to Williams' attention. Pl.'s Opp'n Ex. 11. She further stated that Williams made the necessary changes, and then printed the document for Jackson to photocopy; she also stated that she presented the documents to Williams to ensure that she had everything she needed before copying the documents and filing them with the Board. Finally, according to Jackson, Williams gave her the cover page, reflecting the previous date-stamp for October 31, 2008, and placed it

on top of the brief, stating "you might as well put this with that."  Id. Williams, however,

disputes that she knowingly substituted a revised version of the brief without seeking leave to do

so, or that she knowingly altered a previously-filed brief or filed it with an old certificate of

service or time-stamp. Pl.'s Stmt. ¶ 17.  Williams claims that she never even knew the previous

brief had been filed.  Id. ¶ 15.   Williams also contends that she did not file or cause to be filed

the original brief, or even the second brief, although there is no dispute that she worked on

drafting the brief itself.  See Def.'s Ex. 44 at 3; Williams Dep. 141:10-142:5.

PAB rejected this second brief by an order dated November 4, 2008 because (1) it bore

the same time/date stamp as the already-filed October 31, 2008 brief, (2) it had not been

identified as a revised version, (3) there had been no request to file a corrected copy, and (4)

there was no indication that the respondent had been properly served.  Def.'s Mot. Ex. 17, Order

(Nov. 4, 2008).  The order was signed by Administrative Judge Mary E. Leary, but was followed

by the initials "BLD" because Don had signed the order on Administrative Judge Leary's behalf.

Don had also drafted the order. Def.'s Mot. Ex. 38 ("Don Dep.") 70:8-72:21 (Sept. 15, 2008).

When Wagner returned on Tuesday, she saw the order and saw that the revised brief had the

original certificate of service, signature page, and board-stamped copy from the filing that

previous Friday. Wagner Dep. 91:10-19.  Wagner also stated that there were no substantive

changes to the arguments in the revised brief, but that exhibit numbers were added in, along with

other minor changes. Id. 95:12-18.

Relying on information from Wagner and Jackson, PAB Chair Paul Coran concluded that

Williams was responsible for filing the second brief, and did so in order to deceive PAB and

opposing counsel.  Removal Letter at 2.  According to plaintiff's termination letter, these actions

amounted to "trickery" and her failure to request leave to re-file with PAB and inform opposing

counsel of the updated brief damaged the integrity of PAB. Id.

### B.    Failure to Provide Interview Notes and to Disclose Method of Notetaking

In 2004 Williams served as an investigating attorney in Beyah v. Walker, a matter in

which Williams was responsible for interviewing witnesses and making a recommendation as to

whether PAB/OGC should represent the complainant before the Board.  The complainant

ultimately hired outside counsel, withdrew his administrative complaint, and instead chose to

proceed with his case in federal court.  On November 5, 2008, during the federal court

proceedings, Williams testified before U.S. District Judge Huvelle about certain witness

interview notes she had taken in the Beyah matter.  Def's Mot. Ex. 23, Transcript of Status

Hearing (Nov. 5, 2008) ("Tr.").  During the hearing, Williams testified that she did take notes,

but that all of the documents she had accumulated -- including notes -- went into a file because

the employee had withdrawn his administrative complaint.  Tr. 25:15-19, 26:13-17.  Williams

also stated at that hearing, "I don't know what happened to those documents or the files after I

stopped investigating Mr. Beyah's case." Tr. 26:15-17.  Wagner then testified that she searched

for the notes through the files, but had not completed an entire search.  She claimed that there

was no systematic file system, but that they would continue to look through the boxes for the

notes.  Tr. 29-30.  Hence, Judge Huvelle ordered Wagner to continue searching for the notes, and

directed her to do so by November 14, 2008.  Def.'s Stmt. ¶ 18.

Williams was scheduled to take leave immediately following her testimony, and was not

to return to work until November 13, 2008.  On November 12, 2008, while Williams was still on

leave, Wagner issued a written memorandum to Williams, directing Williams to produce the

disks or portable devices to which she downloaded the notes "immediately," or, if not presently

located in the office, by 3:00 p.m. "this afternoon." Def.'s Mot. Ex. 25. Otherwise, "[i]f such disk(s) or device(s) does not presently exist, or has never existed," Williams was ordered to provide Wagner with a sworn affidavit stating as much. Id. The written memorandum warns that "[f]ailure to comply with any part or all of these instructions will result in dismissal." Id.

This memorandum was followed by an email from Wagner on November 13, 2008, at 4:48 p.m., stating the following: "In my memo dated yesterday, which you received this morning, I directed you to produce by 3:00 pm this afternoon any disk or portable device upon which you downloaded any Beyah interview notes. You have not done so. Alternatively, if you never downloaded the Beyah interview notes onto a computer disk or other portable device, you were to so state in a sworn statement consistent with 28 U.S.C. 1747 . . . I am giving you one final opportunity to produce any computerized version of your Beyah interview notes or provide me with a sworn statement by 9:00 am Nov. 14 explaining that such records do not now or never existed." Def.'s Mot. Ex. 26. In that email, Wagner again stated that failure to comply with the instructions could result in dismissal. Id.

Because Williams was out of the office on leave, she did not receive Wagner's written memorandum dated November 12, 2008 until the next day. When Williams returned to the office, she claims that because she was already out of compliance, she orally told Wagner that she did not have any notes from the matter, and did not know what had happened to them after she had placed them in the case file in the file room. Pl.'s Stmt. ¶ 21. Williams also contends that she had already told Wagner prior to November 5, 2008 everything she could recall regarding the location of the interview notes. Pl.'s Stmt. ¶ 19. According to Williams, she believed that Wagner would draft an affidavit for Williams to sign because it had been Wagner's practice to do so for other matters. Pl.'s Stmt. ¶ 21. Williams explains that because no affidavit

was forthcoming from Wagner, she believed her oral explanation was sufficient.  Id.  This is slightly at odds with Williams' testimony, where she contends that she *did* produce a signed statement to Wagner, although she could not recall when she did so. Williams Dep. 159:1-164:25.  Williams also states that she did not believe the search through the files would be futile; rather, she had printed and placed a hard-copy of the notes in the actual case file four years earlier, and claims that that was where she had last seen them.  Pl.'s Stmt. ¶ 21.  This incident was cited as a charge of "insubordination" and a basis for Williams' termination because it compromised Wagner's ability to obey an order of the federal district court, which PAB Chair Coran concluded had a negative impact on the efficiency and integrity of the PAB/OGC, and was prejudicial to the best interests of the government.  Removal Decision at 3-4.

Related to this incident, the final decision of removal also charged Williams with concealment of a material fact because Williams allegedly failed to inform the Court, Wagner, or the Assistant U.S. Attorney working on the Beyah case that her notes were originally taken on a computer.  Id. at 4.  PAB Chair Coran stated that Williams' failure to provide this information adversely impacted Wagner's ability to comply with court orders and resulted in unnecessary waste of staff time in "what [Williams] had reason to know would be a futile search of the closed case file boxes for [her] interview notes."  Id. at 4.  The final decision of removal stated that Williams withheld this information, and that it was only discovered because GAO's counsel informed Wagner that Williams' practice was to take notes on the computer.  Id. at 5.  PAB Chair Coran therefore concluded that this failure to provide information was prejudicial to Wagner's ability to comply with a court order to produce Williams' notes, that this conduct negatively impacted the PAB's efficiency and integrity, and that this conduct was prejudicial to the best interests of the government.  Id. at 5.

### C.    "Blacks in Government" Email

On June 16, 2008, Williams caused a mass email to be sent to the members of "Blacks in Government" (BIG). Pl.'s Opp'n at 7.  That email, <u>inter alia</u>, requested that members of BIG share with her evidence they had of discrimination at GAO and indicate their interest in joining in a class action lawsuit alleging discrimination at GAO. Def.'s Mot. Ex. 37, Email from Diane Williams to BIG. Plaintiff provided her personal email address for those who felt uncomfortable using official means of communication. <u>Id</u>.

At Wagner's request, PAB conducted an official investigation into Williams' email communication to BIG members. Pl.'s Opp'n at 8. After the investigation, Wagner issued plaintiff a letter of admonishment on September 30, 2008. <u>Id</u>. at 9; <u>see also</u> Def.'s Mot. Ex. 42, Letter from Anne Wagner to Diane Williams (Sept. 30, 2008).  The stated basis for the admonishment was as follows: (1) it was beyond the statutory authority of plaintiff's office to initiate a class action suit, (2) it was against the express interests of plaintiff's client to convert her action into a class action, (3) plaintiff's email circumvented the rules of discovery, (4) any large requests of this nature should have been made at the beginning of discovery, not at its conclusion, (5) mass emails are not an effective investigatory tool and are unlikely to yield the kind of statistical evidence necessary for a class action suit, and (6) offering plaintiff's personal email address as an alternative to communication through official EEO channels undermined the credibility of plaintiff's office as a place where victims of discrimination could safely raise their concerns. Def.'s Mot. Ex. 40. The letter of admonishment was meant to advise Williams of Wagner's concern about her misconduct, but would not be placed in Williams' official personnel folder.  Removal Decision at 3.  The admonishment was not one of the three enumerated charges in the proposed notice of removal, but it was cited by Coran to support the penalty of removal.

Specifically, the termination letter cited Williams' previous disciplinary record, including a prior suspension for insubordination, the July 2006 reprimand for refusing to cooperate with an investigation, and an admonishment for an unauthorized communication to GAO employees in a pending PAB case. Id. at 4.

## **STANDARD OF REVIEW**

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by identifying those portions of "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of motion only), admissions, interrogatory answers, or other materials," which it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1); see Celotex, 477 U.S. at 323.

In determining whether there exists a genuine dispute of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. Celotex, 477 U.S. at 322. Moreover, "if the evidence is merely colorable,

or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).

## **<u>DISCUSSION</u>**

The Court considers Williams' claims for retaliation under the familiar burden-shifting framework established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). Under this framework, a plaintiff must first establish a prima facie case of discrimination or retaliation by a preponderance of the evidence. <u>Id.</u> To show a prima facie case of retaliation, a plaintiff must show that (1) she engaged in a statutorily protected activity; (2) that she suffered a materially adverse action by her employer; and (3) that a causal link connects the two. <u>See</u> <u>Wiley v. Glassman</u>, 511 F.3d 151, 155 (D.C. Cir. 2007) (internal citation omitted). Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory or non-retaliatory explanation for its actions. <u>See</u> <u>Smith v. Dist. of Columbia</u>, 430 F.3d 450, 455 (D.C. Cir. 2005). In asserting a legitimate, nondiscriminatory or non-retaliatory explanation, an employer "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 255 (1981) (citation omitted).

If a defendant offers a legitimate, non-retaliatory reason for its actions, "the district court need not -- and *should not* – decide whether the plaintiff actually made out a prima facie case under <u>McDonnell Douglas</u>. <u>Brady v. Office of Sergeant at Arms</u>, 520 F.3d 490, 494 (D.C. Cir. 2008). Rather, the sole inquiry becomes whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted retaliatory reason was not the actual reason and that the employer intentionally retaliated against the plaintiff on a prohibited basis. <u>Adeyami</u>

v. Dist. of Columbia, 525 F.3d 1222, 1226 (D.C. Cir. 2008). In other words, the McDonnell

Douglas burden-shifting framework essentially disappears and the only remaining issue is

whether the employer retaliated against the employee. See Jones v. Bernanke, 557 F.3d 670, 678

(D.C. Cir. 2009)).  In evaluating whether the plaintiff may defeat summary judgment, the Court

considers all the relevant circumstances in evidence, including the strength of the prima facie

case, any direct evidence of discrimination, any circumstantial evidence that defendant's

proffered explanation is false (which may be enough with the prima facie case to infer unlawful

retaliation), and any properly considered evidence supporting the employer's case.  Id. at 679

(citing Waterhouse v. Dist. of Columbia, 298 F.3d 989, 996 (D.C. Cir. 2002)); Hill v.

Kempthorne, 577 F. Supp. 2d 58, 64 (D.D.C. 2008) (citing cases).

I.      **The April 2006 Non-Promotion**

        The Court previously denied summary judgment on the retaliation claim relating to

Williams' April 2006 denial of a promotion.  Noting that Williams' retaliation claims were less

than clear, the Court nevertheless denied summary judgment because defendant at that time

denied that there had ever been a meeting in April 2006; hence, the Comptroller General never

proffered a legitimate non-retaliatory reason for Williams' non-promotion.  Williams, 576 F.

Supp. 2d at 90.  Indeed, at the time of the 2008 summary judgment motion, "the very occurrence

of this alleged retaliatory action present[ed] a disputed question of fact that [could not] be

resolved – or, indeed, even analyzed further . . . ." Id. at 90.  Now, post-discovery, defendant

does not dispute that a promotion-related conversation occurred between Williams and Wagner

in April 2006.  Instead, defendant now claims that Williams failed to exhaust such a claim.

Alternatively, defendant also now offers several legitimate, non-retaliatory reasons for the April

2006 non-promotion.

It is well-established that before a federal employee with an EEO complaint can have recourse to the courts, she must exhaust all her potential remedies at the administrative level. Payne v. Salazar, 619 F.3d 56, 65 (D.C. Cir. 2010) (citing Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997)); Kilby-Robb v. Spellings, 522 F. Supp. 2d 148, 167 n. 3 (D.D.C. 2007) ("[P]laintiff's claim must fail because [it] was not raised administratively . . . ."). In 2008, while evaluating Williams' claim of discrimination based on the April 2006 non-promotion, the Court noted that "Williams ha[d] failed to exhaust her administrative remedies," but allowed her retaliation claims to remain alive because "the exact contours of [Williams'] retaliation complaint [were] far from clear." Williams, 576 F. Supp. 2d at 85-88. Although she filed her first administrative complaint in May 2006, which is after the alleged January and April 2006 promotion denials, it refers only to the January 2006 non-promotion. Def.'s Ex. 28, Admin. Compl. of Diane Williams (May 17, 2006). Hence, it appears that her retaliation claim premised on the April 2006 non-promotion was unexhausted.

Moreover, as defendant rightfully observes, Williams essentially concedes that she has not exhausted the April 2006 non-promotion claim, and does not even address the exhaustion argument in her opposition to the summary judgment motion. See Def.'s Reply Br. at 3 (citing Smith v. Lanier, --- F. Supp. 2d ----, 2011 WL 1575280 at *10 (D.D.C. Apr. 27, 2011) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."). As this Court previously noted, a consensus has developed in the courts on the need to exhaust all discrete discrimination and retaliation claims. See Keeley v. Small, 391 F. Supp. 2d 30, 40-41 (D.D.C. 2005). Hence, the non-promotion incident in April 2006 that plaintiff claims to have experienced is the type of discrete

and identifiable event that requires separate administrative action. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002); Keeley, 391 F. Supp. 2d at 40-41. Because Williams did not exhaust her administrative remedy as to that claim, it is barred. Nonetheless, in light of the Court's earlier opinion allowing the April 2006 non-promotion claim to survive the first motion for pre-discovery summary judgment, and because the parties have fully briefed the merits of the April 2006 non-promotion retaliation claim and submitted evidence in the record with respect to it, the Court will consider the merits of this claim.

The Comptroller General contends that Williams fails to establish a prima facie case for retaliatory non-promotion in April 2006 because Williams did not apply for an available GS-15 position. Def.'s Mot. at 22-23; Def.'s Reply at 4. However, as this Court already observed, Williams sought a non-competitive accretion of duties promotion, not a promotion to a different, vacant position. See Williams, 576 F. Supp.2d at 84. But in any event, the Comptroller General has provided a legitimate non-discriminatory reason for plaintiff's non-promotion. Defendant contends that Wagner was a newly appointed supervisor who had been in the position for only a month before the April 2006 promotion denial. Wagner stated that she was unfamiliar with Williams' work and was not yet in a position to decide whether a promotion was warranted. Because this is a legitimate, non-retaliatory reason offered by the defendant, it essentially eliminates the inquiry as to whether Williams has established a prima facie case, and the question then becomes whether there is evidence supporting an inference of retaliation vel non. See Jones, 557 F.3d at 678.

On careful consideration of the record before it, the Court finds that Williams has not produced any evidence to rebut the Comptroller General's legitimate, non-retaliatory reason for denying the promotion. Even assuming that Williams had asked for a promotion from GS-14 to

GS-15, and that Wagner had understood Williams to be making such a request during their meeting, Williams concedes that Wagner told her that she was not familiar enough with Williams' work to decide if a promotion was warranted, and that this meeting had taken place only shortly after Wagner had become general counsel. Williams Dep. 74:14-17; 76:10-13. Williams also does not dispute that Wagner lacked the authority to make the actual promotion decision. Williams Dep. 78:5-19. Furthermore, Williams conceded that Wagner never told Williams that she would be barred from attaining a GS-15 pay grade, or that she was foreclosed from consideration for a GS-15 position in the future. Williams Dep. 83:13-18.

In addition, the record reflects, and Williams concedes, that there were no other GS-15 Senior Trial Attorneys in OGC during Williams' tenure. Williams Dep. 79:4-14; Don Interrog. ¶ 14. And while Williams admits that she was also aware that a desk audit was a usual prelude to an accretion of duties promotion, see Williams Dep. 103:5-105:8, and that, indeed, in January 2006 Williams had requested one for all PAB/OGC attorneys, including herself, there is no evidence that she followed through on the request. See, e.g., Wiley, 511 F.3d at 156-57 (finding that plaintiff failed to prove that her duties and responsibilities had increased so as to warrant an accretion of duties promotion, in part because she failed to accept defendant's offer to conduct a desk audit of her position); Burton v. Batista, 339 F. Supp. 2d 97, 115 (D.D.C. 2004) ("The failure to request a desk audit that could lead to a promotion condemns his retaliatory non-promotion claim to failure."); Marshall, 16 F. Supp. 2d at 20 (rejecting discriminatory non-promotion claim "[b]ecause plaintiff failed to take even the most elementary step [of applying for a desk audit]")

Considering this evidence in light of all the circumstances, Williams has not produced evidence from which a reasonable jury could infer that defendant was actually motivated by

retaliatory animus in denying her a promotion in April 2006. Hence, summary judgment on plaintiff's retaliation claim based on the April 2006 non-promotion is granted.

## II.     The July 2006 Reprimand

In its September 2008 memorandum opinion, the Court found that the July 2006 reprimand constituted an adverse employment action, Williams, 576 F. Supp. 2d at 89, a conclusion that defendant does not challenge in this renewed summary judgment motion. The Court also concluded that PAB's explanation for issuing the reprimand was to punish her direct insubordination (and to deter similar, future actions) -- a plainly legitimate employer goal. Id. Nevertheless, the Court denied summary judgment, finding that a reasonable jury could credit Williams' testimony over Wagner's, and conclude that PAB issued the reprimand in retaliation for Williams' recent EEO complaint, which was filed on May 17, 2006. Id. at 90.

Upon considering the record before it in this renewed round of summary judgment, the Court's still finds that Williams has set forth sufficient evidence to allow a reasonable jury to infer that Wagner's basis for reprimanding Williams was pretextual. While it is puzzling why Williams, on a number of occasions, failed to respond to emails or check her emails in a timely manner, it is also puzzling why Wagner, after being told by Williams that she did not have her notes with her in the office, nevertheless ordered Williams to respond by the end of that day, when Williams had already informed her that she would not be able to comply with this order. See Def.'s Mot. Ex. 15. Williams testified that she had already provided this information to Wagner, having told Wagner on numerous occasions that she did not have any additional information beyond what was found on the GRA website, and that she had provided this information prior to June 16, the day of the counseling session. Williams Dep. 95:14-23, 98:17-20, 99:8-14, 107:11-111:18 & 117:11-13.

Williams further testified that she had drafted a response to Wagner, but was led to believe that Wagner did not want it when Wagner had already typed up and served Williams with an official letter of reprimand dated the previous day. Williams Dep. 128:13-25. Considering all the evidence in the record, including Williams' testimony that she had provided this information to Wagner already, the pre-drafted letter of reprimand, the nature and tone of the memorandum provided by Beth Don to Wagner, as well as the nature and tone of the correspondence with Williams (when contrasted with the request for information from Jackson and Gerebenics), a reasonable juror could infer that a case was being built against Wagner and that Williams was, in fact, being singled out because of her protected activity.[5] This evidence, in consideration with the temporal proximity[6] between Williams' EEO activity and the reprimand, could allow a reasonable juror to believe that the reason proffered by the Comptroller General for the reprimand was pretextual, and that the real driving force behind it was retaliatory animus. See, e.g., Lathram v. Snow, 336 F.3d 1085, 1088-89 (D.C. Cir. 2003) (in discrimination context, noting that "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive") (citing and quoting Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)); Holcomb v. Powell, 433 F.3d 889, 903 (D.C. Cir. 2006) (finding that repeated protected activity can be used to demonstrate sufficient temporal proximity between the activity and the

---

[5] Courts are reluctant to second-guess the reasonableness of an employer's decisions or to become involved in the micromanagement of everyday employment decisions. Brady, 520 F.3d at 496; Fischbach v. Dist. of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996). Instead, a court only looks to whether the evidence in the record, when viewed in the light most favorable to the plaintiff, could lead a reasonable juror to believe that the proffered reason may, in fact, be pretext for an unlawful decision made because of retaliatory animus.

[6] Of course, temporal proximity alone cannot demonstrate that defendant, because of the EEO complaint, took retaliatory action against Williams by terminating her. See Douglas-Slade v. LaHood, --- F. Supp. 2d ----, 2011 WL 2469592, at *12 (D.D.C. 2011). Here, however, the temporal proximity between Williams' continuous protected activity and the reprimand, together with the other evidence in the record, could lead a reasonable jury to infer retaliation.

adverse action to allow an inference of retaliatory motive); <u>Ellis v. Georgetown Univ. Hosp.</u>, 723 F. Supp. 2d 42, 53 (D.D.C. 2010) (considering temporal proximity along with additional evidence). Hence, a jury should ultimately make the determination as to whether the July 2006 reprimand was improperly the product of retaliation, as Williams suggests, or was part of a legitimate effort to quash rumors of a potential conflict, or the appearance of a conflict, of interest involving Doheny and GRA. To that end, summary judgment on the July 2006 reprimand is denied.

**III.    Termination**

The Court previously denied the Comptroller General's motion for partial summary judgment on Williams' allegations of retaliation with respect to her termination. <u>Williams</u>, 691 F. Supp. 2d 52. Post-discovery, the Comptroller General has renewed its motion for summary judgment on that claim. The arguments by both parties are largely reiterated in this latest round of briefing; however, in this second summary judgment motion on the termination-based retaliation claim, defendant also contends that the temporal proximity between Williams' protected activity and her termination is insufficient, and hence warrants the grant of summary judgment. Williams, for her part, briefly claims in her opposition memorandum that an investigatory report based on her email to BIG, and the resulting admonishment she received in September 2008, constituted "direct evidence" of retaliation. She argues that this should trigger an analysis of the termination-based claim under a "mixed motive" framework -- in other words, that unlawful retaliation was a "motivating factor" in Williams' termination. These arguments are addressed in turn.

## A.    Temporal Proximity

As a preliminary matter, the Comptroller General takes issue with the Court's prior assessment of the temporal proximity between the notice of proposed removal and Williams' ongoing EEO activity.  However, a review of the Court's earlier opinion would have made it apparent to the Comptroller General that the Court did not base its decision on mere temporal proximity.  Indeed, the Court agrees that here, temporal proximity alone would not be sufficient to indicate that defendant took retaliatory action against Williams by terminating her.  See Douglas-Slade, 2011 WL 2469592, at * 12.  To the contrary, the Court clearly stated that, "in considering plaintiff's evidence *together with* the close temporal relationship between Williams' protected activity and her termination, there were genuine issues of material fact remaining on the termination-based claim." Williams, 691 F. Supp. 2d at 57 (emphasis added).  Furthermore, the Court considered not just the time period between court proceedings, including a partially favorable disposition for Williams in the first round of summary judgment motions practice, but the temporal proximity of Williams' *repeated* protected activity, which included, as defendant concedes, the filing of EEO complaints at or around the same time as Williams' proposed and finalized termination.[7]

---

[7]  Plaintiff also points to her November 20, 2008 testimony in the Beyah case. Williams had been subpoenaed to appear, and Wagner had warned her not to appear by stating to Williams that it would lead to "serious disciplinary action."  See Pl.'s Opp. at 18-19.  At the Beyah deposition, Williams testified that Mr. Beyah was a satisfactory employee who may have been discriminated against.  Id. at 19.  Plaintiff stated that she received the proposed notice of removal ten days after this testimony.  Id. As noted in this Court's 2010 memorandum opinion, Wagner appears to have drafted the notice of proposed removal on November 18, 2008 -- two days prior to this incident.  Williams, 691 F. Supp. 2d at 56.  In any event, the Court does not rely on it in considering whether there is sufficient temporal proximity.  Further, as already stated, while temporal proximity may serve as an inference of a causal connection between the termination and the protected activity, the Court considers all the evidence, taken together as a whole, and need not decide whether this incident, standing alone, would be sufficient to constitute close temporal proximity.

## B.    Mixed Motive Framework

Plaintiff, for her part, argues that summary judgment on her termination-based retaliation claim is inappropriate because there is direct evidence of retaliation.  In support of this contention, Williams cites her admonishment for an email she sent to BIG members, claiming that the sending of this email constituted protected activity under both Title VII's "participation clause," giving protection to employees who participate in EEO proceedings, and Title VII's "opposition clause," extending protection to employees who oppose unlawful employment practices.  42 U.S.C. § 2000e-3 (2006); Pl.'s Opp'n. at 41-43.  Williams argues that in representing Ms. Lasley, she was both participating in an EEO investigation and opposing an unlawful employment practice. Pl.'s Opp'n at 41.  Williams also adds that "in proposing Plaintiff's removal and removing Plaintiff from her position, Defendant considered and relied on Plaintiff's past disciplinary history" and listed the admonishment as part of that history.  Pl.'s Opp'n at 42. Hence, Williams contends that this case must be analyzed under the "mixed-motive" or "motivating-factor" framework of Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).  This argument appears for the first time in this litigation in Williams' opposition to this second round of summary judgment on the retaliatory termination claim.   Williams now argues that the analysis, when applied, defeats defendant's summary judgment motion because Williams has demonstrated that the retaliation played a "motivating part" or was a "substantial factor" in the employment decision.  See Pl.'s Opp'n at 42-43 (citing Porter v. Natsios, 414 F.3d 13, 18 (D.C. Cir. 2005)).

Courts have grappled with whether the motivating-factor or mixed-motive framework even applies to claims of retaliation.  Indeed, it remains a matter of prolonged debate and an open question in this Circuit.  See, e.g., Porter, 414 F.3d at 19 ("[A]lthough every circuit to

address the issue has held that the mixed motive [framework] do[es] not apply to retaliation claims, it remains an open question in this circuit."); <u>Beckham v. Nat'l R.R. Passenger Corp.</u>, 736 F. Supp. 2d 130, 142-46 (D.D.C. 2010) (analyzing evolution of mixed-motive cases and its potential applicability to retaliation claims, observing that other circuits find that the mixed-motive analysis does not apply to retaliation claims and that this continues to remain an open question in the D.C. Circuit); <u>Hayes v. Sebelius</u>, 762 F. Supp. 2d 90, 109-15 (D.D.C. 2011) (stating that whether a mixed-motive retaliation claim could be brought is still an open question in the D.C. Circuit). Neither party even addresses in their briefings whether a mixed-motive or motivating-factor analysis could apply to Williams' retaliation claims.

In any event, this Court need not join in the debate because Williams' amended complaint and previous pleadings in this case make clear that she has been proceeding throughout this litigation on a single motive theory. <u>See</u> Am. Compl. ¶¶ 11 ("Plaintiff did not engage in any conduct for which she could or would have been disciplined in the absence of the Defendant's unlawful and retaliatory animus."); <u>see also</u> <u>Beckham</u>, 736 F. Supp. 2d at 145 (contrasting mixed-motive cases with single-motive cases and proceeding to analyze case as a "single-motive" case based, in part, on what plaintiff alleged); <u>Perry v. Shinseki</u>, --- F. Supp. 2d. ----, 2011 WL 1770715, at * 6 (D.D.C. May 10, 2011) (limiting its analysis of the case to single-motive because plaintiff had never alleged that she had a mixed motive claim in her complaint, and had focused her arguments solely on the justifications offered by defendant). Furthermore, whether the admonishment itself constituted unlawful retaliation for Williams' protected activity is not at issue in this case; as the Court has stated, the only claims of retaliation remaining at issue involve the April 2006 non-promotion, the July 2008 reprimand, and the December 2008 termination.

Although the report on which Williams now relies is critical of Wagner's leadership, it is not the "smoking gun" that Williams characterizes it to be. Williams contends that the Rosenthal Report of Investigation ("ROI") vindicated her, because it was critical of Wagner's management approach, observed that Williams and Wagner viewed each other with suspicion, and stated that Williams' email, standing alone, was likely not serious enough to warrant disciplinary action. Pl.'s Opp'n at 7-10; Pl's Opp'n Ex. 6 ("Rosenthal ROI") at 4, 8-9 (Aug. 18, 2008). Notably, however, the ROI never concluded that Wagner sought to remove Williams because of her EEO protected activity. See Barry, 636 F. Supp. 2d 95, 107 (D.D.C. 2009) (describing what constitutes direct evidence of retaliation). Indeed, the ROI concluded that Williams' conduct was improper, and indicated that Wagner may have even been reluctant to discipline Williams sooner because she feared reprisal through another filing of a complaint. Rosenthal ROI at 9. In any event, even assuming that the report could be construed as direct evidence, the inquiry does not end there. The Court must still consider all the evidence in the record to determine whether a showing of retaliation vel non has been made. See Barry, 636 F. Supp. 2d at 107 n. 11 (stating that a court must still consider all evidence in the record, *including* direct evidence) (internal citations omitted). In summary, the Court does not find that the "mixed-motive" framework is triggered here. Hence, the Court will analyze the retaliation-based termination claim under the traditional McDonnell Douglas framework.

There are three claimed grounds for removing Williams -- the charges set forth in Wagner's notice of proposed removal and the final decision on proposed removal, which were summarized above and in greater detail in this Court's 2010 memorandum opinion. See generally Williams, 691 F. Supp. 2d 52. The decision on removal charges that Williams' conduct with respect to a twice-filed brief in the Jones matter constituted "Deliberate

27

Misrepresentation, Falsification, Or Concealment Of Material Facts With Regard To An Official Government Document Or Matter Under Official Investigation." Removal Decision at 2. The decision on removal also asserts that Williams' failure to provide her interview notes or a sworn statement in the <u>Beyah</u> matter, and her failure to disclose that her notes had been taken on a computer, constituted (1) insubordination and (2) concealment of a material fact, which impinged on the PAB's ability to comply with a court order. <u>Id.</u> at 3-5. This Court already found that these charges constitute legitimate non-retaliatory reasons proffered by the Comptroller General for terminating Williams.[8] Hence, the inquiry at this stage is whether Williams has provided sufficient evidence for a reasonable juror to find that the proffered reasons masked the real reason behind the termination -- retaliatory animus for Williams' protected activity. The Court will assess Williams' challenge to the explanations proffered by the Comptroller General "in light of the total circumstances of the case." <u>See</u> <u>Aka v. Wash. Hosp. Ctr.</u>, 156 F.3d 1284, 1291 (D.C. Cir. 1998) (en banc).

### C. Deliberate Re-Filing of Brief

As the Court indicated in its 2010 memorandum opinion, "a jury could reasonably conclude that the characterization of the <u>Jones</u> brief filed with the PAB as a 'deliberate misrepresentation' was manufactured by Wagner, in light of the explanation of the background circumstances provided by Williams, which, if believed, show a miscommunication rather than a falsification." <u>Williams</u>, 691 F. Supp. 2d at 56. Now, following discovery, it is even more apparent that there is a strong dispute about what events transpired surrounding the filing of the

---

[8] The parties dispute whether Williams can establish a prima facie case for her termination claim. <u>See</u> Pl.'s Opp'n. at 35; Def.'s Mot. at 29. However, defendant has proffered legitimate non-retaliatory reasons for the termination; hence, the prima facie case evaporates and the court considers whether the plaintiff has sufficient evidence of retaliatory conduct to survive summary judgment. <u>Brady</u>, 520 F.3d at 494. The Court can consider evidence of the prima facie case, pretext, and any other evidence in the record to determine whether such evidence either separately or in combination provides sufficient evidence for a reasonable jury to infer retaliation. <u>Barnabas v. Board of Trustees of University of District of Columbia</u>, 686 F. Supp. 2d 95, 105 (D.D.C. 2010).

brief on October 31, 2008 (and then again on November 3, 2008), as well as Williams' intent with respect to the filing. The Comptroller General contends that Williams filed a second, revised brief and intended to do so in order to deceive PAB and opposing counsel. Def.'s Mot. at 31. Williams, however, steadfastly maintains that she "at no time filed or caused to be filed any version of the brief." Pl.'s Opp'n at 12. She stated this in her reply to the notice of proposed removal, see Def.'s Mot. Ex. 29, and maintained that she would work on drafting the brief, and that Wagner would review the brief and coordinate with Jackson to get the filing done. Williams Dep. 141:9-142:5.

Paul Coran, who was PAB Chair at the time, testified that he relied upon information provided by Jackson and Wagner, as well as the reaction from the presiding judge in the case, in deciding that Williams had filed the revised brief in a "surreptitious way." But Coran also stated that he found Williams' conduct to be "senseless." Def.'s Ex. 22 ("Coran Dep.") 95:17-97:21 (Sept. 27, 2010). Wagner stated that it was "incomprehensible" to her as to why Williams would take this approach, but that she thought Williams did it intentionally. Wagner Dep. 98:19-99:1, 108:7-12. There is nothing in the record showing that Williams had a history or problem with concealment or misrepresentation, and there is no real explanation (even considering Jackson's memorandum to Wagner purportedly explaining that Williams had reviewed the documents and supplied the former cover page) as to why Wagner concluded that the brief was filed as a result of Williams' intention to deceive and mislead, rather than as a result of a simple misunderstanding. Williams, in fact, contends that, at most, this was a misunderstanding. Indeed, the record reflects that there were both scheduling and technical difficulties arising from filing the brief on Friday, which could have been exacerbated by Wagner's absence from the office on Monday.

A review of the October 31, 2008 brief and the November 3, 2008 brief fails to provide any illumination on what actually transpired. The earlier brief has two cover pages, with the first page reflecting a time stamp of 3:58 pm, October 31, 2008. See Def.'s Mot. Ex. 19. It contains a signature page, where signatures for both Wagner and Williams appear, and a certificate of service signed by Jackson indicating that a copy of the brief had been placed in intra-office mail on October 31, 2008. The second version of the brief has only one cover page, but that page contains two time and date stamps. The certificate of service and signature pages appear to be the same. See Def.'s Mot. Ex. 20. A reasonable juror could find that the two time stamps would have made it clear to the PAB that the document had already been filed, and that, in any event, the defendant could not have honestly believed that the briefs were indicative of an intent by Williams to deceive the PAB. Moreover, the certificate of service was signed by Jackson. Here too, a reasonable juror could conclude that the defendant could not have honestly believed that a certificate of service, dated October 31, 2008, which was not even signed by Williams herself, indicated that Williams intended to deceive opposing counsel or the PAB.

Furthermore, based on the record, a reasonable juror could credit Williams' account that she believed that an extension of time had been given not just for the exhibits, but for the brief as well, particularly since the brief was -- as Wagner concedes -- incomplete. And since Wagner signed both her own name and Williams' name, and does not dispute that Darian Jackson had some role and responsibility in effectuating the actual filing, there is a genuine dispute over how much Williams even knew with respect to the previous filing. Don also testified that she drafted the order rejecting the filing on behalf of the presiding judge on the case, and that the explanation for why the filing should be rejected would have come from Don, who was also the target of Williams' recent EEO complaints. Don Dep. 70:8-72:21. This evidence raises a genuine factual

dispute as to whether Williams purposefully filed another brief on Monday with the intent to deceive opposing counsel and PAB, and whether Wagner could have honestly believed that was the case. In short, and taken together, these circumstances could lead a reasonable juror to conclude that the charge lodged against Williams for deliberately and intentionally filing the second brief was pretextual and that the real motivation behind Williams' termination was retaliatory animus.

### D. Failure to Provide Interview Notes and to Disclose Method of Notetaking

In this Court's 2010 memorandum opinion, the Court found that a reasonable jury could conclude that a directive issued by Wagner on November 12, 2008 to provide a response that same day (a day Williams was on leave) could undermine defendant's conclusion that Williams should be discharged for insubordination and concealment of material facts. The record now contains an email that Wagner sent to Williams at 4:48 p.m. on November 13, 2008, the day Williams returned from leave, purporting to extend the deadline for Williams to produce her notes or a sworn statement until the next morning. Def.'s Mot. Ex. 26.

It is unclear whether Williams, in fact, provided what Wagner requested. Williams maintains that she did provide Wagner with a hard-copy of a signed statement, declared under penalty of perjury, but does not know what happened to it. Williams does not recall whether she provided it to Wagner prior to November 14, 2008. Williams Dep. 160:1-2 & 19-20; 162:16-18; 164:5-25. However, when asked why she did not attach a copy of the statement with her reply, Williams states that she did not have the statement with her, because she had been required to leave her office without taking any papers, including the removal notice itself. Williams Dep. 164:5-165:11. Indeed, Williams' notice of proposed removal indicates that she was required to turn over all identification cards, keys, and access cards to all worksites and all devices. Def.'s

31

Mot. Ex. 21.  But her opposition to summary judgment also provides an account that is slightly at odds with her testimony.  Here, Williams does not even mention that she provided a statement to Wagner, but contends that she responded orally to Wagner that she was unsure of what action she should take because the memorandum, dated November 12, 2008, had a deadline that had already passed; she also claims that if Wagner required further action from her, *Wagner* would have drafted an affidavit for Williams to sign because it was Wagner's practice to do so. Pl.'s Opp'n at 40. Wagner disputes this.

In drawing all factual inferences in Williams' favor, it is possible that Williams responded orally to Wagner first, when she arrived at the office in the morning and found the memo dated the previous day sitting on her desk.  And Williams did consistently testify that she had already responded to Wagner both orally and in writing, before the deadlines.  While this incident, taken by itself, may be insufficient to allow a reasonable juror to infer that the proffered reason for termination was pretextual, when considered along with the other evidence there is enough to suggest that Williams' termination could be linked to her recent EEO and litigation activity. See Wilson v. Wash. Metro. Area Transit Auth., 631 F. Supp. 2d 58, 64 (D.D.C. 2009) (analyzing all the circumstances and evidence, taken together, to conclude that genuine disputes of material facts existed on retaliation claim and that sufficient evidence had been proffered by plaintiff to deny summary judgment).

This is especially apparent when considering the third and final charge against plaintiff in the final decision on proposed removal.  The decision on proposed removal cited plaintiff's failure to inform Wagner, the Court and the Assistant U.S. Attorney working on the case that some or all of the interview notes in the Beyah matter were taken on a computer as a "concealment of a material fact" regarding an official government document or matter under

official investigation. Removal Decision at 4. The charge asserts that Williams' failure to do so adversely impaired Wagner's compliance with court-ordered discovery, threatened the integrity of PAB/OGC, and resulted in an unnecessary expenditure of time in what Williams had reason to know would be a futile search of files.

But Wagner concedes that Williams told her that she had printed out the notes and had placed them in the file. Wagner Dep. 136:18-137:1. Moreover, a search was ultimately completed of Williams' computers, as well as her previously-issued computer, and the notes at issue were not found. A reasonable juror, crediting Williams' account and the other evidence, could believe that Williams did not inform the Court that her notes were originally taken on a computer because the computer was no longer in Williams' possession, and, in any event, would not have contained the notes at issue. In other words, a reasonable juror could conclude that the fact of the notes initially appearing on a computer was immaterial, and could also conclude under all the circumstances that the Comptroller General could not have honestly believed that non-disclosure of this fact constituted "concealment of a material fact." Correspondingly, a reasonable juror could then conclude that the defendant relied upon this fact as a pretext for the real reason for the discharge -- retaliation against Williams for her protected activity.

Taking each of the three charges and considering the totality of the evidence, the Court finds that Williams has made a sufficient showing that would allow a reasonable juror to decide that the reasons offered for Williams' removal were pretextual. Holcomb, 433 F.3d at 897; Wilson, 631 F. Supp. 2d at 64. The Court takes no position on whether Williams will prevail at trial; there are several instances where her responses to requests by Wagner are confrontational and uncooperative, which undoubtedly further exacerbated an increasingly hostile and untenable working relationship. But there are also instances in the record where the circumstances

surrounding and supporting the charges against Williams are equally, if not more, questionable; several documents, on their face, suggest that conditions and requests were imposed upon Williams with which she could not possibly comply.  These documents beg the question whether Williams' conduct, taken together, warranted dismissal, or whether a case was, in fact, being built against her in retaliation for her numerous EEO complaints.  See Butler v. Dist. of Columbia Hous. Fin. Agency, 593 F. Supp. 2d 61, 68-69 (D.D.C. 2009) (noting that "[i]n the end, the court has little more than a swearing match between parties, but finding that plaintiff "has pointed to just enough direct and circumstantial evidence to allow the court, considering all the evidence in its full context,  to find that the case was unfit for summary judgment because a jury should weigh the evidence and decide the credibility of witnesses) (internal quotations and citations omitted).   The Court cannot, and indeed should not, decide the merits of these arguments, and only concludes that Williams has produced enough evidence to allow a reasonable jury to decide the issue.  Summary judgment must therefore be denied with respect to the retaliatory discharge claim.

## CONCLUSION

For the foregoing reasons the Court will grant defendant's motion in part and deny it in part.  Summary judgment will be entered in favor of the Comptroller General on the retaliation claim that is based on the denial of promotion in April 2006, and denied on the retaliation claims based on the written reprimand in July 2006 and plaintiff's termination.  A separate Order accompanies this Memorandum Opinion.


_____/s_____
JOHN D. BATES
United States District Judge

Date:   August 31, 2011

34